UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BASIL YOUNG | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 303CV0216(MRK) |
| v. | : | |
| | : | |
| COOPERSURGICAL INC. | : | |
| | : | |
| Defendant. | : | APRIL 12, 2004 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 9(d) and Rule 56 of the Federal Rules of Civil Procedure, defendant

CooperSurgical, Inc. ("CooperSurgical") submits this Memorandum of Law in Support of its Motion

for Summary Judgment.

**I.    INTRODUCTION**

Plaintiff, who is African-American, worked for the defendant, CooperSurgical, for less than

five months. He was initially placed at CooperSurgical by a temporary employment agency. After

working as a temporary employee for one month, CooperSurgical hired him as a direct employee.

Plaintiff's supervisors recommended his hire as a direct employee and, at his request, provided him a

salary and benefits in excess of those normally offered to other employees as part of that hire.

After working less than four months as a direct employee, plaintiff was terminated for

insubordination and a demonstrated inability to work cooperatively with members of his department.

Plaintiff now claims that CooperSurgical terminated him because of his race and color, and in

retaliation for alleged complaints of discrimination. He has sued several other prior and subsequent

employers for similar claims. In the present case, in the First Count, plaintiff claims that he was

terminated because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended

("Title VII"). In the Second Count, plaintiff claims that he was terminated in retaliation for

opposing the defendant's race discrimination in violation of Title VII. In the Third Count, plaintiff

claims that his race and color were motivating factors in the defendant's decision to terminate him in

violation of Title 42 U.S.C. § 1981. In the Fourth Count, plaintiff alleges that his race and color

were motivating factors in the decision to terminate him in violation of the Connecticut Fair

Employment Practices Act ("CFEPA"). In the Fifth Count, plaintiff alleged that he was terminated

in retaliation for opposing discrimination in violation of the CFEPA. In essence, he claims he was

terminated because of this race and color, and in retaliation for complaining of discrimination.

As fully discussed below, there are <u>no material</u> facts in dispute and no reasonable person

could find in plaintiff's favor based on the record of this case. Thus, the Court should grant

summary judgment as to each of plaintiff's claims.

## II.    STATEMENT OF FACTS

### A.    CooperSurgical Is A Premium Supplier of Women's Medical Devices.

CooperSurgical is a premium supplier of medical devices sold to and used by obstetricians

and gynecologists both domestically and worldwide. Affidavit of Tom Williams dated April 12,

2004 ("Williams Aff.") ¶ 3. [1] CooperSurgical is dedicated to serving women's healthcare providers

with innovative and high quality products. Williams Aff. ¶ 4. Among other things, for instance,

CooperSurgical manufactures a variety of instruments used to perform gynecological examinations

and to treat gynecological problems in women, such as culposcopes, specula, in vitro diagnostics, an

---

[1] Copies of all depositions transcript pages cited herein are attached to the Affidavit of Deborah
DeHart Cannavino dated April 12, 2004 ("Cannavino Aff.") as Exhibit A. Other Exhibits are

array of uterine manipulators, and cryo surgery devices.    Williams Aff. ¶ 4.  Because of the sensitive nature of the medical devices, as well as the potential harm to women by improper manufacture, CooperSurgical is heavily regulated and falls under the scrutiny of medical device industry regulatory bodies, including the United States Food and Drug Administration ("FDA"), United States federal regulatory requirements found in 21 CFR 200-299 and 800-1299, the Federal Drug and Cosmetic Act (the "Act"), the International European Conformity Standards ("IEC"), International Standards Organization ("ISO"), Canadian Health regulations, the Medical Device Directive 99-42- EEC (for all European countries), Health Canada Medical Devices Regulations, and Underwriter Laboratories ("UL").  Williams Aff. ¶5.

The FDA, British Standards Institute, and UL conduct frequent on-site audits of CooperSurgical to ensure that their stringent requirements are being met.  Williams Aff.  ¶6. Customers also routinely conduct on-site audits of CooperSurgical to ensure the quality of the products, as well as compliance with domestic and international standards. Williams Aff.  ¶6. To comply with these numerous regulations and to ensure that their medical devices are of the highest quality, CooperSurgical has created a quality assurance program, which includes a manual and a formalized procedure by which CooperSurgical's medical devices (and component parts) are tested. Records are created to ensure that the proper quality controls are in place and to ensure that such controls are effective. Williams Aff. ¶6.   During audits, the agencies review, among other things, these quality assurance records to ensure their compliance.  Williams Aff.  ¶6.  Accordingly, CooperSurgical's Employee Handbook states that falsification of company records is a basis for immediate termination of employment.  Williams Aff.  ¶ 6; Affidavit of Joanne Augustine dated

---

attached to Ms. Augustine's and Ms. Cannavino's Affidavits.

April 12, 2004 ("Augustine Aff."), Exhibit A.

In 2000, CooperSurgical had approximately 84 employees at its facility in Shelton, Connecticut. Augustine Aff. ¶ 4. All of these employees are involved in the development, manufacturing, distribution and sale of premium health care devices used in women's healthcare. Augustine Aff. ¶ 4.

**B.    In November 2000, Plaintiff Was Placed As Temporary Employee at CooperSurgical.**

In November 2000, plaintiff was placed by a temporary agency at CooperSurgical as a Quality Assurance Inspector. See Certified Copy of Basil Young's Deposition Transcript (hereinafter "Young Depo.") at 73:11-18, 74:20-22; Affidavit of Tom Flynn dated April 8, 2004 ("Flynn Aff.") ¶ 4; Williams Aff. ¶ 9. As a Quality Assurance Inspector, plaintiff was responsible for following procedures to ensure inspections resulted in satisfactory release of individual pieces used in the manufacturing process and that they were in strict compliance with specifications. Williams Aff. ¶8; Flynn Aff. ¶5; Young Depo. 84:18-24.

Specifically, the Quality Assurance Inspector reviews specifications for a specific equipment piece and takes the measurements as directed on what is called an Incoming Inspection Procedure Sheet. Williams Aff. ¶ 8; Flynn Aff. ¶ 5. The Inspection Sheet sets forth the characteristic, i.e., measurement, to be taken and the equipment and method to be used in performing the measurement. Williams Aff. ¶ 8; Flynn Aff. ¶5. During the inspection process, the Inspector takes the measurements, and then the Inspector records the results on the Inspection Report Form. Williams Aff. ¶ 8; Flynn Aff. ¶ 5. The Inspector writes the following information: (a) the date the piece was received, (b) the date of the inspection, (c) the Purchase Order number, (c) the Work Order number,

4

(d) the inspections performed, (e) the results, and (f) whether the results match the required measurements. Then, the Inspection Sheet is signed by the Inspector. Williams Aff. ¶ 8; Flynn Aff. ¶5.

As a Quality Assurance Inspector, plaintiff reported to Tom Flynn, Quality Assurance Supervisor. Young Depo. 74:6-9; Flynn Aff. ¶6; Williams Aff. ¶9. Mr. Flynn reported to Tom Williams, Director, Quality Assurance and Regulatory Affairs. Williams Aff. ¶9; Flynn Aff. ¶ 6. At the time of plaintiff's employment, there were two other Quality Assurance Inspectors in the department, Jeanette Freese and William Tanner. Young Depo. 213:22-24. During his time as a temporary employee, plaintiff got along well with his co-workers and felt that Mr. Flynn and Mr. Williams treated him with respect, in good faith, and in a fair fashion. Young Depo. 75:13-18.

### C. After Four Weeks, CooperSurgical Offered Plaintiff a Position As a Regular Employee.

Mr. Flynn and Mr. Williams reviewed plaintiff's performance and job skills over his four weeks as a temporary employee. Williams Aff. ¶10; Flynn Aff. ¶7. Because CooperSurgical needed another Inspector on a long-term basis, Mr. Flynn recommended that plaintiff be hired as a direct employee of the company. Young Depo. 74:14-25; Flynn Aff. ¶7; Williams Aff. ¶ 10. Mr. Williams approved the hire and completed it before December 31st so that plaintiff could receive more favorable benefits which would not be available to him if he became a regular employee on January 1st or later.[2] Williams Aff. ¶ 10.

_____

[2] Pursuant to CooperSurgical's policies, if plaintiff had been hired on or after January 1st, he would not have received any accrued sick days for 2002, and he would only have been entitled to five days of paid vacation. Because Plaintiff was hired by December 31st, however, he was able to receive two weeks of paid vacation and six paid sick days available for use immediately on January 1st. Young Depo. 79:17-81:7; Williams Aff. ¶11.

On December 20, 2001, Mr. Williams offered plaintiff a regular  position as a Quality Assurance Inspector, which plaintiff accepted. Young Depo. 74:14-19; Williams Aff. ¶ 12. Quality Assurance Inspectors are responsible for reviewing equipment pieces and taking measurements as directed on the Incoming Inspection Procedure Sheet. Williams Aff. ¶ 8; Flynn Aff. ¶ 5. The Inspection Sheet sets forth the characteristic, i.e., measurement, to be taken and the equipment and method to be used in performing the measurement. Williams Aff. ¶8; Flynn Aff. ¶5. During the inspection process, the Inspector takes the measurements, and then the Inspector records the results on the Inspection Report Form. The negotiated wage was agreed at $15.00 an hour. Williams Aff. ¶ 12.

As part of the hiring process, plaintiff completed an Application of Employment. On the application, plaintiff indicated that he had never "pled guilty or non contest to, or been convicted of a crime." Augustine Aff. ¶ 6. Plaintiff also signed an affidavit certifying that all the information he provided in order to secure employment with CooperSurgical  was true, complete and correct. Augustine Aff. ¶ 6; Exhibit B.

In conjunction with plaintiff's direct employment, Mr. Williams agreed to pay plaintiff a higher hourly rate than had been previously approved for the position. Young Depo. 76:13-22; Williams Aff. ¶ 13. Williams Aff. ¶ 13. Mr. Williams also told plaintiff he could be reviewed as early as six-months from the date of hire, with the opportunity for a raise at that time, rather than the standard twelve months. Young Depo. 78:19-79:16; Williams Aff. ¶14. In addition, Mr. Williams agreed to authorize plaintiff's request for a $4,000 tuition reimbursement toward college level courses, even though the company's policy only provided for tuition reimbursement up to $2,000.

Young Depo. 77:9-78:18; Williams Aff. ¶15. In effect, CooperSurgical treated plaintiff more favorably than other newly hired employees by extending him benefits beyond those offered to other newly hired employees. Williams Aff. ¶16. Plaintiff testified:

> I felt recognized for my skill. I was appreciated for my professional manner, especially from Mr. Williams. I felt I had a dialogue with him. I was happy. I was excited.

Young Depo. 82:3-7.

## D.    Plaintiff's Performance Quickly Deteriorated and He Received Counseling From Mr. Williams For His Poor Productivity Rate.

Unfortunately, almost immediately upon being hired as a regular employee, plaintiff's performance began to deteriorate. Flynn Aff. 8; Williams Aff. ¶ 17. One issue of primary concern became his habit of asking a number of employees the same question over and over again. Flynn Aff. ¶8. In addition, Mr. Flynn tried to work with plaintiff to encourage him to work more productively and more efficiently, as he was not working at an appropriate pace after several weeks of employment. Flynn Aff. ¶8.

When Mr. Williams reviewed the Inventory Movement Audit Report for all Quality Assurance Inspectors on or about January 18, 2001, he became even more concerned about plaintiff's productivity level. Williams Aff. ¶ 17. The Inventory Movement Audit sets forth the date, the product, and the name of the Inspector who conducted each inspection. Williams Aff. ¶ 17. Mr. Williams determined that plaintiff was not meeting the target of inspecting 17 items a day. Williams Aff. ¶ 17. Specifically, from January 2 -17, plaintiff only inspected on average of eight pieces per day, and on one day, he inspected only four. Williams Aff. ¶ 17. On January 19, 2001, Mr. Williams met with plaintiff to review his productivity. Williams Aff. ¶ 18. Mr. Williams

7

explained to him that he was not meeting expectations as to the number of pieces inspected, and reminded him that the goal was 17 pieces. Williams Aff. ¶ 18. Plaintiff was not given a formal warning or disciplined at this time about this issue. Williams Aff. ¶ 17.

### E.    Plaintiff Received An Oral Warning From Mr. Williams For His Poor Performance on February 2, 2001 .

Just weeks later, on February 2, 2001, Mr. Flynn asked plaintiff to release an order that morning. Flynn Aff. ¶ 9. Later, Mr. Flynn discovered that plaintiff had asked several other employees in Quality Assurance the same question about releasing this product, all the way up to the Director, Mr. Williams. Flynn Aff. ¶ 9. Mr. Flynn was told that they all gave him the same answer, and yet he still had not released the product. Flynn Aff. ¶ 9.

By afternoon, plaintiff still had not released the order, and Mr. Flynn asked him why he had not done so. Flynn Aff. ¶ 9. Plaintiff did not offer any reason, and Mr. Flynn told him that he needed to release product when he was instructed to do so. Flynn Aff. ¶ 9. Plaintiff acknowledges that Mr. Flynn told him at the time that he was not following his instructions and he was spending too much time on the products. Young Depo. 239:16-18.

Later, plaintiff angrily interrupted a meeting involving Mr. Williams and Mr. Flynn, to complain to Mr. Williams about the incident. Williams Aff. ¶ 19; Flynn Aff. ¶ 11. Plaintiff testified that Mr. Flynn listened to him and then told him he was asking too many questions and wasting time. Young Depo. 234:1-234:6. Mr. Williams stated that he was in the middle of another meeting but excused himself to provide the plaintiff with exclusive attention. Williams Aff. ¶ 19. The plaintiff indicated that he had had dental work performed and was feeling the effects of the procedure. Therefore, Mr. Williams said that they would make arrangements to discuss plaintiff's

performance first thing on Monday, February 5, 2001. Williams Aff. ¶ 19.

On Monday, February 5, 2001, Mr. Williams and Mr. Flynn met with the plaintiff to discuss his performance and to encourage correction and improvement. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. Mr. Williams told plaintiff he was spending too much time asking the same questions to multiple employees. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. This behavior distracted the other employees and resulted in decreased department efficiency. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. Specifically, Mr. Williams explained that on Friday, February 2, 2001, he understood plaintiff had asked multiple employees, including Mr. Tanner, Ms. Pflugh, Mr. Flynn, and him, for guidance on the same question. Williams Aff. ¶ 20. Mr. Williams confirmed that they all gave him the same answer. Williams Aff. ¶ 20. Mr. Williams explained to plaintiff the appropriate chain of command for seeking direction on his work: first, William Tanner, a Quality Assurance Inspector, then Mr. Flynn, Supervisor of Qualify Assurance, and finally himself, the Director. Williams Aff. ¶ 20; Flynn Aff. ¶ 12; Young Depo. 241:1-4. He was only to move beyond the first person if he was not satisfied with the answer. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. Plaintiff agreed to this procedure. Williams Aff. ¶ 20. Mr. Flynn also reminded plaintiff that his productivity needed to improve. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. He was not coming close to meeting the target of inspecting 17 pieces a day, and he would have to focus on becoming more efficient. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. Mr. Flynn told the plaintiff that they would continue to evaluate the situation with hopes of improving his performance to a satisfactory level. Williams Aff. ¶ 20; Flynn Aff. ¶ 12.

## F.    Plaintiff Falsified Inspection Documents, Which Was Grounds for Immediate Termination.

A few weeks later, on March 14, 2001, Mr. Flynn was reviewing and updating the Quality

9

Assurance Inspection Reports to ensure their accuracy, as is routine. Flynn Aff. ¶ 13. Mr. Flynn reviewed an Inspection Report for an inspection plaintiff had performed. Flynn Aff. ¶ 13. The piece that plaintiff was inspecting, part no. 33590, is a delivery connector tube used in a cryo surgery device to remove genital warts and other lesions from female patients. Williams Aff. ¶ 20; Flynn Aff. ¶18.

Mr. Flynn asked plaintiff how he had performed the inspections. Flynn Aff. ¶ 13. Plaintiff told Mr. Flynn that he had "visually" inspected and recorded measurements of the minor threading and the radius of the threading. Flynn Aff. ¶13. Mr. Flynn asked him how he could visually take the measurements of .065 of an inch for the minor thread and .010/.015 of an inch for the radius of the threading, as recorded on the form on both November 29, 2000 and March 14, 2001. Flynn Aff. ¶13.

Plaintiff again stated that he took the measurements visually. Flynn Aff. ¶13. Mr. Flynn told him that was impossible to do. Flynn Aff. ¶13. Measurements that small (thousandths of an inch) can only be made using the shadow graph[3], as specifically stated on the Incoming Inspection Procedure Sheet. Flynn Aff. ¶ 13. Plaintiff responded that he really should have written only that the measurements were "acceptable" rather than putting in measurements that he did not take. Flynn Aff. ¶ 14. Even this was not a proper procedure, as accurate measurements were required. Flynn Aff. ¶ 14.

Mr. Flynn told plaintiff that he considered him to have falsified the records by recording

---

[3] Plaintiff admits that measurements in microns cannot be accurately made by the naked eye. Young Depo. 108:11-17. Plaintiff denied, and still denies to this day, however, that it was necessary for him to take accurate measurements using a shadow graph and insists that his eyeball estimate was sufficient. Young Depo. 108:11-17. This attitude is completely unacceptable. Flynn Aff. ¶ 13.

10

imaginary numbers, as plaintiff had effectively admitted, and that if he had merely noted that the measurements were "acceptable" without properly measuring the dimensions, such actions would also have been a violation of the performance standard for a Quality Assurance Inspector. Flynn Aff. ¶ 15. Mr. Flynn instructed plaintiff to take the measurements with the shadow graph, which he later informed Mr. Flynn he did with the help of co-worker Bill Tanner. Flynn Aff. ¶ 15.

On March 21, 2001, Mr. Williams and Mr. Flynn held a meeting to review the situation with plaintiff. Williams Aff. ¶ 20; Flynn Aff. ¶16. They reviewed what had transpired and emphasized that ethical and responsible judgment is required in the job of Quality Assurance Inspector. They further pointed out that falsification of company records, which were required to be kept by the FDA and are audited by that agency for compliance, is grounds for immediate dismissal pursuant to the CooperSurgical Employee Handbook. Williams Aff. ¶ 20; Flynn Aff. ¶ 16. However, because plaintiff had honestly admitted that he had not used the shadow graph and stated that he did not know how to use the device, he was not terminated. Williams Aff. ¶ 20; Flynn Aff. ¶ 16. Instead, management agreed they would provide him with additional training on the shadow graph, but at the same time issued a stern written warning, placing him on a 30-day probation. Williams Aff. ¶ 20; Flynn Aff. ¶ 16.

## G. Days After The Shadowgraph Incident, Plaintiff Had A Significant Verbal Altercation With a Co-Worker.

Just days later, on April 3, 2001, while still on probation, plaintiff was involved in a verbal altercation with another Quality Assurance Inspector, Jeannette Freese. Young Depo. 249:20-250:25; Flynn Aff. ¶ 19. During the altercation, plaintiff admits that he became "very upset because [he] felt it was inappropriate for her to make such a statement to [him that he was misarranging the

11

files and falsifying inspection records]." Young Dep. 250:17-20. Moreover, he testified he was angry with Ms. Freese because she had no right to confront him with the issues. Young Depo. 251:23-252:2.

Mr. Flynn heard raised voices in the open quality assurance inspection area. Flynn Aff. ¶19. He walked over and heard plaintiff telling Ms. Freese to see him about something. Flynn Aff. ¶ 19. At this point, plaintiff was standing very close to Ms. Freese and speaking to her in a loud tone. Mr. Flynn moved between them. Flynn Aff. ¶ 19. Ms. Freese explained that she was asking plaintiff how to take a measurement for a piece that required use of the shadow graph, as plaintiff had been the last one to inspect the piece. To avoid further confrontation with the plaintiff, Mr. Flynn told Ms. Freese to have the part set aside until the next day when Mr. Tanner could assist her. Flynn Aff. ¶ 19.   At this point, Mr. Flynn thought the matter was closed. Flynn Aff. ¶ 19.

But, plaintiff would not let the matter go. He immediately approached Ms. Freese in an aggressive and forceful manner stating that she was not his boss and that he did not need her to give him problems. Flynn Aff. ¶ 20. Plaintiff was apparently objecting to the fact that Ms. Freese had asked him to tell her how he had performed the inspection last time. Mr. Flynn intervened again at this point and asked plaintiff to stop speaking in that fashion, but he refused to stop. Flynn Aff. ¶ 20. Mr. Flynn continued to tell him to stop and listen to what he [Mr. Flynn] was saying. Flynn Aff. ¶ 20. Mr. Flynn reminded plaintiff that in Mr. Tanner's absence, Ms. Freese was the lead person in the department and that if she asked him something, he needed to respond. Flynn Aff. ¶20.

Afterwards, at his desk, Mr. Flynn heard plaintiff continue to speak angrily to Ms. Freese about the matter. Flynn Aff. ¶ 21. Mr. Flynn went back and instructed plaintiff to finish releasing

12

the product and then see him. Flynn Aff. ¶ 21. When plaintiff came to see him, Mr. Flynn told

him again that in Mr. Tanner's absence, Ms. Freese was the lead person in that area. Flynn Aff. ¶ 21.

Plaintiff raised his voice to Mr. Flynn stating that Freese was not his boss, and he was not going to

take it. Flynn Aff. ¶ 22. Mr. Flynn asked him to lower his voice, but he did not. Flynn Aff. ¶22.

He repeated that she was not his boss and then walked away. Flynn Aff. ¶ 22.

## H.    The Company's Human Resources Department Investigated The Incident With Ms. Freese.

On April 3, 2001, plaintiff went to see Joanne Augustine, the company's human resources

manager, and asked to make a complaint. Augustine Aff. ¶ 6. He appeared angry and agitated.

Augustine Aff. ¶ 6. Ms. Augustine stated that since Mr. Williams was out of the office that day, she

would set up a meeting for the next morning at 8:30 a.m. to discuss the matter. Augustine Aff. ¶ 7.

The next morning, plaintiff informed Mr. Williams, Ms. Augustine, and Mr. Flynn that Ms. Freese

had wrongfully confronted him and accused him of misarranging files and of falsifying records, and

that he had gone to his supervisor who ignored his concerns and spoke "down" to him. Williams Aff.

¶ 20; Augustine Aff. ¶ 8. He said the situation made him feel harassed and discriminated against.

Williams Aff. ¶ 20; Augustine Aff. ¶ 8.

Ms. Augustine initiated an investigation into the plaintiff's complaint. Augustine Aff. ¶ 9.

During the investigation, Ms. Augustine interviewed Mr. Flynn, Ms. Freese, and Mr. Rutowski (a

co-worker witness). Augustine Aff. ¶ 9. Ms. Freese said that she had to take a measurement of an

equipment piece that required her to use the shadow graph. Augustine Aff. ¶ 9. Normally, she

would ask Bill Tanner to assist her. Augustine Aff. ¶ 9. He was not in. Augustine Aff. ¶ 9. She

first asked Chet Rutkowski, but he was unable to assist her. Augustine Aff. ¶ 9. So, Ms. Freese

13

looked through the records to see which Inspector had done the prior inspection, and she saw that it was plaintiff. Augustine Aff. ¶ 9. She asked plaintiff if he remembered how he got the dimension, or if Mr. Tanner had helped him. Augustine Aff. ¶ 9. She said she needed help. Augustine Aff. ¶ 9. Plaintiff responded completely inappropriately to this request for help, becoming defensive and asking whether Freese was questioning him. Augustine Aff. ¶ 9. She responded that she was only asking for help, not accusing him of anything. Augustine Aff. ¶ 9. Plaintiff said to ask his boss, then he started to raise his voice. Augustine Aff. ¶ 9. Ms. Freese told him that she just wanted to know how to take the measurement. Augustine Aff. ¶ 9. Plaintiff started yelling at this point, and Mr. Flynn came down and told plaintiff to stop. Augustine Aff. ¶ 9.

Ms. Freese complained to CooperSurgical that she felt verbally attacked by plaintiff for asking a simple question. Augustine Aff. ¶ 10; Williams Aff. ¶ 28. She accused plaintiff of harassing her. Augustine Aff. ¶ 10; Williams Aff. ¶ 28. She told Ms. Augustine that, given the proximity of their work areas, she was afraid that it could happen again, and she wondered who might be around next time. Augustine Aff. ¶ 10; Williams Aff. ¶ 28. She indicated she was scared. Augustine Aff. ¶ 10; Williams Aff. ¶ 28.

Mr. Rutowski corroborated Ms. Freese's version of events. Augustine Aff. ¶ 11. He confirmed that Ms. Freese merely asked the plaintiff a question about how to use the shadow graph and plaintiff raised his voice and then became irate with her. Augustine Aff. ¶ 11.

Ms. Freese is a 22-year-old woman who had worked at CooperSurgical for three and one-half years at the time. Augustine Aff. ¶ 12. Mr. Rutowski had worked for CooperSurgical for three years. Mr. Flynn, Ms. Freese and Mr. Rutowski (an independent witness) were credible, longer term

14

employees with good work records, who relayed the exact same facts. Augustine Aff. ¶ 12.

Based upon the investigation, CooperSurgical could not substantiate plaintiff's complaint. Augustine Aff. ¶ 13.    To the contrary, the investigation revealed that plaintiff had been the aggressor and had again acted inappropriately. Augustine Aff. ¶ 13. Rather than discipline the plaintiff, the company tried to resolve the situation by holding a conflict resolution meeting with all of the parties. Augustine Aff. ¶ 14; Williams Aff. ¶ 29.

## I.    During the Conflict Resolution Meeting, Plaintiff Became Hostile and Aggressive and Called His Supervisor A Liar.

On April 11, 2001, in an effort to resolve the interpersonal conflict between plaintiff and Ms. Freese, Mr. Williams held a conflict resolution meeting. Augustine Aff. ¶ 14; Williams Aff. ¶30. Led by Ms. Augustine, the purpose of the meeting was to meet as a group to try to resolve the conflict between plaintiff and Ms. Freese, so that these two employees could work together cooperatively in the future. Williams Aff. ¶ 30; Augustine Aff. ¶ 15.

During the meeting, Ms. Augustine asked Ms. Freese to explain her feelings regarding the incident. Young Depo. 277:19-25. Ms. Freese began by stating that she would not tolerate being yelled at by the plaintiff again. Augustine Aff. ¶16. She stated that all she trying to do was to ask for his help in using the shadow graph as she could not remember how to use it, and she saw on the Inspection Sheet that he had inspected the same equipment in the past using the shadow graph. Augustine Aff. ¶ 16. Ms. Freese said she did not want to be yelled at by plaintiff or anyone else, or spoken to in that manner again. Williams Aff. ¶ 30; Augustine Aff. ¶ 16.

Plaintiff responded that everything Ms. Freese said was wrong. Williams Aff. ¶ 30; Augustine Aff. ¶ 17. He stated that he had always been respectful towards her and it was she who

15

had not spoken to him since February 2. Williams Aff. ¶ 30; Augustine Aff. ¶ 17. He said Chet Rutkowski, the witness, was not in the area. Williams Aff. ¶30; Augustine Aff. ¶17. He said he would not be falsely accused of falsifying documents by Ms. Freese or anyone else. Williams Aff. ¶ 30; Augustine Aff. ¶ 17. As plaintiff's voice was elevated and threatening, Mr. Flynn asked him to lower his voice. Williams Aff. ¶ 30; Augustine Aff. ¶ 17.

Ms. Freese, who remained calm and professional throughout the meeting, stated that Chet Rutkowski was present, and that she never said plaintiff falsified records. Williams Aff. ¶ 31; Augustine Aff. ¶ 18. She merely asked him for help because he had performed the same test as reflected by the Inspection Report. Williams Aff. ¶ 31; Augustine Aff. ¶ 18.

Plaintiff then began yelling at Ms. Freese that she was not telling the truth. Williams Aff. ¶ 31; Augustine Aff. ¶ 19. Mr. Flynn responded that he told Ms. Freese and Mr. Rutkowski to wait to conduct the test when Mr. Tanner returned, and he would assist with it. Flynn Aff. ¶ 24; Augustine Aff. ¶ 19. Mr. Flynn said he thought the issue was resolved, but that plaintiff had continued to yell at Ms. Freese. Flynn Aff. ¶ 24; Augustine Aff. ¶ 19. Plaintiff then stated in a aggressive, hostile tone that Mr. Flynn was a liar. Flynn Aff. ¶ 24; Augustine Aff. ¶ 19; Williams Aff. ¶ 32.[4] Because plaintiff appeared so out of control at that point, Mr. Williams ended the meeting and excused Mr. Flynn and Ms. Freese. Williams Aff. ¶ 33; Augustine Aff. ¶ 20.

Throughout the meeting, plaintiff did not display any remorse or exhibit a willingness to consider the positions of others or to resolve the matter, and his tone was disruptive and angry; then his anger escalated and he called his supervisor a liar. Williams Aff. ¶33; Augustine Aff. ¶21; Flynn

---

[4] Plaintiff was questioned by defense counsel at his deposition, "Did you call Mr. Flynn a liar at the meeting?" Plaintiff responded "Yes. I stated that accusations by Mr. Flynn and Jeanette

16

Aff. ¶ 25.  Based upon plaintiff's most recent conduct, and in light of his record of problems over

the few months he had worked as a regular employee, Mr. Williams made the decision to terminate

plaintiff's employment.  Williams Aff. ¶ 34.  Plaintiff had taken no responsibility for his actions

with Ms. Freese, had previously refused to acknowledge his poor judgment in recording

measurements that he had not taken, had had an angry outburst during the company's attempt to

improve his relationship with a co-worker, and had accused his supervisor and others of lying. He

was terminated for these reasons, including insubordination to his supervisor and a demonstrated

inability or unwillingness to work together as a team member.[5] Williams Aff. ¶ 34.  In accordance

with CooperSurgical's policy, insubordination is grounds for immediate termination.  Augustine Aff.

¶  22; Williams Aff.  ¶ 34.

---

Freese were untrue, they were false." Pl. Dep.  276:9-17.  7:1-5; 277: 15-17.

[5]  Plaintiff's short-term employment and termination from both CooperSurgical and Sikorsky
Aircraft are consistent with his overall work history.  *Plaintiff admitted at his deposition that he
had been employed by numerous companies in the last 10 years.*  Similarly, plaintiff's claim in
this case of race discrimination and retaliation are consistent with a pattern of short-term
employment followed by a lawsuit claiming unlawful race discrimination.

In fact plaintiff admitted at his deposition that he has filed at least *six* complaints with the
Connecticut Commission on Human Rights and Opportunities ("CCHRO") against former
employers for race discrimination.  In addition to the claim made in this case, plaintiff made
claims against Precision Sensors for discriminatory failure to hire in March 2000 (Young Depo.
191:9-192:3), against Cytec for discriminatory failure to hire in April 2000 (Young Depo.
192:12-193:1), against KX Industries for failure to pay wages and for discrimination (Young
Depo. 189:14-22), against SVG Lithography for discrimination (Young Depo. 190:7-22), and
against Fermont Industries for discrimination (Young Depo. 197:6-198:3).  Cannavino Aff,
Exhibit D.

Additionally, he filed a CHRO complaint against the Department of Social Service alleging race
discrimination (Young Depo. 188:14-25) and a former landlord, also alleging race discrimination
(Young Depo. 193:17-194:25).  Cannavino Aff, Exhibit D.

**J.    Plaintiff Subsequently Worked For Sikorsky Aircraft But Was
        Terminated for Lying on His Application.**

In May 2001, less than one month after being terminated by CooperSurgical, plaintiff

obtained comparable employment at Sikorsky Aircraft. Plaintiff was paid $15.62 an hour (more than

he had been paid by CooperSurgical) and was offered health insurance benefits.  Young Depo.

286:13-20; Exhibit F.  Less than one month after being hired by Sikorsky, plaintiff was terminated

for providing false information on his employment application. Young Depo. 169:10-19. Sikorsky

listed "Falsification of company documents" as the reason for plaintiff's termination on his pink slip.

Exhibit F.

At his deposition, plaintiff admitted that, when asked on the Sikorsky job application whether

he had ever been convicted of a crime, plaintiff indicated that he had not. Young Depo. 169:24-

170:7.  In reality, however, plaintiff admitted he had been convicted of "felony welfare fraud" in

1994. Young Depo. 167:23-25. As a result of the conviction, plaintiff was sentenced to five years'

probation and ordered to repay approximately Eight Thousand Dollars ($8,000.) in restitution.

Young Depo. 167:20-168:14.  When Sikorsky learned that plaintiff had lied on his employment

application, it terminated his employment. Young Depo. 169:10-19.

**III.    PROCEDURAL HISTORY**

Plaintiff filed a complaint with the CHRO on October 5, 2001. Before the CHRO could fully

investigate the matter and prior to any fact-finding conference with that agency, the plaintiff

18

requested a release of jurisdiction and instituted this action by Complaint dated January 29, 2003 (the

"Complaint"). In his Complaint, plaintiff alleges: (1) termination of employment because of race in

violation of Title VII of the Civil Rights Act of 1964; (2) retaliatory discharge in violation of Title

VII of the Civil Rights Act of 1964; (3) termination of employment because of race in violation of 42

U.S.C. § 1981; (4) termination of employment because of race in violation of the Connecticut Fair

Employment Practice Act ("CFEPA"); and (5) retaliatory discharge in violation of the CFEPA.

## IV.    STANDARD FOR SUMMARY JUDGMENT

### A.    Summary Judgment Should Be Granted Where Plaintiff Cannot Produce Probative Evidence Of An Essential Element Of His Claim.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c). Courts should not "strain to find the existence of [a] genuine issue[] where none exists."

Kirk v. Home Indem. Co., 431 F.2d 554, 560 (7th Cir. 1970). The Second Circuit has noted that

"[s]ummary judgment is appropriate even in discrimination cases," since "the salutary purposes of

summary judgment – avoiding protracted, expensive and harassing trials – apply no less to

discrimination than to . . . other areas of litigation." Weinstock v. Columbia University, 224 F. 3d

33, 41(2d Cir. 2000) (affirming summary judgment).

The United States Supreme Court has reaffirmed that the burden is not on the party moving

for summary judgment to produce evidence showing the absence of a genuine issue of material fact.

Celotex Corp. v Cattrett, 477 U.S. 317, 325-26 (1986). The moving party may prevail "by

'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support

19

the [nonmovant's] case." Id. at 325. Thus, a defendant moving for summary judgment need not

negate the plaintiff's claims by submitting evidence that refutes them. Id. at 323. Instead, the

moving party may merely point out the lack of evidence supporting the opposing party's position and

need not "support its motion with affidavits or other similar materials negating the opponent's

claim." Id.

Once the moving party points out the absence of evidence to support the plaintiff's claims,

the opposing party "must do more than simply show that there is some metaphysical doubt as to the

material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Where, as here, the nonmoving party will bear the burden of proof at trial on dispositive issues, he

must come forward and make an evidentiary showing sufficient to establish each essential element of

his claim in opposing a motion for summary judgment. See Celotex, 477 U.S. at 322; Matsushita,

475 U.S. at 587.

A party opposing summary judgment "may not rest upon the mere allegations or denials of

the pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule,

must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)

(emphasis added). The facts must be submitted in the form of admissible and significantly probative

evidence. Celotex, 477 U.S. at 322-23. In opposing a motion for summary judgment, a plaintiff

may not rely on conclusory statements or mere contentions that the evidence in support of summary

judgment is not credible. See Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.

1993); Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995).

20

**B.    Summary Judgment Is No Less Available To Parties In Discrimination Cases.**

The Federal Courts have made clear that summary judgment applies no less to employment

discrimination actions than to other types of litigation.  Kotlowski v. Eastman Kodak Co., 922 F.

Supp. 790, 795 (W.D.N.Y. 1996); see Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d

Cir. 1994); McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994).  The United States Supreme

Court has recently reiterated that, in determining whether an issue should go to the jury, "courts

should not treat discrimination differently from other ultimate questions of fact." Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)(internal quotations omitted).  For a

plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more

than present "conclusory allegations of discrimination"; the record must contain "concrete

particulars" to substantiate the claim.  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); Johnson

v. New York Hosp., No. 97 Civ. 7089, 1998 WL 851609 at *7 (S.D.N.Y. Dec. 9, 1998) (copy

attached) ("summary judgment is available to defendants in an employment discrimination case");

Cavuoto v. Oxford Health Plans, Inc., 3:99 Civ. 00446, 2001 WL 789316 at *2 (D. Conn. June 13,

2001) (copy attached) (granting summary judgment in a Title VII case).

**V.    ARGUMENT AND CITATION OF AUTHORITY**

**A. The Court Should Grant Summary Judgment on the First and Fourth Counts Because Plaintiff Cannot Establish that He Was Discriminated Against on the Basis of His Race or Color.**

In the First and Fourth Counts of his Complaint, plaintiff claims that CooperSurgical

terminated his employment because of his race and color in violation of federal law (Count One) and

state law (Count Four).  Specifically, plaintiff claims in the First Count of the Complaint that:

Because the plaintiff's race and color were motivating factors and made a difference in the

21

decision by the Defendant to terminate the plaintiff's employment, the Defendant has violated the provisions of Title VII of the Civil Rights Act of 1964 as amended.
. . .

The defendant's termination of the plaintiff's employment constitutes unlawful racial discrimination.

Complaint, ¶ 109-111.  The plaintiff makes identical allegations of discrimination in the Fourth

Count brought under the CFEPA.[6] Complaint, ¶¶ 280-282.  This is the sum total of the plaintiff's

claim for discriminatory conduct.  While plaintiff claims that he was discriminated against because

of his race and color, he admits that he never heard anyone at CoooperSurgical make jokes or

inappropriate comments about his (or anyone else's) race or national origin.  Young Depo. 257:19-

259:17.

In cases such as this where there is no direct evidence of discrimination, courts rely on the

familiar three-stage, burden-shifting analysis first set out by the United States Supreme Court in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to analyze the discrimination claim.[7]

---

[6] Plaintiff makes identical claims in his Third Count, in which he alleges a violation of Title 42 USC §1981.  Complaint, ¶¶ 224-225.

[7] Direct evidence is "an acknowledgment of discriminatory intent by the defendant or its agents." Trouper v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir. 1984); see also Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 396-97 (7th Cir. 1997).  Generally, the only evidence that meets this high standard is an unequivocal statement of discriminatory intent by the decision maker regarding the decision complained of.  "Strictly speaking, the only 'direct evidence' that a decision was made 'because of' an impermissible factor would be an admission by the decision maker such as 'I fired him because he was too old.'" Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir. 1992); see also Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992), abrogated on other grounds by Smith v. Borough of Wilkinsburg, 147 F.3d 272, 277 (3d Cir. 1998)(direct evidence is "evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged discriminatory attitude."); Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994) (direct evidence "must directly reflect a discriminatory . . . animus on the part of a person involved in the decision making process").  There is no direct evidence of discrimination in the record of this case.

22

Under that familiar paradigm, the initial burden is on the plaintiff to establish a prima facie case of

discrimination.  If he meets this prima facie burden, the burden of production, but not proof, then

shifts to the employer to merely articulate a legitimate, nondiscriminatory reason for its decision.

"The defendant's burden of production . . . is not a demanding one; [the employer] need only offer

such an explanation for the employment decision." Bickerstaff v. Vassar College, 196 F.3d 435, 446

(2d Cir. 1999).  Once the employer has done that, any inference of discrimination raised by the

prima facie case drops out of the analysis and the burden of production shifts back to the employee.

The employee must then prove both that the employer's explanation is a pretext and that the

actual reason was discriminatory.  See Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248,

253 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993); Sample v. Wal-Mart

Stores, Inc., 273 F. Supp. 2d 185, 188 (D. Conn. 2003).[8] The "ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff." Burdine, 450 U.S. at 253.

In this case, summary judgment is appropriate because plaintiff cannot establish a prima facie

case of discrimination, cannot produce evidence that CooperSurgical's legitimate, nondiscriminatory

reasons are pretextual, and cannot produce evidence that the real reason for his dismissal was

discrimination.

**1.      Plaintiff Cannot Establish a Prima Facie Case, Because His
Termination Did Not Occur Under Circumstances That Raise a
Reasonable Inference of Race Discrimination.**

---

[8] The elements of a prima facie case brought under the Connecticut Fair Employment Practices
Act mirror those of a Title VII action.  "CFEPA claims are analyzed in the same manner as those
under Title VII." Sample, 273 F. Supp. 2d at 188; see also Levy v. Commission on Human
Rights & Opportunities, 236 Conn. 96 (1996).

To establish a prima facie case of race discrimination, the employee must prove that: (1) he was a member of the protected class, (2) he was qualified for the position in question, (3) he was subject to an adverse employment action, and (4) such action occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

In this matter, plaintiff cannot establish a prima facie case of discrimination because he cannot show that he was terminated[9] under circumstances that create an inference of discrimination. For an employment action to occur under circumstances that would raise a reasonable inference of unlawful discrimination, the "evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law." Ennis v. National Ass'n of Bus. & Ed. Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995). To establish such circumstances, the plaintiff must present more than "mere unsupported speculation." Id. at 62.

In this case, there is nothing to suggest that CooperSurgical fired plaintiff because of his race

_____

[9] Plaintiff also claimed during his deposition that he was discriminated against because on one occasion Mr. Williams unfairly gave a box of candy to a member of the department as a reward for productivity (Young Depo. 221:16-222:3), such a claim does not constitute an adverse employment action as defined by the Second Circuit Court of Appeals and cannot form the basis of a claim under Title VII. See Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (adverse employment action is a "materially adverse change in the terms and conditions of employment."). Such a change might "be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id.; see also Fontanez v. Thompson, No. 00 Civ. 2090, 2003 WL 1964052 (S.D.N.Y.) (copy attached) (calling employee at home to request documents allegedly already provided, writing letters to employee, and writing a memorandum announcing plaintiff's replacement were not "adverse employment actions"); Bennet v. Watson Wyatt & Co., 136 F.Supp.2d 636, 640 (S.D.N.Y) ("reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions."); Stembridge v. City of New York, 88 F.Supp.2d 276, 283 (S.D.N.Y. 2000) (reprimand that contained a warning of potential

or color. Thus, for the reasons set forth below, summary judgment should be granted.

a.    **The Same Individuals Who Made The Decision to Dismiss the Plaintiff Hired Him Only Four Months Earlier.**

The individuals who hired the plaintiff, and arranged for him to be given a more generous hiring package than the norm, were the same people who made the decision to terminate his employment. Numerous courts have recognized that a strong presumption of no discrimination arises when the same person or persons who terminated the plaintiff had hired him a short time earlier. See Eisele v. Southern New England Tel., No. 3:98 CV 00790 (DJS) (copy attached) (granting summary judgment on plaintiff's claim for gender discrimination where the same person who hired her reassigned her approximately eight months later); Townsend v. Clairol, Inc., No. Civ. 3:97 CV 02599 (AWT), 2001 WL 173764 at *6 (D. Conn, Feb. 15, 2001) (copy attached) (strong inference that defendant did not discriminate against plaintiff based on race where defendant aggressively pursued hiring him three months earlier); Cousins v. Howell Corp., 113 F. 2d 262, 269 (D. Conn. 2000) (finding a strong inference that age was not motivating factor in termination where termination occurred within short time of hire); Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173, 175 (8th Cir. 1992) (in granting summary judgment for the employer, the court explained, "[i]t is simply incredible, in light of the weakness in the plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.")

Here too, it would be incredible to believe that Mr. Flynn and Mr. Williams, the two individuals who recommended and approved plaintiff's direct employment with CooperSurgical,

---

future disciplinary action did not constitute an adverse action).

would thereafter develop an "aversion" to African-Americans, as plaintiff essentially claims, in the short less than four months that plaintiff was a direct employee of CooperSurgical.    This is especially true in this case, where Mr. Williams offered plaintiff employment benefits that were in excess of those normally offered, and where Mr. Williams offered them – in plaintiff's own words – "as a recognition for [his] skill and in appreciation of [his] professional manner." Young Depo. 82:3-7.

In addition, Mr. Flynn was plaintiff's direct supervisor when plaintiff was both a temporary and regular employee, and plaintiff was offered a position as a regular employee based on his work with Mr. Flynn during his temporary assignment and Mr. Flynn's recommendation to hire him. Williams Aff. ¶ 10; Flynn Aff. ¶ 7.  Plaintiff admitted during his deposition that during the time that he worked directly for Mr. Flynn as a temporary employee, he had no complaints regarding Mr. Flynn's treatment of him and that Mr. Flynn had treated him with respect and in a fair fashion.  In fact, he does not believe Mr. Flynn discriminated against him or harassed him in any manner. Young Depo. 75:7-18.

Given that Mr. Flynn and Mr. Williams, plaintiff's two supervisors who made the decision to terminate his employment, had recommended and hired plaintiff after meeting him and working with him, and less than four months before he was terminated, there exists is a strong inference that CooperSurgical did not discriminate against plaintiff because of his race.

      **b.**     **There is No Evidence in the Record of This Case That Plaintiff Was Treated Differently Than Other Similarly Situated White Employees.**

The plaintiff asserts that his  claim of discrimination is based on "disparate treatment" in that

26

he was terminated "on the basis of his race." Complaint, 20, 49. To establish that plaintiff was

terminated under circumstances that raise a reasonable inference of unlawful race discrimination

through disparate treatment, the plaintiff must show that he was treated differently than similarly

situated white employees. See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir.

1997). To qualify as a similarly situated employee, "the individuals with whom [plaintiff] attempts

to compare [himself] must be similarly situated in all material respects." Martinez v. United Tech.

Corp., 50 F. Supp. 2d 130, 133-134 (D. Conn. 1999). Here, plaintiff would have to submit

evidence that other white employees did what he did and were not terminated.

    Plaintiff cannot meet this burden. There is no evidence in the record of this case that plaintiff

was treated differently than any similarly situated white employee with respect to his termination.

Plaintiff was placed on probation after CooperSurgical learned that he had recorded measurements

indicating that he had inspected the minor threading (i.e., the side of the threading that is shortest)

and the radius of the threading on a piece of medical equipment when he had not done so. Plaintiff

admits that he recorded measurements he did not take but instead estimated with the naked eye. At

the same time, he admits that the measurements cannot be seen by the naked eye. (Young Depo.

108:11-17). Because accurate records are required to be kept by the FDA and other domestic and

international licensing authorities who regularly audit the company's quality assurance records to

ensure compliance with applicable standards, and because CooperSurgical has a legitimate need to

ensure that its medical devices are accurately inspected and produced with the highest quality,

falsification of a record is grounds for immediate termination. Williams Aff. ¶ 5-6; Augustine Aff.

¶ 5. Notwithstanding these facts, CooperSurgical opted to place the plaintiff on a 30-day probation

instead of immediately terminating his employment. Williams Aff. ¶ 24. If CooperSurgical had been looking for a reason to terminate plaintiff, they certainly had one. Instead of terminating him, they gave him a second chance. Unfortunately, his performance did not improve; it quickly deteriorated.

Not long after being placed on probation for the falsification, CooperSurgical ultimately decided to discharge plaintiff based on his altercation with Jeanette Freese, his refusal to engage in constructive conflict resolution, and his insubordination when he confronted and accused his supervisor of lying. Plaintiff has not and cannot identify any other employee who has established such a history of disruptive behavior (in such a short period) without being terminated from employment.

### c.    Plaintiff's Complaint Concerning a Box of Chocolate is a Red Herring.

Plaintiff claims that Mr. Flynn discriminated against him when he once gave a co-worker a box of chocolate candies but did not give plaintiff anything  Specifically, plaintiff testified:

> I recall a particular month – I believe it was the month of February – when the income inspection sector had met a certain quota based on – there was some quality studies that were being done in terms of our productivity. And for the month February we had, I believe, exceeded our quota. And Mr. Tanner was given a box of candy, could have been Whoppers or something, I think. And Mr. Williams was present; and I just felt that, well, he got all the attention. But I had really worked hard and diligently that particular month as part of the incoming team, and I didn't feel as if I was recognized at all —

Young Depo. 221:16-25.

To the extent plaintiff tries to make the "chocolates" incident a claim in this case, it has no merit. First, plaintiff admitted during his deposition that other than the single box of candy that was

28

given to Mr. Tanner, he was not aware of any instances where Mr. Flynn gave anyone else in his department any candy or gifts. Young Depo. 222:6-8, 14-16, 223:19-21. As such, plaintiff's claim relating to the box of candy is nothing more than an isolated and trivial incident. Since it cannot be an adverse employment action, as required to support the discrimination claims plaintiff alleges, it cannot form the basis for opposing summary judgment. See Galabya, 202 F.3d at 640 (adverse employment action is a "materially adverse change in the terms and conditions of employment."); Flaherty v. Gas Research Inst., 31 F.3d 451, 457 (7th Cir. 1994) (even a "bruised ego" does not constitute adverse employment action where pay, benefits and level of responsibility remained the same).

For all of the above reasons, plaintiff cannot produce any evidence in this case to establish a prima facie case of race discrimination, i.e., that would create an inference that he was terminated from employment because of his race.

## 2.    There is No Evidence that CooperSurgical's Legitimate Non-Discriminatory Reasons for Terminating Plaintiff's Employment Are Pretextual.

Even if plaintiff could establish a prima facie case of discrimination -- which he cannot -- the Court should also grant summary judgment as to Counts One and Four because plaintiff cannot show that CooperSurgical's reasons for terminating his employment are pretextual.

CooperSurgical terminated plaintiff's employment because of his insubordination and demonstrated unwillingness or inability to work with members of his department as a team. Once an employer has articulated its legitimate, non-discriminatory reason for an employment decision, the presumption of discrimination raised by the prima facie case "drops out of the picture." Grady v.

29