Not Reported in F.Supp.2d
(Cite as: 2003 WL 21108325, *20 (S.D.N.Y.))

Page 20

working environment." *Constanzo v. United States Postal Service,* 2003 WL 1701998 *6 (S.D.N.Y. March 31, 2003) (citing *Cruz,* 202 F.3d at 570).

Plaintiff alleges a number of incidents spanning over more than ten years which, he claims, constitutes an actionable hostile work environment claim under Title VII. Defendant argues that plaintiff has alleged only one incident within the applicable 300-day limitations period. Mr. Bailey alleges that in 1995, after he was informed of his termination he overheard a conversation in an office bathroom during which an employee said "[t]hese niggers just don't get it. We decide who comes and goes at Colgate Palmolive." Under the applicable standard, this timely allegation alone, without more, would be insufficient to establish a hostile work environment pursuant to Title VII.

*21 Notwithstanding this, plaintiff argues that he has alleged at least three acts within the 300-day period that constitute part of a single actionable employment practice. Plaintiff argues that the other incidents, which occurred outside of the applicable 300-day period, are "sufficiently related" to enable the court to consider them as part of one unlawful employment practice. In his supplemental brief arguing that *Morgan* supports his hostile work environment claim, plaintiff asserts that the record discloses three acts which fall within the 300-day period: (1) on January 14, 1995, while working in Puerto Rico, Carol Smith told a racially offensive joke about Puerto Ricans in Bailey's presence; (2) in 1995, while working in Puerto Rico, Mr. Bailey consulted Colgate's accounting Department Instructions and the Cost Accounting Manual, in which he found references to "Nigger Soap." Mr. Bailey claims that he had first seen this use of the word "nigger" while using the manual during the course of his employment in 1985. He claims that he brought these offensive references to the attention of Harold Lange and Peter Panbakker, presumably management personnel at Colgate; he claims that no corrective or responsive action was taken; (3) on May 23, 1995, after he was notified of his termination, Mr. Bailey overheard the conversation in the bathroom during which a co-worker, implicitly with reference to Mr. Bailey and his termination, used the phrase "[t]hese niggers."

The court notes that there is a discrepancy between the timeline presented in plaintiff's supplemental brief and the Amended Complaint. In the Amended Complaint, plaintiff alleges that Carol Smith made an offensive joke while working in Puerto Rico in 1994, not, as plaintiff claims in his supplemental brief, on January 14, 1995. Plaintiff's feeble attempt to somehow prove that the incident occurred on January 14, 1995 consists of his submission, with his supplemental brief, of an expense report for the week ending "1-14-95" which lists, under "place and nature of entertainment," the names Carol Smith and Ismael Bailey. Plaintiff has never asked the court for leave to amend the complaint to reflect that the incident occurred on January 14, 1995 rather than in 1994. This incident was alleged in the Amended Complaint to have occurred in 1994, outside of the 300-day filing period.

The court further notes that in the Amended Complaint, Mr. Bailey did claim that he "had to use [the offensive accounting manual] during the course of his employment until his termination in 1995." Am. Complt. ¶ 15. Under the forgiving standard of pleading embraced by the federal courts, this allegation, which makes reference to his termination in 1995, which occurred on May 23, 1995, could conceivably be sufficient to timely allege an incident which contributes to a racially hostile employment practice under Title VII. The court is baffled that plaintiff did not flesh out the issue of the timeliness of this allegation in its reply to Colgate's motion for summary judgment. Nowhere in its reply papers does plaintiff make reference, for example, to using the offensive manual while working on the Ross project in Puerto Rico.

*22 Even assuming that this allegation is timely, the court is not convinced that it, or the alleged remark in the bathroom, or the two together, are sufficient to establish a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d                                                                          Page 21
(Cite as: 2003 WL 21108325, *22 (S.D.N.Y.))

hostile work environment. As the court has discussed, however, plaintiff also alleges an array of miscellaneous acts and incidents involving a variety of people during various stages of Mr. Bailey's career at Colgate which, he claims, sufficiently form an actionable hostile environment. To repeat, these include allegations that (1) in New York in 1985, plaintiff viewed, in an accounting department manual (which plaintiff was required to use in the course of his employment) the term "Nigger Soap" used with reference to soap residue. Mr. Bailey asserts that the term "Nigger Soap" describes a soap or residue of inferior quality. This use of the word "nigger" to denote a quality of inferiority, Mr. Bailey claims, was offensive and contributed to a hostile work environment; (2) during an audit in Kansas City in 1986, a co-worker named Robert "Bob" Proctor introduced himself as the Grand Wizard of the Ku Klux Klan and repeatedly used the word "nigger" in the presence of Mr. Bailey. During oral argument on the pending motion for summary judgment, defendant asserted that it cannot find any record of a person named Bob Proctor being employed at Colgate at that time; (3) during an audit in France in 1987, plaintiff viewed a sign that referred to black soap residue as "Nigger Soap"; (4) at a meeting in Texas in February 1989, he overheard a co-worker use the offensive Afrikaner word *Kaffa* with reference to blacks; (5) in June 1990, during a budget review, plaintiff prepared "budget templates and graphics which depicted a logo of a smiley, black face, black top-hatted, bright-eyed minstrel for Defendant's 'Darkie Toothpaste." ' *See* Am. Compl. ¶ 28.(6) in New York in 1990, a co-worker referred to plaintiff as "one big nigger." *See* Bailey Tr. at 382-84.

These claims, as well as the timely claims, all involve different co-workers. All occurred in different geographical locations, including France and at least two states within the United States. These alleged incidents appear to have been episodic and unrelated. They were not "sufficiently continuous and concerted in order to be deemed pervasive." *Carrero,* 890 F.2d at 577. In addition, plaintiff offers no evidence probative of, e.g., the existence of a sign which says "Nigger Soap"

at a Colgate facility in France. Moreover, the record indicates that Colgate was not unresponsive to plaintiff's complaints concerning the offensive Darkie Toothpaste brand name and logo. In a letter to Bailey dated March 30, 1990, Reuban Mark stated that the Darkie toothpaste name and package design were "totally unacceptable." Bailey Aff. at 32. Mr. Mark explained that the product's new name, "Darlie," would be phased in on a country-by-country basis and that the offensive package design would be changed. *Id.*

*23 The court is mindful that courts should consider "all the circumstances" relevant to a hostile work environment claim and that such claims can be based on the cumulative effects of individual acts which might not be independently actionable. *See Morgan* at 2073. However, the record simply does not establish any link between the acts allegedly occurring within the limitations period and any of the alleged incidents predating that period "such as would warrant a finding of any actionable hostile work environment straddling the cut-off date." *Costanzo,* 2003 701998 at *10. *See also Stembridge v. City of New York,* 88 F.2d 276, 286 (S.D.N.Y.2000) (finding use of epithets such as "uppity nigger" and "boy" in isolated incidents over the course of three years not sufficient to create a hostile work environment. "Overall, seven instances over three years does not create a work environment permeated with racial hostility").

Finally, even if considered to have be timely, the court does not believe that plaintiff's allegations with respect to the accounting manual can constitute a hostile work environment. Plaintiff provides a copy of a page entitled "Accounting Dept. Instructions," dated "4/15/69," which includes the following: "6.0243 *Degrading Variances.* Degrading variances usually occur in kettle soaps where Nigger Soaps are transferred from the originating kettle to a kettle soap of inferior quality." See Bailey Aff. at 31. Plaintiff claims that he had to refer to this manual and be exposed to the word "nigger" in a document disseminated by Colgate during the course of his employment, through his termination in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21108325, *23 (S.D.N.Y.))

Page 22

1995. Plaintiff does not, however, provide any evidence which might suggest that the manual was in regular usage as a part of his job at Colgate. He fails to explain how often he had to use it. He does not explain how often he encountered the offensive content when he found it expedient to consult the manual or how it altered the course of his employment. "[M]ere utterances of an ... epithet which engenders offensive feelings in an employee ... does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 20.

As this court has observed, use of the word "nigger" in the workplace "legitimately [evinces] racial hostility." *Stembridge,* 88 F.2d at 286. The question, then--if the claim were deemed to be timely--would be whether the existence of this manual, and plaintiff's alleged references to it, constitute an environment of hostility that was sufficiently severe or pervasive to alter the conditions of plaintiff's employment. *See Richardson,* 180 F.3d at 440 ("a work environment may be actionable if the conduct there is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee." (citing *Harris* at 23). Although isolated, minor episodes of harassment do not merit relief under Title VII," *Torres,* 116 F.3d at 631, "even a single episode of harassment, if severe enough, can establish a hostile work environment," id. n. 4. This is so even if the plaintiff was not physically threatened or assaulted. *See Richardson* at 440. As the Seventh Circuit noted in *Rodgers v. Western-Southern Life Ins. Company,* 12 F.3d 668, 675 (1993), "[p]erhaps no single act can more quickly 'alter the conditions of employment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Is the mere existence of such a manual, which was apparently made in 1969, tantamount to such circumstances? The court thinks not. Plaintiff fails to explicate the extent of the severity of the putatively hostile work environment caused by the reference to "Nigger Soap" in this manual.

*24 Based on the record presented, a factfinder could not conclude that the existence and alleged use of this manual was so objectionable as to alter negatively the terms and conditions of a reasonable person's employment. Defendant's motion for summary judgment is GRANTED.
SO ORDERED.

2003 WL 21108325 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Westlaw.

2001 WL 180119                                                                                    Page 1
(Cite as: 2001 WL 180119 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Margaret ROOKARD, Plaintiff,
v.
KATERI RESIDENCE, INC., Catholic Charities of the Archdiocese of New York, and Sarah Jerro, Defendants.

No. 98 CIV.8301(BSJ).

Feb. 22, 2001.

Order and Opinion

JONES, District J.

## INTRODUCTION

*1 Plaintiff, Margaret Rookard ("Rookard"), alleges that Defendants, Kateri Residence, Inc. ("Kateri"), Catholic Charities of the Archdiocese of New York and Sarah Jerro ("Jerro") discriminated against her on the basis of race in violation of 42 U.S.C. § 1981, and age in violation of New York State Executive Law § 296 et seq., with regard to the terms and conditions of her employment at Kateri. [FN1] Presently before this Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motion is granted.

> FN1. Plaintiff concedes that she cannot establish that Defendant Catholic Charities of the Archdiocese of New York exercises control over Kateri, and thus does not oppose its dismissal. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 2. Accordingly, this Court dismisses Catholic Charities of the Archdiocese of New York from this action.

## STANDARD

Federal Rule of Civil Procedure 56 provides that the moving party is entitled to summary judgment when there is no genuine issue as to any material fact. The moving party has the burden to establish the absence of a genuine issue of material fact. Once the moving party has accomplished this, the non-moving party must set forth specific facts which demonstrate that a genuine issue for trial exists. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

Section 1981 employment discrimination claims and claims arising under New York Executive Law § 296, et seq. are both analyzed under the familiar three-part burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). [FN2] *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987)(§ 1981); *Feder v. Bristol-Myers Squibb Co.,* 33 F.Supp.2d 319, 324 (S.D.N.Y.1999)(§ 296). The plaintiff must first establish a *prima facie* case of discrimination by a preponderance of evidence. *See Lopez,* 831 F.2d at 1188. In order to establish a § 1981 claim, the complainant must demonstrate: "(1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981." *Lauture v. International Business Machines Corporation,* 216 F.3d 258, 261 (2d Cir.2000). In order to set forth a *prima facie* case under New York Executive Law § 296 et seq., Plaintiff must show: (1) that she belongs to a protected group; (2) that she was qualified for the position; (3) that she was discharged; and (4) that her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in the protected group. *See Bucknell v. Refined Sugars, Inc.,* 82 F.Supp.2d 151, 155 (S.D.N.Y.2000).

> FN2. 42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works


give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ..." 42 U.S.C. § 1981(b) states that "[f]or the purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of privileges, terms, and conditions of the contractual relationship."

The burden to establish a *prima facie* case is minimal and once accomplished, creates the presumption that the employer unlawfully discriminated against the employee. *Bickerstaff v. Vassar College,* 196 F.3d 435, 446 (2d Cir.1999). Accordingly, if the plaintiff establishes a *prima facie* case, the defendant must articulate evidence which establishes a legitimate, non-discriminatory basis for its actions. *Lopez,* 831 F.2d at 1188. If the defendant accomplishes this, the plaintiff must demonstrate that there is sufficient potential proof that the defendant's proffered legitimate, non-discriminatory reason was merely a pretext for the impermissible discrimination. *Id.*

## FACTS

*2 The following facts are undisputed. Kateri is a not-for-profit long term nursing facility for the aged and infirm in Manhattan. In June 1993, Jerro, [FN3] Kateri's Director of Nursing, hired Rookard, [FN4] then a 62 year old Black female, as her day Assistant Director of Nursing. As such, Rookard became a senior manager, holding the third highest position in Kateri's Nursing Department. In this capacity, Rookard essentially became Jerro's alter ego, implementing Jerro's policies and carrying out her directives. [FN5] Affidavit of Sarah Jerro in Support of Defendants' Motion for Summary Judgment ("Jerro Aff.") ¶¶ 10-11.

> FN3. Jerro, a White female who was in her early 50's when she hired Rookard, is the only employee at Kateri that Rookard accuses of discrimination. Deposition of Margaret Rookard at 238 (attached to Affidavit of John L. Ambile in Support of Defendants' Motion for Summary Judgment as Ex. 7).

> FN4. Rookard holds a Masters Degree in Nursing Administration from Columbia University. Prior to her employment with Kateri, she was an Associate Professor of Nursing at St. Joseph College and Medgar Evars College. Affidavit of Margaret Rookard in Opposition to Defendants' Motion for Summary Judgment ("Rookard Aff.") ¶ 1.

> FN5. Rookard was expected to perform her duties in the same manner and with the same efficiencies as Jerro including dealing with nurses and residents with the same respect, civility and fairness that they would receive from Jerro. Affidavit of Sarah Jerro in Support of Defendants' Motion for Summary Judgment ("Jerro Aff.") ¶ 11.

Rookard was one of many Black employees at Kateri. Indeed, the manager of the facility and its Executive Vice President and Administrator, Lascelles Bond ("Bond"), and its Director of Human Resources, Anita Harvey ("Harvey") are Black. In addition, Rookard's immediate supervisor, Elsie Mitchell, who was the second highest manager in Kateri's Nursing Department as Associate Director of Nursing, was a Black female whom Jerro had appointed to the position. So too was Jerro's other Assistant Director of Nursing, Norma Anderson. Jerro Aff. ¶¶ 5-6. In fact, as of September, 1998, sixteen of Kateri's 41 managers were Black and 17 were White, the remaining 8 were members of other minorities. Moreover, 14 of its 38 professionals were Black while only 9 were White, and more than half of Kateri's 651 employees were Black while less than 10 percent were White. Affidavit of Anita Harvey in Support of Defendants Motion for Summary Judgment ("Harvey Aff.") ¶ 5.

On November 17, 1998, Rookard was effectively discharged by Jerro. Bond and Harvey both fully supported Jerro's decision to discharge Rookard. *See* Affidavit of Lascelles Bond in Support of Defendants Motion for Summary Judgment ("Bond Aff.") ¶ 15; Harvey Aff. ¶ 11. Indeed, both Harvey and, in particular, Bond wanted to terminate Rookard earlier. Kateri had a tuition reimbursement program whereby employees who obtained credits from higher learning institutes were reimbursed 75% of their tuition costs.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 180119            Page 3
(Cite as: 2001 WL 180119, *2 (S.D.N.Y.))

Rookard, who participated in the program had submitted a voucher for reimbursement for the Autumn, 1996 term. The voucher contained a copy of her transcript which indicated she had received an "A" in two of her courses. Accordingly, Rookard was reimbursed for those courses. Thereafter, Rookard submitted a voucher for the Spring, 1997 term which contained a copy of Rookard's official transcript. For the courses in which Rookard had received an "A" in the Autumn, 1996 term, this transcript indicated that she had withdrawn from one and received an incomplete in the other. Jerro Aff. ¶¶ 14-15. Since, Rookard had sought and received a $2610.00 reimbursement for courses in which she did not obtain credit, Bond had decided to terminate her. He was ultimately convinced not to by Jerro. Bond Aff. ¶ 4. While Rookard strongly denies any misconduct because "the documents [she] submitted accurately reflected the fact that [she] had not completed the courses in question," Rookard ¶ 12, she does not deny or explain that she, in fact, submitted a falsified transcript.

*Rookard's Claims*

*3 The following facts are taken from Rookard's deposition or her affidavit in opposition to Defendants motion for summary judgment, unless otherwise indicated. First, Rookard alleges that Jerro demonstrated extreme racial animus towards Rookard and other Black employees at Kateri while displaying obvious favoritism towards White members of the nursing staff. Rookard alleges, specifically, that Jerro held private meetings with the White nurses, to her exclusion. Rookard claims that as a result of Jerro's bias, she was subjected to disparate treatment and then discharged. Affidavit of Margaret Rookard in Opposition to Defendants' Motion for Summary Judgment ("Rookard Aff.") ¶¶ 2; 11.

In support of these claims, Rookard asserts Jerro disregarded her senior job status by preventing Rookard from exercising authority over the White staff under her supervision. Indeed, she states that every time she corrected the performance of a White employee under her charge, the employee complained to Jerro and Jerro inevitably took the employee's side and countermanded Rookard's directive. For example, Rookard admonished Carolann Murphy ("Murphy"), Kateri's Cognitive Care Coordinator, for contaminating food she was feeding a resident. When the incident was reported to Jerro, Rookard claims that Jerro took Murphy's side, not bothering to note Murphy violated hospital protocol. Rather, Jerro reprimanded Rookard and instructed her to apologize to Murphy. As a result, Rookard asserts that she was forced to make it a practice of having a witness present when she disciplined a White nurse, to ensure the matter would be accurately reported to Jerro. Rookard Aff. ¶¶ 2-4.

Second, Rookard alleges that Jerro engaged in discrimination with respect to which nurses she granted permission to attend continuing education seminars. Specifically, she contends that Jerro regularly sent White nurses to such seminars while denying the same opportunities to Black nurses. Even when conferences concerned areas of medical treatment for which Rookard bore supervisory responsibility, she claims that Jerro sent a White or younger staff member in her place. In particular, Rookard asserts that on November 13, 1998, she was denied the opportunity to attend a Nursing Rehab conference that her White subordinates were permitted to attend. Rookard Aff. ¶ 11; Complaint ¶¶ 10; 11.

Rookard also states that while she and other Black nurses were required to make-up any time lost attending school, White nurses were given time off with pay to pursue continuing education. Moreover, Rookard notes that she was compelled to attend conferences that interested her on her own time and at her own expense. Rookard Aff. ¶ 11.

Third, Rookard alleges that Defendants removed her as co-chair of the Resident Education Committee and replaced her with a young White male. [FN6] Complaint ¶ 15. Arguing that her qualifications were far superior than her successor's, Rookard claims

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 180119     Page 4
(Cite as: 2001 WL 180119, *3 (S.D.N.Y.))

this act lacked any objective basis and thus was discriminatory. Shortly thereafter, she was prevented from participating in the final sessions of a mock survey that she had been working on as co-chair of that committee while her White subordinates were permitted to participate. Rookard Aff. ¶¶ 18-20; Complaint ¶ 12.

> FN6. This committee was charged with preparing Kateri to receive the approval of The Joint Commission on Accreditation of Healthcare Organizations.

*4 Fourth, Rookard asserts that Defendants unfairly denied her the opportunity to be considered for the position of Resident Education Director in favor of a younger White female with less qualifications. Complaint ¶ 14. She states that although she submitted a memo to Jerro expressing her interest in it, she was not considered for the position. Rookard Aff. ¶ 22.

Fifth, Rookard claims that in an effort to harass her into quitting, Jerro made constant remarks about Rookard's age in front of the staff. Specifically, Rookard contends that Jerro stated, "I hope I have as much energy as you when I get to be as old as you are," and "you are the oldest in the group." She also asserts that in an effort to humiliate her, and perhaps to test her stamina, Jerro assigned her the menial task of pushing a heavy surgical cart while making rounds with a surgeon, a function customarily performed by those holding the lowest positions in the department. Rookard Aff. ¶ 16.

Finally, Rookard alleges that her discharge was discriminatory. On November 11, 1998, directly preceding her discharge, Rookard contends that she was forced to reprimand Murphy for performing a function she was not qualified to perform. As a result of Rookard's actions, Jerro called a meeting with Rookard and Murphy. Although Jerro claims Rookard called Murphy a liar, turned her back on Murphy and was disrespectful to her, Rookard denies these allegations. Nonetheless, once again, she asserts that Jerro took Murphy's side, accused Rookard of acting inappropriately toward Murphy and demanded she apologize to her. Rookard refused to apologize. Immediately thereafter, Jerro requested Rookard's resignation. When Rookard did not comply, Jerro discharged her. Rookard Aff. ¶¶ 5-7; 12-15.

*Defendants' Response*

In support of its motion Defendants rely on Rookard's deposition and the affidavits of the following individuals: Sarah Jerro; Lascelles Bond, and Anita Harvey. Defendants deny that they illegally discriminated against Rookard. They assert that they are entitled to summary judgment because Rookard, despite all of her allegations, has not established a *prima facie* case of discrimination. In addition, Defendants argue that even if she has established a *prima facie* case, they still are entitled to summary judgment because they had legitimate non-discriminatory bases for all of their actions, including Jerro's discharge of Rookard.

First, Defendants argue that Rookard's allegations that Jerro favored White employees over Black employees are vague and unsupported. [FN7] Indeed, it is unrefuted that no one, including Rookard, ever complained to Harvey that Jerro was biased, and Harvey never observed Jerro act in a discriminatory manner. Harvey Aff. ¶ 13. More significantly, Defendants correctly note that even if Jerro treated White employees more favorably than Black employees, this disparate treatment allegation does not give rise to an inference of illegal discrimination because Rookard has not established that she was similarly situated to any employee who was allegedly treated more favorably because of his or her race.

> FN7. Rookard does not offer deposition testimony or affidavits from any Black employee that was allegedly discriminated against.

*5 Second, Defendants deny Rookard's claim that Jerro engaged in discrimination with respect to which nurses she granted permission to attend continuing education seminars. Indeed, Kateri claims to have a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 180119                                                                Page  5
(Cite as: 2001 WL 180119, *5 (S.D.N.Y.))

policy of encouraging *all* employees, irrespective of race or age, to attend continuing education programs. They note that Black employees regularly attended these seminars. However, employees were only permitted to attend the programs at Kateri's expense and time if they directly related to the employee's position . [FN8] In addition, employees were limited to two programs a year. Harvey Aff. ¶¶ 6-7.

> FN8. Kateri emphasizes that it has different policies regarding these continuing education seminars and school attendance. School attendance involved education credits from a higher learning institute for which employees were reimbursed 75% of their tuition costs. Jerro Aff. ¶ 14. Employees participating in this program were required to make up any lost time. On the other hand, continuing education programs are not for credit programs which employees are encouraged to take to improve their skills and keep informed of new trends and developments in their fields. Harvey Aff. ¶ 6. Employees participating in these programs were not required to make up lost time.

While Jerro admits Rookard's allegation that she denied Rookard permission to attend a continuing education program on November 13, 1998, she states that she did so not for discriminatory reasons, but because Elsie Mitchell, Jerro's first assistant and Rookard's supervisor, was away and Jerro needed Rookard at work to ensure the department was adequately supervised. Jerro Aff. ¶ 42. Rookard does not refute this explanation because she admitted at her deposition that she did not know why her request was turned down. Deposition of Margaret Rookard ("Rookard Dep.") at 225-26 (attached to Affidavit of John L. Ambile in Support of Defendants' Motion for Summary Judgment ("Ambile Aff.") as Ex. 9. Moreover, although Rookard alleged that "her White subordinates were permitted to attend" the November 13, 1998 conference, *see* Complaint ¶ 11, it is undisputed that of the four attendees, only one was White. Harvey Aff. ¶ 8. The other attendees consisted of one Black and two Asian employees. *Id.* Furthermore, this was the only conference or seminar which Rookard claims that she was precluded from attending for discriminatory reasons. Indeed, Rookard could not recall at her deposition any other occasion where she was eligible for an education program and was denied permission to attend. Rookard Dep. at 218 (attached to Ambile Aff. as Ex. 10). She also admitted at her deposition that Jerro did approve her attendance at one or two seminars or continuing education programs a year. Rookard Dep. at 222 (attached to Ambile Aff. as Ex. 8).

Third, Defendants assert that Rookard was not removed as co-chair of the Resident Education Committee for discriminatory reasons. Indeed, Rookard herself testified that she did not know why she was removed from the committee. Rookard Dep. at 117 (attached to Ambile Aff. as Ex. 20). According to Bond, it was he who made the decision to remove Rookard as co-chair of the Resident Education Committee based on his perception of Rookard's unsatisfactory performance and on the recommendation of Kateri's outside consultant. Specifically, Bond noted that Rookard was unprepared at meetings, that she repeatedly missed deadlines and that her weekly reports were inadequate. In addition, he was told by Kateri's outside consultant that Rookard's position as co-chair jeopardized Kateri's chances for success in the survey conducted by The Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). As further evidence that Rookard was not removed for discriminatory reasons, Defendants note and it is undisputed that the other co-chair of the committee, Evelyn McCoy, is Black and was not removed. In addition, two White employees were previously removed as co-chairs of the committee. Bond Aff. ¶¶ 6-7; 10.

*6 Bond also selected Rookard's replacement on the recommendation of another Kateri employee. He asserts that this selection was not based on the race or age of the employee. Bond also stated that Rookard was not invited to participate in the mock survey after she was removed as co-chair because she no longer was a project leader and attendance of the mock survey was limited to project leaders and certain senior facility administrative leaders.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 180119                                      Page 6
(Cite as: 2001 WL 180119, *6 (S.D.N.Y.))

Bond Aff. ¶ ¶ 9; 11. Further, Rookard admitted in her deposition that she did not know whose decision it was to deny her an invitation to the mock survey or what the decision was based upon and that Blacks and other minorities were invited to the meeting. Rookard Dep. at 233-35 (attached to Ambile Aff. as Exs. 11-13).

Fourth, Defendants claim that they did not impermissibly discriminate against Rookard when they promoted Rosemary Murray, a younger White female, to fill the position of Staff Education Director for the Staff Education Department. [FN9] First, although Rookard claims to have notified Jerro of her interest in the position, it is undisputed that it was not Jerro's decision to make and that Rookard never made a formal application to Bond, the person in charge of filling the position. In addition, Bond made the decision to promote Ms. Murray, an Assistant Director, to the position not on the basis of race or age, but because she had been performing the duties required by the position for the previous year. [FN10] Furthermore, the position was not in the Nursing Department and would have been resulted in a pay cut for Rookard had she received the spot. Moreover, Rookard admits, contrary to what she alleged in the Complaint, that she did not know whether she was more qualified for the position than Ms. Murray. Rookard Dep. at 241-42 (attached to Ambile Aff. as Ex. 17); Rookard Aff. ¶ 22. She also admitted that she did not know why she did not receive the position or who made the decision to appoint Ms. Murray. Rookard Dep. at 243 (attached to Ambile Aff. as Ex. 18). Finally, Rookard testified that Jerro responded positively to her request for consideration for this position by stating that she was needed in the Nursing department. Rookard Dep. at 115 (attached to Ambile Aff. as Ex. 15).

> FN9. Rookard's alleges, in her Complaint, that the position in question was Staff Education Director, but her Affidavit describes the position as Resident Education Director. Defendants state that the position was actually Staff Development Director.

> FN10. Bond made this decision at the recommendation of Rosemary Murray's immediate supervisor, Dr. Patricia Schneider.

Fifth, Jerro claims that her comments regarding Rookard's age were intended as compliments and not as discrimination. Jerro Aff. ¶ 44. Whatever their nature, Defendants argue that these statements are insufficient to support a claim for discrimination because there is no nexus between the comments and her discharge. In addition, Jerro asserts that she assigned Rookard to make rounds with a surgeon because the surgeon had complained to Jerro that the nurse managers, who customarily performed this job, were not doing a satisfactory job, and Jerro wanted it done correctly. Jerro Aff. ¶ 27.

Finally, Defendants generally assert that Rookard was not terminated for discriminatory reasons. Instead, Defendants proffer a variety of legitimate, job performance related reasons including: rude, disruptive and disrespectful conduct; unresponsiveness; disloyalty; poor and unsatisfactory performance of supervisory duties and Jerro's loss of confidence and trust in Rookard. [FN11] Jerro specifically states: that Rookard complained about Jerro in front of staff members on several occasions; that Rookard complained about and attempted to avoid new assignments, including ignoring an assignment to prepare a response to a report by Kateri's JCAHO consultant; that Rookard was inexplicably absent from a meeting that she was expected to attend; that she berated Murphy in the presence of other employees (which she previously had been told was inappropriate) and publicly questioned Jerro's decision to hire Murphy; and that she was thereafter rude to Murphy and refused to apologize. Jerro Aff. ¶¶ 23-38. Defendants contend that these reasons alone provided Kateri with sufficient cause to terminate Rookard and when viewed together with Rookard's forgery of her transcript to fraudulently obtain Kateri funds, that they had complete justification for the decision to discharge Rookard.

> FN11. As previously noted, Bond, Kateri's Executive Vice President and Administrator, and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 180119                                                                                                                Page  7
(Cite as: 2001 WL 180119, *6 (S.D.N.Y.))

Harvey, its Director of Human Resources, are Black and both fully supported Jerro's decision to discharge Rookard. *See* Bond Aff. ¶ 15; Harvey Aff. ¶ 11.

**\*7** In response to Defendants claim that she was insubordinate and that her work deteriorated, Rookard alleges that they did not issue her any warning memoranda or otherwise follow the procedures in Kateri's employee manual to give her notice of any problems. Indeed, she asserts that in the period leading up her discharge, rather than attempting to correct any deficiencies in her performance, Jerro sought out every opportunity to undermine her authority, reduce her responsibilities and degrade her in front of the staff. Rookard Aff. ¶ 15. It is undisputed, however, that Jerro and Harvey did follow approved procedures in the manual by putting her on notice through a verbal reprimand in August of 1998. Jerro Aff. ¶ 29; Harvey Aff. ¶ 10; Rookard Aff. Ex. 4.

## DISCUSSION
*Race Discrimination*

For the purposes of this motion, this Court assumes that Rookard has set forth a *prima facie* case of racial discrimination. [FN12] Nonetheless, Defendants have demonstrated that they had legitimate, non-discriminatory reasons for their actions, including discharging Rookard. By doing so, Defendants have rebutted the presumption of discrimination created by Rookard's establishment of a *prima facie* case, and placed the burden back on Rookard to make her case of impermissible discrimination. *Fisher v. Vassar College*, 114 F .3d 1332, 1335-36 (2d Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075 (1998). However, Rookard cannot satisfy this burden. Indeed, she has not presented any concrete facts from which this Court could infer that Defendants' proffered non-discriminatory reasons for its actions were really a pretext for illegal discrimination, [FN13] and a number of undisputed facts rebut any inference of discrimination.

FN12. It is clear that Rookard has satisfied the first element of a *prima facie* case as she was a 69 year old Black female. In addition, while Rookard's factual assertions provide scant evidence that Defendants intended to discriminate on the basis of race, she has set forth enough evidence to meet her minimal burden on this element of a *prima facie* case under § 1981. Finally, she was discharged from her employment at Kateri which satisfies the third element a *prima facie* case under § 1981. *See Lauture v. International Business Machines Corporation*, 216 F.3d 258, 261 (2d Cir.2000) (" § 1981 covers claims of discriminatory termination")

FN13. For instance, there is no evidence that Jerro made any derogatory comments about Rookard or Blacks in general.

First, Bond and Harvey both Blacks fully supported the decision to discharge Rookard. *See* Bond Aff. ¶ 15; Harvey Aff. ¶ 11. In fact, Harvey stated that she would have terminated Rookard months before Jerro discharged her. Harvey Aff. ¶ 11. And Bond had decided to terminate Rookard for misappropriating Kateri monies in connection with Kateri's tuition reimbursement program and was convinced not to by Jerro. *See supra* at n. 6; Bond Aff. ¶ 4. As Defendants correctly point out, Jerro's decision to intervene and save Rookard's job the previous year makes it difficult to impute a discriminatory motivation for her subsequent discharge.

In addition, it is undisputed that Jerro hired Rookard when she was over 60 years old to replace a younger Black woman who had left Kateri. Jerro Aff. ¶ 10; *see Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir.1997), *cert. denied*, 525 U.S. 936 (1998) (holding that where the same person is responsible for a plaintiff's hiring and firing, a strong inference exists that discrimination was not the determinating factor for the firing); *Brennan v. Metropolitan Opera Assoc.*, 1998 WL 193204 (S.D.N.Y.1998), *aff'd*, 192 F.3d 310 (2d Cir.1999) (same). In addition, Jerro replaced Rookard with a Black female in the same age category. [FN14] Jerro Aff. ¶ 7; *see Balut v. Local Elec. Sys.*, 988 F.Supp. 339, 349 (S.D.N.Y.1997), *aff'd*, 166 F.3d 1199 (1998) (finding a lack of discriminatory inference where plaintiff's replacement belonged to the same protected class); *Ralkin v. New York City*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 180119  
(Cite as: 2001 WL 180119, *7 (S.D.N.Y.))

Page 8

*Transit Authority,* 62 F.Supp.2d 989, 1000 (E.D.N.Y.1999) (holding that a defendant's continued employment of individuals who are roughly in the plaintiff's same age category and protected class undercuts any inference that the plaintiff's termination was discriminatory).

> FN14. Moreover, Rookard's immediate supervisor, Elsie Mitchell, whom Jerro had promoted to that position, was a Black female as was Jerro's other assistant Director of Nursing, Norma Anderson. Jerro Aff. ¶¶ 5-6.

*8 Furthermore, in general, Rookard's conclusory allegations that Defendants discriminated against her by, among other things, favoring White employees with regards to continuing education classes; by removing her as co-chair of the Resident Education Committee; by denying her the opportunity to participate in the mock survey; and by ordering her to make rounds with the surgeon, are not supported by any concrete facts from which an inference of discrimination may be found and are therefore insufficient to support a claim for illegal discrimination. Assuming, again, that Rookard has satisfied a *prima facie* case of discrimination here, the record is replete with Defendants' legitimate non-discriminatory reasons for these actions. *See supra* at 10-15.

Finally, Rookard's attempt to set forth a disparate treatment claim and thus raise an inference of discrimination based upon her conclusory and unsupported allegations that Jerro treated White employees more favorably than Black employees fails because she has not established that similarly situated employees were treated more favorably than she because of race. *See Norville v. Staten Island University Hospital* 196 F.3d 89, 95-96 (2d Cir.1999); *See generally Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (stating that an employer subjects an employee to disparate treatment by treating the employee less favorably than a similarly situated employee outside his or her protected group).

Accordingly, this Court grants Defendants motion for summary judgment as to this claim. *See Meiri v. Dacon,* 759 F.2d 989, *cert. denied,* 474 U.S. 829 (1985) (stating that in order to defeat a summary judgment motion, complaintant must set forth concrete evidence of discrimination).

*Age Discrimination*

While this Court found that Rookard satisfied the elements for a *prima facie* case for race discrimination, she cannot do so for her age discrimination claim. Specifically, Rookard has not established that her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her age. [FN15]

> FN15. Rookard satisfied the first and third elements of a *prima facie* case because she was a 69 year old Black female who was discharged from her employment at Kateri. This Court finds that Rookard also has demonstrated that she was qualified for her position at Kateri and thus meets the second element of a *prima facie* case.

Jerro's statements regarding Rookard's age are insufficient to support her claim for discriminatory discharge. Verbal comments demonstrate discriminatory intent only where the plaintiff establishes a nexus between the allegedly discriminatory statements and the defendant's decision to discharge the plaintiff. *See Emanuel v. Oliver, Wyman & Co., LLC,* 85 F.Supp.2d 321, 334 (S.D.N.Y.2000). While, on their face, the comments seem neutral if not complimentary--- even if they were uttered to be disparaging of Rookard's age, Rookard has not presented any evidence of a nexus between Jerro's comments and her discharge. Thus, Jerro's comments are insufficient to establish an inference of discrimination. *See id.* Accordingly, Rookard has failed to establish a *prima facie* case for age discrimination and thus this Court grants Defendants' summary judgment for this claim as well. Even if Rookard had established a *prima facie* case, however, many of the same undisputed facts which rebut any inference of race discrimination, *see supra* at 10-17, also rebut any inference of age discrimination. [FN16]

> FN16. This Court has considered Rookard's other

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 180119                                                                    Page 9
(Cite as: 2001 WL 180119, *8 (S.D.N.Y.))

allegations and has found them to be without merit.

## CONCLUSION

*9 For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is ORDERED to close this case.

SO ORDERED:

2001 WL 180119, 2001 WL 180119 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw