UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BASIL YOUNG | : | CIVIL ACTION |
| | : | NO: 3:03CV0216 (MRK) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COOPERSURGICAL, INC. | : | |
| | : | |
| Defendant. | : | April 12, 2004 |

### APPENDIX OF EXHIBITS IN SUPPORT OF
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Affidavit of Thomas Williams dated April 12, 2004.

Affidavit of Joanne Augustine dated April 12, 2004.

Affidavit of Tom Flynn dated April 8, 2004.

Affidavit of Deborah D. Cannavino dated April 14, 2004.

# WILLIAMS AFF.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| BASIL YOUNG | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 303CV0216(MRK) |
| v. | : | |
| | : | |
| COOPERSURGICAL, INC. | : | |
| | : | |
| Defendant. | : | APRIL 12, 2004 |

## AFFIDAVIT OF THOMAS WILLIAMS

I, Thomas Williams, having been duly sworn, do hereby depose and say:

1.      I am over the age of 18 and I understand the obligations of an oath.

2.      I base this Affidavit on personal knowledge.

3.      Since August 1998, I have been the Director of Quality Assurance and Regulatory

Affairs for CooperSurgical, Inc. ("CooperSurgical"). As the Director, I am responsible for

compliance with medical device industry regulations as well as ensuring that CooperSurgical's

medical devices meet specified high quality standards.

4.      CooperSurgical is a premium supplier of medical devices sold to and used by

obstetricians and gynecologists both domestically and worldwide.   CooperSurgical is dedicated

to servicing women's healthcare providers with innovative and high quality products.  Among

other things,  CooperSurgical manufactures  a variety of instruments used to treat gynecological

problems in women, such as colposcopes, specula, in vitro diagnostics, an array of uterine

–1–

manipulators, and cryo surgery devices.

5.    Because of the product classification as medical devices, as well as the potential harm to women by improper manufacture, CooperSurgical is heavily regulated and falls under the scrutiny of medical device industry regulatory bodies, including the United States Food and Drug Administration ("FDA"), United States federal regulatory requirements found in 21 CFR 200-299 and 800-1299, the Federal Drug and Cosmetic Act (the "Act"), International European Conformity Standards ("IEC"),   the International Standards Organization ("ISO"), the Medical Device Directive 99-42- EEC (for all European countries), Health Canada Medical Devices Regulations,  and Underwriter Laboratories ("UL") (electrical medical devices).

6.    The FDA, the British Standards Institute ("BSI") and UL conduct frequent on-site audits of CooperSurgical to ensure that their stringent requirements are being met.  Customers also routinely  conduct on-site audits of CooperSurgical to ensure the quality of the products, as well as compliance with domestic and international standards. To comply with these numerous regulations and to ensure that our medical devices are of the highest quality, CooperSurgical has implemented a comprehensive quality assurance program, which includes formalized procedures by which CooperSurgical's medical devices (and component parts) are tested.  Records are created to demonstrate the controls in place and to ensure that such controls are effective.  During these audits, the agencies review, among other things, these quality assurance records for compliance.

7.    In November 2000, plaintiff was placed by a temporary agency at CooperSurgical as a Quality Assurance Inspector.

–2–

8.     As a Quality Assurance Inspector, plaintiff was responsible for following procedures to ensure that inspection resulted in satisfactory release of individual pieces used in the manufacturing process. Specifically, the Quality Assurance Inspector reviews specifications for a given piece and takes the measurements as directed on the Incoming Inspection Procedure Sheet. The Inspection Sheet sets forth the characteristic, i.e., measurement, to be taken and the equipment and method to be used in performing the measurement. During the inspection process, the Inspector takes the measurements and then the Inspector records the results on the Inspection Report form. The Inspector completes the following information: (a) the date the piece was received, (b) the date of the inspection, (c) the Purchase Order number, (c) the Work Order number, (d) the inspections performed, (e) the results, and (f) whether the results match the required measurements. Then, the Report is signed by the Inspector.

9.     As a Quality Assurance Inspector, plaintiff reported to Tom Flynn, Quality Assurance Supervisor. Mr. Flynn in turn reports to me.

10.     Because CooperSurgical needed another Inspector on a long term basis, Mr. Flynn and I reviewed plaintiff's performance and job skills over his four weeks as a temporary employee. Mr. Flynn recommended that plaintiff be hired as a direct employee of the company, and I approved the hire.

11.     Hire on or before December 31, 2001 would permit plaintiff to receive more favorable benefits, which would not be available if he became a regular employee on January 1st

or later.[1]

12.    On December 20, 2001, I offered plaintiff a position as a regular Quality Assurance Inspector, which he accepted. The negotiated wage was agreed at $15.00 an hour. Entry level compensation at the time was $12.00 an hour.

13.    In conjunction with plaintiff's direct employment, I agreed to pay plaintiff a higher hourly rate than had been previously approved for the position and attributed this to the direct representations by the plaintiff that he possessed significant experience in the field of Quality Inspection. As a temporary employee, it is our understanding that he had earned approximately $12.50 per hour by the temporary agency.

14.    As a condition of employment, I also agreed that plaintiff could be reviewed as early as six-months from the date of hire, with the opportunity for a raise at that time, rather than the standard 12 months.

15.    In addition, I authorized plaintiff's request for a $4,000 tuition reimbursement toward college level courses. The company's policy provided for tuition reimbursement up to $2,000.

16.    In effect, CooperSurgical extended benefits to the plaintiff beyond those offered to other newly hired employees.

17.    Unfortunately,  and almost immediately, plaintiff's performance began to

---

[1]  Pursuant to CooperSurgical's policies, if plaintiff had been hired on or after January 1st, he would not have received any accrued sick days for 2002, and been entitled to five days of paid vacation only. Because plaintiff was hired by December 31st, however, he was able to receive two weeks of paid vacation and six paid sick days available for use immediately on January 1st.

deteriorate. On or about January 18, 2001, I reviewed the Inventory Movement Audit Report for all Quality Assurance Inspectors and then became concerned about plaintiff's productivity level. The Inventory Movement Audit Report sets forth the date, the product, and the identity of the Inspector who conducted each inspection. I determined that plaintiff was not meeting the target of inspecting 17 items per day. Specifically, from January 2, through January 17, he accomplished an average of 8 pieces per day, and on one day, he inspected only 4. He was not given a formal warning or disciplined at this time about this issue.

18.    On January 19, 2001, I met with plaintiff to review his productivity. I explained to him that he was not meeting expectations as to the number of units inspected, and that the goal was 17 pieces. Further, I told him that any and all resources necessary to improve his productivity would be made available to plaintiff upon request.

19.    A few weeks later, on February 2, 2001 at the end of the day, plaintiff angrily interrupted a meeting I was having that included Mr. Flynn. Plaintiff was complaining that Mr. Flynn had spoken to him disrespectfully about the method of release of a particular product earlier in the day. I told plaintiff I was in the middle of another meeting, but excused myself in order to provide the plaintiff with exclusive attention. This discussion occurred in the hallway outside of my office and carried onto the main operations floor. The plaintiff indicated that he had had dental work performed and was feeling the effects. I suggested we end our discussion and then reconvene the first thing Monday morning. In closure, I firmly stated that he needed to follow the instructions of his supervisor and release product when told to do so. Questions to the contrary can be raised later.

20.    On Monday, February 5, 2000, I held a meeting with Mr. Flynn and the plaintiff to discuss his performance and to encourage correction and improvement. I told plaintiff he was spending too much time asking the same questions and seeking repetitive guidance from multiple employees. This behavior distracted the other employees and resulted in decreased department efficiency. Specifically, I explained that on Friday, February 2, 2001, I understood that plaintiff asked several employees, Mr. Tanner, Ms. Pflugh, Mr. Flynn and me for guidance on the proper disposition of product. I confirmed that we all provided the same guidance. I explained to plaintiff the appropriate chain of command for seeking direction on his work: first, William Tanner, a Quality Assurance Inspector, then Mr. Flynn, Quality Assurance Supervisor, and finally me, the Director of Quality Assurance and Regulatory Affairs. He was only to move beyond the first person if he was not satisfied with the answer. Plaintiff agreed to this procedure. I also told plaintiff that his productivity needed to improve. He was not close to meeting the target of inspecting 17 pieces a day, and that he would have to become more diligent and work to become more efficient. I told the plaintiff that we would continue to evaluate the situation with hopes of correction and anticipated better performance and efficiency.

21.    On March 21, 2001, plaintiff represented that he inspected a component of a medical device using visual methodology. Specifically, plaintiff was tasked to inspect the threading and the radius of the threading of a component that contained fine threads. The specification provided to plaintiff called for measurements in the thousands of an inch. Because of the size, such measurements can only be made with the assistance of magnification. An optical comparator (also known as shadow graph) provides the appropriate vehicle to measure in

–6–

such detail.

22.    When questioned, plaintiff admitted that he did not use the shadow graph to take the measurements that he recorded as his measurements on the Inspection Report. He also said, although he recorded that he had made measurements with the shadow graph, he did not know how to use the shadow graph. Plaintiff admitted, however, that measurements in microns cannot be accurately made by the naked eye. In fact, measurements of that minute size (thousandths of an inch) cannot be taken visually.

23.    At the meeting on March 21st, Mr. Flynn and I emphasized that ethical and responsible judgment is required in the job of Quality Assurance Inspector. I further pointed out that falsification of company records, which were required to be kept by the FDA and are audited by that agency for compliance, is grounds for immediate termination pursuant to the CooperSurgical Employee Handbook.

24.    However, because plaintiff had freely admitted that he had not used the shadow graph and stated that he did not even know how to use the equipment, nor was he trained to do so, immediate dismissal was not initiated. Rather, and as a result, I agreed to provide additional training to include the shadow graph, and issued a stern written warning to him, placing him on a 30-day probation. The purpose of this extension was to further evaluate the inspection skill level possessed by the plaintiff.

25.    The piece that plaintiff was inspecting, part no. 33590 is a delivery connector tube used in a cryo surgery, which employs high pressure (600-800 psi) gas to freeze dermatological lesions from female patients. Due to the high pressure, fittings of this nature must fit with a high

–7–

degree of certainty to withstand extreme pressure.

26.    Just days later, on April 3, 2001, I was informed that plaintiff was involved in a verbal altercation with another Quality Assurance Inspector, Ms. Jeannette Freese.

27.    On April 4, 2001, plaintiff informed me, Joanne Augustine, and Mr. Flynn that Jeanette Freese confronted him and had wrongfully accused him of misarranging files and of falsifying records and that he had gone to his supervisor, who ignored his concerns and spoke "down" to him. He said the situation made him feel harassed and discriminated against.

28.    The company investigated plaintiff's complaint. I was involved in the investigation. During a meeting with Ms. Freese, she complained that she felt verbally attacked by plaintiff for asking a simple question. She accused plaintiff of harassing her. She was afraid that, given the proximity of their work areas, it could happen again, and she wondered who might be around to intercede next time. She indicated that she was scared.

29.    The investigation did not substantiate plaintiff's complaint. To the contrary, the investigation revealed that plaintiff had been the aggressor and had acted inappropriately. Rather than discipline the plaintiff, we tried to resolve the situation by holding a conflict resolution meeting with all of the parties.

30.    On April 11, 2001, in an effort to resolve the interpersonal conflict between plaintiff and Ms. Freese, I held a conflict resolution meeting. Led by Ms. Augustine, the purpose of the meeting was to meet as a group and resolve the conflict between plaintiff and Ms. Freese, and so that these two employees could work together in the future cooperatively. The meeting was scheduled to occur promptly at 1:00 just after lunch. The plaintiff returned from his lunch

break and was observed driving onto the property at 1:23. The meeting began thereafter. Ms. Freese began by stating that she would not tolerate being yelled at by the plaintiff again. She stated that all she trying to do was to ask for plaintiff's help in using the shadow graph as she could not remember how to use it, and saw on the inspection sheet that he had previously inspected the component using the shadow graph. Ms. Freese said she did not want to be yelled at by plaintiff or anyone else, or spoken to in that disrespectful manner again. Plaintiff stated that everything she said was wrong. He stated that he had always been respectful towards her and that it was she who had not spoken to him since February 2. He said the witness, Chet Rutkowski, was not in the area at the time in contradiction to the investigation. He said he would not be falsely accused of falsifying documents by Ms. Freese or anyone else. As plaintiff's voice elevated, Mr. Flynn asked him to lower his voice.

31.    Ms. Freese, who remained professional throughout the meeting, calmly stated that Chet Rutkowski <u>was</u> present, and that she never said plaintiff falsified records. She merely asked him for help because he had performed the same test, as reflected by the Inspection Report. Plaintiff began yelling at Ms. Freese, that she was not telling the truth. Mr. Flynn responded that he instructed Ms. Freese (and Mr. Rutkowski) to wait to conduct the test when Mr. Tanner returned, and that he would assist with it. Mr. Flynn stated that this should have resolved the issue, but that plaintiff had continued to yell at Ms. Freese.

32.    Plaintiff then stated in an aggressive, hostile tone to Mr. Flynn "You are a liar!" Because the plaintiff appeared so out of control at that point, Mr. Williams ended the meeting and excused Mr. Flynn and Ms. Freese. Throughout the meeting, plaintiff did not display any

remorse or exhibit a willingness to consider the positions of others or exhibit any attempt to resolve the matter, and his tone was disruptive and angry; then his anger escalated and he called his supervisor a liar.

33.     Based on plaintiff's most recent conduct of insubordination and aggressive demeanor toward management and co-workers, and in light of his record of problems over the few months he had worked as a regular employee, I made the decision to terminate plaintiff's employment. Plaintiff took no responsibility for his actions with Ms. Freese. He had previously refused to acknowledge his poor judgment in recording measurements, had had an angry outburst during the company's attempt to improve his relationship with a co-worker, and had accused his supervisor and others of being liars. Plaintiff also had been warned previously about his poor work performance. He was terminated for these reasons, including insubordination to his supervisor and, a demonstrated inability or unwillingness to work together as a team member.

34.     Employees who are insubordinate to their supervisors can be immediately terminated pursuant to company policy.

Tom Williams

STATE OF CONNECTICUT )
COUNTY OF FAIRFIELD     )          ss: Trumbull, Connecticut

Personally appeared, Tom Williams, who swore to and subscribed the above affidavit before me, this 12th day of April, 2004

Notary Public/Commissioner of the Superior Court

JOANNE AUGUSTINE
NOTARY PUBLIC
MY COMMISSION EXPIRES MAY 31, 2005

–11–

# AUGUSTINE AFF.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BASIL YOUNG | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 303CV0216(MRK) |
| v. | : | |
| | : | |
| COOPERSURGICAL, INC. | : | |
| | : | |
| Defendant. | : | APRIL 12, 2004 |

## **AFFIDAVIT OF JOANNE AUGUSTINE**

I, Joanne Augustine, being duly sworn, hereby depose and say:

1.      I am over 18 years of age and believe in the obligation of an oath.

2.      I have personal knowledge of the facts set forth in this affidavit, and the facts are true and accurate to the best of my knowledge and belief.

3.      Since 1987, I have been an administrative assistant for CooperSurgical Inc.("CooperSurgical") and my responsibilities include the human resources manager function.  In that position, I have access to the company's records concerning all employee discipline and terminations.  I am also personally involved in most employee disciplines and terminations.

4.      In 2000, CooperSurgical had approximately 84 employees at its facility in Shelton, Connecticut.  All of these employees are involved in the development, manufacturing, distribution and sale of premium health care devices used in women's healthcare.

5.      CooperSurgical has an Employee Handbook that provides, among other things, that

–1–

falsification of company records as well as insubordination are bases for immediate termination of employment. A true and correct copy of that portion of the handbook is attached hereto as Exhibit A.

5.       On December 20, 2001, plaintiff was offered a direct position with CooperSurgical. As part of the hiring process, plaintiff completed an Application of Employment. On the application, plaintiff indicated that he had never "pled guilty or non contest to, or been convicted of a crime." Plaintiff also signed an affidavit certifying that all the information he provided in order to secure employment with CooperSurgical was true, complete and correct. A true and correct copy of plaintiff's job application is attached hereto as Exhibit B.

6.       On April 3, 2001, plaintiff came to see me and asked to make a complaint. He appeared angry and agitated.

7.       I stated that since Mr. Williams was out of the office that day, I would set up a meeting for the next morning at 8:30 am to discuss the matter.

8.       The next morning, Mr. Williams, Mr. Flynn and I met with plaintiff. He said that that Jeanette Freese confronted him and wrongfully accused him of misarranging files and of falsifying records, and that he had gone to his supervisor, who ignored his concerns and spoke "down" to him. He said the situation made him feel he was being harassed and discriminated against.

9.       I then initiated an investigation into the plaintiff's complaint. During the investigation, I interviewed Mr. Flynn, Ms. Freese, and Mr. Rutkowski (a co-employee witness). Ms. Freese said that she had to take a measurement of an equipment piece that required her to use

–2–

the shadow graph. Normally, she would ask Bill Tanner to assist her. He was not in. She asked

Chet Rutkowski, but he was unable to assist her. So, Ms. Freese looked through the records to see

which Inspector had done the prior inspection, and she saw that it was plaintiff. She asked plaintiff

if he remembered how he got the dimension, or if Mr. Tanner had helped him. She said she needed

help. Plaintiff responded completely inappropriately to this request for help becoming defensive

and asking whether she was questioning him. She said she was only asking for help, not accusing

him of anything. Plaintiff said to ask his boss, then he started to raise his voice. Ms. Freese told

him that she just wanted to know how to take the measurement. Plaintiff started yelling at this

point, and Mr. Flynn came down and told plaintiff to stop.

10.    Ms. Freese complained that she felt verbally attacked by plaintiff in response to

simply asking him to assist her is taking a measurement using the shadow graph, as he was the last

Inspector to have conducted the measurements based on the Inspection Report. Ms. Freese accused

plaintiff of harassing her. She was afraid that, given the proximity of their work areas, she was

afraid that it could happen again and she wondered who might be around next time. She indicated

she was scared.

11.    Mr. Rutowski corroborated Ms. Freese's version of events. He confirmed that Ms.

Freese merely asked a plaintiff question on how to use the shadow graph and plaintiff raised his

voice and became very irate at her.

12.    In 2001, Ms. Freese was a 22 year old woman who had worked at CooperSurgical

for three and a half years. Mr. Rutowski had also worked for CooperSurgical for three years. Ms.

Freese and Mr. Rutkowski (an independent witness) were credible longer term employees with

–3–

good work records who relayed exactly the same facts.

13.     Based upon the investigation, we could not substantiate plaintiff's complaint.  To the contrary, the investigation revealed that plaintiff had been the aggressor and had acted inappropriately.

14.     Rather than discipline the plaintiff, the company tried to resolve the situation by holding a conflict resolution meeting with all of the parties.

15.     On April 11, 2001, in an effort to resolve the interpersonal conflict between plaintiff and Ms. Freese, Mr. Williams held a conflict resolution meeting.  The purpose of the meeting was to meet as a group to try to resolve the conflict between plaintiff and Ms. Freese, so that these two employees could work together in the future cooperatively.

16.     During the meeting,  Ms. Freese began by stating that she would not tolerate being yelled at by the plaintiff again.  She stated that all she trying to do was to ask for his help in using the shadow graph and she could not remember how to use it, and saw on the sheet that he had inspected the equipment using the shadow graph..  She said she did not want to be yelled at by the plaintiff or anyone else, or spoken to in that manner again.

17.     Plaintiff stated that everything she said was wrong. He stated that he had always been respectful towards her and it was she who had not spoken to him since February 2nd.  He said Chet Rutkowski, the witness, was not  in the area.  He said he would not be falsely accused of falsifying documents by Ms. Freese or anyone else.  As plaintiff's voice was elevated, Mr. Flynn asked him to lower his voice.

18.     Ms. Freese, who remained calm and professional throughout the meeting,  tated that

–4–

Chet Rutkowski <u>was</u> present, and that she never said plaintiff falsified records. She merely asked him for help because he had performed the same, as reflected by the Inspection Report.

19.    Plaintiff began yelling at Ms. Freese, that she was not telling the truth. Mr. Flynn responded that he had informed Ms. Freese to wait to conduct the test when Mr. Tanner returned, and he would assist with it. Mr. Flynn said that should have resolved the issue, but that plaintiff had continued to yell at Ms. Freese. Plaintiff then stated in an aggressive, hostile tone to Mr. Flynn "You are a liar!"

20.    Because plaintiff appeared so out of control at that point, Mr. Williams ended the meeting and excused Mr. Flynn and Ms. Freese.

21.    Throughout the meeting, plaintiff did not display any remorse or exhibit a willingness to consider the positions of others or to resolve the matter, and his tone was disruptive and angry; then his anger escalated and he called his supervisor a liar.

22.    In accordance with its policy, CooperSurgical terminates all employees who are insubordinate toward their supervisors. For instance, in July 2003, CooperSurgical terminated a

white female for insubordination.  The company has not terminated any other African American

employees for insubordination, other than plaintiff.

Joanne Augustine

STATE OF CONNECTICUT  )
COUNTY OF FAIRFIELD      )              ss: Trumbull, Connecticut

Personally appeared, Joanne Augustine, who swore to and subscribed the above affidavit
before me, this 12th day of April, 2004

Notary Public/Commissioner of the Superior Court

Deborah A. Chandler
Notary Public
My Commission Expires
August 31, 2008

–6–

# EXHIBIT A

# Application for Employment

PLEASE PRINT                     CURRENT AS OF 9/97

Equal access to programs, services and employment is available to all persons. Those applicants requiring reasonable accommodation to the application and/or interview process should notify a representative of the Human Resources Department.

Position(s) applied for __Quality Assurance Inspector__   Date of application __12 / 20 / 00__

Referral Source  ☐ Advertisement   ☐ Employee   ☐ Relative   ☐ Government Employment Agency
☐ Walk-in   ☒ Private Employment Agency   ☐ Other _____

Name of source (if applicable) __MONROE ENGINEERING__

Name __YOUNG__ (LAST)   __BASIL__ (FIRST)   __STANLEY__ (MIDDLE)

Address __3370 MADISON Ave__ (STREET)  __BRIDGEPORT__ (CITY)  __CT__ (STATE) __06606__ (ZIP CODE)  Social Security # __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__

Telephone # __(203)372-5936__ Mobile/Beeper/Other Phone # (____) _____  E-mail Address _____

If necessary, best time to call you at home is ............................................................ ___ : ___  AM / PM

May we contact you at work? ....................................................................................... ☐ Yes   ☐ No

If yes, work number and best time to call .................................... (____) _____  ___ : ___  AM / PM

If you are under 18 and it is required, can you furnish a work permit? ......................... ☐ Yes   ☐ No

If no, please explain _____

Have you submitted an application here before? ........................................................... ☐ Yes   ☒ No

If yes, give date(s) and position(s) _____ ___ / ___

Have you ever been employed here before? ................................................................... ☐ Yes   ☒ No

If yes, give dates ............................................ From ___ / ___   To ___ / ___

Are you legally eligible for employment in this country? ............................................. ☒ Yes   ☐ No

Date available for work .......... __12 / 20 / 00__  What is your desired salary range? .......... $ __16 hr__

Type of employment desired   ☒ Full-Time   ☐ Part-Time   ☐ Temporary   ☐ Seasonal   ☐ Educational Co-Op

Will you relocate if job requires it? .................. ☒ Yes ☐ No   Will you travel if job requires it? ........... ☒ Yes   ☐ No

Are you able to meet the attendance requirements of the position? ............................... ☒ Yes   ☐ No

Will you work overtime if required? .............................................................................. ☒ Yes   ☐ No

If no, please explain _____

Have you ever been bonded? ......................................................................................... ☐ Yes   ☒ No

Have you ever pled "guilty" or "no contest" to, or been convicted of a crime? ............ ☐ Yes   ☒ No

If yes, please provide date(s) and details _____
ANSWERING "YES" TO THESE QUESTIONS DOES NOT CONSTITUTE AN AUTOMATIC BAR TO EMPLOYMENT. FACTORS SUCH AS DATE OF THE OFFENSE, SERIOUSNESS AND NATURE OF THE VIOLATION, REHABILITATION AND POSITION APPLIED FOR WILL BE TAKEN INTO ACCOUNT.

Driver's license number if driving is an essential job function _____   State _____

AN EQUAL OPPORTUNITY EMPLOYER

## Employment History

Provide the following information of your past and current employers, assignments or volunteer activities, starting with the most recent (use additional sheets if necessary). Explain any gaps in employment in comments section below.

| | | DATES EMPLOYED | | SUMMARIZE THE TYPE OF WORK PERFORMED AND JOB RESPONSIBILITIES |
|---|---|---|---|---|
| **EMPLOYER** PERKIN ELMER Corp. / Monroe Engineering | **TELEPHONE#** | **FROM** | **TO** | |
| **ADDRESS** WILTON   CT | | 10/99 | 10/00 | Electro-Mechanical Service + Technical |
| **STARTING JOB TITLE / FINAL JOB TITLE** Technician   (PhoTovAc) | | **HOURLY RATE/SALARY STARTING** | | Support :- PhoToVAc Air MONITORING + |
| **IMMEDIATE SUPERVISOR AND TITLE** ED PYRCH / Technical Support MANAGER | | $ 16 | PER hr | GAS ChromaTOGRAPhy |
| **REASON FOR LEAVING** END OF CONTRACT | | **HOURLY RATE/SALARY FINAL** | | ANALYTICAL INSTRUMENTS |
| **MAY WE CONTACT FOR REFERENCE?** ☒YES ☐ NO ☐ LATER | | $ | PER | |

| | | DATES EMPLOYED | | SUMMARIZE THE TYPE OF WORK PERFORMED AND JOB RESPONSIBILITIES |
|---|---|---|---|---|
| **EMPLOYER** | **TELEPHONE #** | **FROM** | **TO** | |
| **ADDRESS** | | | | |
| **STARTING JOB TITLE / FINAL JOB TITLE** | | **HOURLY RATE/SALARY STARTING** | | |
| **IMMEDIATE SUPERVISOR AND TITLE** | | $ | PER | |
| **REASON FOR LEAVING** | | **HOURLY RATE/SALARY FINAL** | | |
| **MAY WE CONTACT FOR REFERENCE?** ☐ YES ☐ NO ☐ LATER | | $ | PER | |

| | | DATES EMPLOYED | | SUMMARIZE THE TYPE OF WORK PERFORMED AND JOB RESPONSIBILITIES |
|---|---|---|---|---|
| **EMPLOYER** | **TELEPHONE #** | **FROM** | **TO** | |
| **ADDRESS** | | | | |
| **STARTING JOB TITLE / FINAL JOB TITLE** | | **HOURLY RATE/SALARY STARTING** | | |
| **IMMEDIATE SUPERVISOR AND TITLE** | | $ | PER | |
| **REASON FOR LEAVING** | | **HOURLY RATE/SALARY FINAL** | | |
| **MAY WE CONTACT FOR REFERENCE?** ☐ YES ☐ NO ☐ LATER | | $ | PER | |

| | | DATES EMPLOYED | | SUMMARIZE THE TYPE OF WORK PERFORMED AND JOB RESPONSIBILITIES |
|---|---|---|---|---|
| **EMPLOYER** | **TELEPHONE #** | **FROM** | **TO** | |
| **ADDRESS** | | | | |
| **STARTING JOB TITLE / FINAL JOB TITLE** | | **HOURLY RATE/SALARY STARTING** | | |
| **IMMEDIATE SUPERVISOR AND TITLE** | | $ | PER | |
| **REASON FOR LEAVING** | | **HOURLY RATE/SALARY FINAL** | | |
| **MAY WE CONTACT FOR REFERENCE?** ☐ YES ☐ NO ☐ LATER | | $ | PER | |

**Comments** INCLUDING EXPLANATION OF ANY GAPS IN EMPLOYMENT

## Skills and Qualifications

Summarize any special training, skills, licenses and/or certificates that may qualify you as being able to perform job-related functions in the position for which you are applying.

## Educational Background (if job re...)

A. List last three (3) schools attended, starting with most recent. B. List number of years completed. C. Indicate degree or diploma earned, if any. D. Grade Point Average or Class Rank. E. Major field of study. F. Minor field of study (if applicable).

| A. SCHOOL | B. NUMBER OF YEARS COMPLETED | C. DEGREE DIPLOMA | D. GPA CLASS RANK | E. MAJOR | F. MINOR |
|---|---|---|---|---|---|
| BEI SCHOOL OF ENGR. FAIRFIELD U. | 4 | | | BSEE | BSME |
| NAVAL AIR TECHNICAL COMMAND | 2 | CERTIFICATE | | A + P Tech | |
| WARREN HARDING HIGH | 4 | DIPLOMA | | Science | General |

## References

List name and telephone number of three business/work references who are *not* related to you and are *not* previous supervisors. If not applicable, list three school or personal references who are not related to you.

| NAME | TELEPHONE | NUMBER OF YEARS KNOWN |
|---|---|---|
| ED KRIZ | ( 203 ) 268 - 8624 | 7 |
| RICHARD Johnson | ( 203 ) 335 - 4449 | 10 |
| GAIL MURRAY | ( 203 ) 799 - 4764 | 5 |

## Additional Information

List professional, trade, business or civic associations and any offices held.
EXCLUDE MEMBERSHIPS THAT WOULD REVEAL RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, CITIZENSHIP, AGE, MENTAL OR PHYSICAL DISABILITIES, VETERAN/RESERVE NATIONAL GUARD OR ANY OTHER SIMILARLY PROTECTED STATUS.

| ORGANIZATION | OFFICES HELD |
|---|---|
| | |
| | |
| | |

List special accomplishments, publications, awards, etc.
EXCLUDE MEMBERSHIPS THAT WOULD REVEAL RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, CITIZENSHIP, AGE, MENTAL OR PHYSICAL DISABILITIES, VETERAN/RESERVE NATIONAL GUARD OR ANY OTHER SIMILARLY PROTECTED STATUS.

List any additional information you would like us to consider.

**Applicant Statement**

I certify that all information I have provided in order to apply for and secure work with the employer is true, complete and correct.

I understand that any information provided by me that is found to be false, incomplete or misrepresented in any respect, will be sufficient cause to (i) cancel further consideration of this application, or (ii) immediately discharge me from the employer's service, whenever it is discovered.

I expressly authorize, without reservation, the employer, its representatives, employees or agents to contact and obtain information from all references (personal and professional), employers, public agencies, licensing authorities and educational institutions and to otherwise verify the accuracy of all information provided by me in this application, resumé or job interview. I hereby waive any and all rights and claims I may have regarding the employer, its agents, employees or representatives, for seeking, gathering and using such information in the employment process and all other persons, corporations or organizations for furnishing such information about me.

I understand that the employer does not unlawfully discriminate in employment and no question on this application is used for the purpose of limiting or excusing any applicant from consideration for employment on a basis prohibited by applicable local, state or federal law.

I understand that this application remains current for only 30 days. At the conclusion of that time, if I have not heard from the employer and still wish to be considered for employment, it will be necessary to reapply and fill out a new application.

If I am hired, I understand that I am free to resign at any time, with or without cause and without prior notice, and the employer reserves the same right to terminate my employment at any time, with or without cause and without prior notice, except as may be required by law. This application does not constitute an agreement or contract for employment for any specified period or definite duration. I understand that no supervisor or representative of the employer is authorized to make any assurances to the contrary and that no implied oral or written agreements contrary to the foregoing express language are valid unless they are in writing and signed by the employer's president.

I also understand that if I am hired, I will be required to provide proof of identity and legal authority to work in the United States and that federal immigration laws require me to complete an I-9 Form in this regard.

**DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE APPLICANT STATEMENT.**

I certify that I have read, fully understand and accept all terms of the foregoing Applicant Statement.

**Signature of Applicant**_____     Date _12_ / _20_ / _00_

FRIENDLY® Call toll free 800-999-9111 to reorder Application for Employment (Long Form) #R8-A0501.E
FORMS  G. Neil Companies assumes no responsibility for the employer's use of this form or any decision the employer makes which may violate local, state or federal law. By selling this form, G. Neil Companies is not giving legal advice.

© 1997 G. Neil Companies, P.O. Box 450939, Sunrise, FL 33345-0939 • Printed in U.S.A. (8/97)
The purchaser of this form is granted a limited license to photocopy this completed form for its internal use only. Any other photocopying or reproducing in any form, whether in whole or in part, is a violation of federal copyright laws and is strictly prohibited.

# EXHIBIT B

**CooperSurgical**

EMPLOYEE

# Hand book

**CooperSurgical**®

SHELTON, CT  06484  ■  203 • 929 • 6321

Fair Play Rules

The Company reserves the right to terminate any employee at any time for any reason. Examples of the types of misconduct which may result in immediate dismissal include, but are not limited to:

1.    Misconduct which shall include willful disobedience of orders from Supervisory personnel including the refusal to perform assigned work, the use of violent or threatening language and all acts of violence such as striking a fellow employee or representative of the Company, or carrying a concealed weapon.

2.    Acts of sabotage, deliberate interference with production, willful destruction of Company property or the property of fellow employees, or admitting non-employees to the plant or property without authorization.

3.    Conduct violating basic morality and common decency, such as drinking or being under the influence of drugs or alcohol on Company premises or providing alcohol on Company property.

4.    Failure to promptly report accidents, injuries or damaged equipment or products to your Supervisor.

5.    Falsification of employment application information, employment records, or other Company records.

66

6. Misuse or removal from the premises without authorization, information about the Company or its employees such as blueprints, Company records, or other Company information.

7. Punching another employee's time card or allowing another employee to punch your time card.

8. Sexual harassment of any employee.

9. Making false or malicious statements about the Company or its personnel which has a detrimental effect upon the Company or its employees.

Warnings do not have to be for the same offense to result in discharge. The above disciplinary rules are guidelines which will apply in most situations, however, the Company reserves the right to exercise its judgment in applying discipline depending on each particular situation.

These rules are subject to modification by announcement or posted bulletins.

67