# FLYNN AFF.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| BASIL YOUNG | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 303CV0216(MRK) |
| v. | : | |
| | : | |
| COOPERSURGICAL, INC. | : | |
| | : | |
| Defendant. | : | APRIL 8, 2004 |

**AFFIDAVIT OF TOM FLYNN**

I, Tom Flynn, having been duly sworn, do hereby depose and say:

1.      I am over the age of 18 and I understand the obligations of an oath.

2.      I base this Affidavit on personal knowledge.

3.      Since approximately June, 2000, I have been the Quality Assurance Supervisor for CooperSurgical, Inc. ("CooperSurgical"). As the Quality Assurance Supervisor, all of the Quality Assurance Inspectors report to me and I am responsible for supervising their work performance. The Quality Assurance department ensures compliance with all regulatory agencies and regulations as well as ensuring that CooperSurgical's medical devices meet our high quality standards.

4.      In November 2000, plaintiff was placed by a temporary agency at CooperSurgical as a Quality Assurance Inspector.

5.      As a Quality Assurance Inspector, plaintiff was responsible for ensuring that each individual piece used in the manufacturing process was in strict compliance with specifications.

–1–

Specifically, the Quality Assurance Inspector reviews specific equipment pieces and takes the measurements as directed on the Incoming Inspection Procedure Sheet. The Inspection Sheet sets forth the characteristic, i.e., measurement, to be taken and the equipment and method to be used in performing the measurement. During the inspection process, the Inspector takes the measurements and then the Inspector records the results on the Inspection Report form. The Inspector writes the following information: (a) the date the piece was received, (b) the date of the inspection, (c) the Purchase Order number, (c) the Work Order number, (d) the inspections performed, (e) the results, and (f) whether the results match the required measurements. Then, the Report is signed by the Inspector.

6.      As a Quality Assurance Inspector, plaintiff reported to me. I report to Tom Williams, Director of Quality Assurance.

7.      Mr. Williams and I reviewed plaintiff's performance and job skills over his four weeks as a temporary employee. I recommended that plaintiff be hired as a direct employee of the company, and Mr. Williams approved the hire.

8.      Unfortunately, almost immediately, plaintiff's performance began to deteriorate. One issue of primary concern became his habit of asking a number of employees the same question over and over again. I tried to work with him to encourage him to work more productively and more efficiently, as he was not working at an appropriate pace. Mr. Williams also counseled plaintiff about his inspection rate in January, 2001.

9.      Just weeks later, on February 2, 2001, I asked plaintiff to release an order that morning. By afternoon, plaintiff still had not released the order, and I asked him why he had

–2–

not done so. He did not offer any reason, and I told him that he needed to release product when I directed him to do so.

10.      I discovered that plaintiff had asked several other employees in Quality Assurance the same question about releasing this product, all the way up to the Director, Mr. Williams. I was informed that they all gave him the same answer, and yet he still had not released the product.

11.      Later that same day, plaintiff angrily interrupted a meeting involving Mr. Williams and myself. Plaintiff was complaining about the earlier situation and Mr. Williams told him that he needed to follow the instructions of his supervisor.

12.      On Monday, February 5, 2000, I held a meeting with Mr. Williams and the plaintiff to discuss his performance and to encourage correction and improvement.   Mr. Williams told plaintiff he was spending too much time asking the same question to multiple employees. He explained that this behavior distracted the other employees and resulted in decreased efficiency. During the meeting, Mr. Williams explained to plaintiff of the appropriate chain of command for seeking direction on his work: first, William Tanner, a Quality Assurance Inspector, then me, and finally Mr. Williams. Mr. Williams also told plaintiff that his employment needed to improve, and that he still was not meeting the target of inspecting 17 pieces a day, and that he would have to work to become more efficient. We told the plaintiff that we would continue to evaluate the situation with hopes of correction and better performance and efficiency.

13.      A few weeks later, on March 14, 2001, I was reviewing and updating the Quality

–3–

Assurance Inspection Reports to ensure their accuracy, as I routinely do. I reviewed an Inspection Report for an inspection plaintiff had performed. I asked him how he had performed the inspections. Plaintiff told me that he inspected and recorded measurements of the minor threading and the radius of the threading visually. I asked him how he took the measurements of .065 inches for the minor thread and .010/.015 inches for the radius of the threading, as recorded on the form on both November 29, 2000 and March 14, 2001. He again stated that he took the measurements visually. I told him that was impossible to do. Measurements that small can only be made using the shadow graph, as specifically stated on the Incoming Inspection Procedure Sheet.

14.    He said that he should not have put in the actual measurements, but should have listed only that they were "acceptable."

15.    I told plaintiff that he had falsified the records by recording imaginary numbers, as plaintiff had essentially admitted, and that even if he merely noted that the measurements were "acceptable" without properly measuring the dimensions, such actions would have been a violation of performance standards for a Quality Assurance Inspector. I instructed plaintiff to take the measurements with the shadow graph, which he later informed me he did with the help of Bill Tanner.

16.    Mr. Williams and I held a meeting on March 21st, to review this situation with plaintiff. We reviewed what had transpired and emphasized that ethical and responsible judgment is required in the job of Quality Assurance Inspector and further that falsification of company records, which were required to be kept by the FDA and are audited by that agency for

-4-

compliance, is grounds for immediate termination pursuant to the CooperSurgical Employee Handbook.

17.    However, because plaintiff had honestly admitted that he had not used the shadow graph and further that he did not even know how to use the device, he was not terminated. Instead, we agreed we would provide him with additional training on the shadowgraph, and issued him a stern written warning and placed him on a 30-day probation.

18.    The piece that plaintiff was inspecting, part no. 33590 is a delivery connector tube used in a cryo surgery device to remove genital warts and other lesions from female patients.

19.    Just days later, on April 3, 2001, plaintiff was involved in a verbal altercation with another Quality Assurance Inspector, Jeannette Freese. I heard raised voices in the open quality assurance inspection area. I walked over and heard plaintiff telling Ms. Freese to see me about it. At this point, plaintiff was standing very close to Ms. Freese and speaking in a loud tone. I moved between them. Then, I spoke to Ms. Freese and Mr. Rutowski and decided to have the part set aside until the next day when Mr. Tanner could assist them. At this point, I thought the matter was closed.

20.    However, plaintiff approached Ms. Freese in a very aggressive and forceful manner stating that she was not his boss and that he did not need her to give him problems. I intervened at this point and asked him to stop speaking in that fashion, but he did not stop. I continued to tell him to stop and listen to what I was saying. I told him that in Mr. Tanner's absence, she was the lead person in the department and that if she asked him something, he needed to respond. I returned to my desk.

21.     Afterwards, at my desk, I heard plaintiff continuing to angrily speak to Ms. Freese about this matter. I went back and instructed plaintiff to finish releasing the product and to see me. When plaintiff came to see me, I told him again that with in Mr. Tanner's absence, Ms. Freese was the lead person in that area. Plaintiff raised his voice to me stating that she was not his boss, and he wasn't going to take it. I asked him to lower his voice, but he did not. He repeated that she was not his boss and then walked away.

22.     On April 11, 2001, in an effort to resolve the interpersonal conflict between plaintiff and Ms. Freese, a conflict resolution meeting was held. Led by Ms. Augustine, the purpose of the meeting was to meet as a group to try to resolve the conflict between plaintiff and Ms. Freese, and to have these two employees work together in the future as part of a team Ms. Freese began by stating that she would not tolerate being yelled at by plaintiff again. She stated that all she trying to do was to ask for his help in using the shadow graph as both she and another employee (Chet Rutkowski) could not remember how to use it. She said she did not want to be yelled at by plaintiff or anyone else, or spoken to in that manner again. Plaintiff stated that everything she was wrong.   He stated that he had always been respectful towards her and it was she who had not spoken to him since February 2. He said Chet Rutkowski was not in the area. He said he would not be falsely accused of falsifying documents by Ms. Freese or anyone else. As plaintiff's voice was elevated, I asked him to lower his voice.

24.     Ms. Freese, who remained calm and professional throughout the meeting, stated that Chet Rutkowski was present, and that she never said plaintiff falsified records. She merely sked him for help because he had previously performed the same test, as reflected by the

$-6-$

Inspection Report. Mr. Tanner was not available, she had not been trained on the shadow graph, Chet Rutkowski did not remember how to use it and she simply needed plaintiff's assistance. Plaintiff began yelling at Ms. Freese, that she was not telling the truth. I responded that I told Ms. Freese and Mr. Rutkowski to wait to conduct the test when Mr. Tanner returned, and he would assist with it. I said I thought the issue was resolved, but that plaintiff continued to yell at Ms. Freese. Plaintiff stated in an aggressive, hostile tone to me "You are a liar!" Mr. Williams asked me to leave.

25.     During the meeting, plaintiff did not display any remorse, or exhibit any willingness to consider the positions of others, or to resolve the matter. His tone was disruptive and angry.

Tom Flynn

STATE OF CONNECTICUT )
COUNTY OF FAIRFIELD    )        ss: _____, Connecticut

Personally appeared, Tom Flynn, who swore to and subscribed the above affidavit before me, this 8th day of April, 2004

Notary Public/Commissioner of the Superior Court

–7–

# CANNAVINO AFF.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BASIL YOUNG | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 303CV0216(MRK) |
| v. | : | |
| | : | |
| COOPERSURGICAL INC. | : | |
| | : | |
| Defendant. | : | APRIL 12, 2004 |

## AFFIDAVIT OF DEBORAH DEHART CANNAVINO
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Deborah DeHart Cannavino, being duly sworn, hereby depose and say:

1.  I am over 18 years of age and believe in the obligation of an oath.

2.  I have personal knowledge of the facts set forth in this affidavit, and the facts are true and accurate to the best of my knowledge and belief.

3.  I am an attorney at Tyler Cooper & Alcorn and I, along with Attorney Lori Alexander, represent the defendant CooperSurgical, Inc. in the above-referenced matter.

4.  I make this Affidavit in support of the Defendant's Motion for Summary Judgment and supporting memorandum of law.

5.  True and complete copies of the plaintiff, Basil Young's deposition transcript pages cited in the defendant's supporting memorandum of law are attached hereto as Exhibit A.

–1–

6.    A true and complete copy of the plaintiff's March 21, 2001 written warning from CooperSurgical is attached hereto as Exhibit B.

7.    A true and complete copy of the plaintiff's April 11, 2001 letter from CooperSurgical is attached hereto as Exhibit C.

8.    True and complete copies of the plaintiff's prior charges of discrimination filed with the Connecticut Commission on Human Rights and Opportunities, that were identified at plaintiff's deposition and introduced as Exhibits at that deposition, are attached hereto as Exhibit D.

9.    True and complete copies of the plaintiff's pink slip and Employment Interview Record received from the files of Sikorsky Aircraft in response to a Subpoena, are attached hereto as Exhibit E.

10.   True and complete copies of the plaintiff's termination letter and warnings received from the files of KX Industries in response to a Subpoena, are attached hereto as Exhibit F.

Deborah DeHart Cannavino

STATE OF CONNECTICUT )
COUNTY OF NEW HAVEN )          ss: New Haven, Connecticut

Personally appeared, Deborah DeHart Cannavino, who swore to and subscribed the above affidavit before me, this 12th day of April 2004.

Notary Public/Commissioner of the Superior

–2–

ANNE W. WINTERSON
NOTARY PUBLIC
My Commission Expires Jan. 31, 2008

# EXHIBIT A

1

<pre>
 1                UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF CONNECTICUT

 3      * * * * * * * * * * * *

 4                                    *        COPY
        BASIL YOUNG,                  *
 5
                 Plaintiff           *
 6
            VS.                      *    3:03CV0216(AWT)
 7
        COOPER SURGICAL, INC.,       *
 8
                 Defendant           *
 9
        * * * * * * * * * * * *

10
                              Stamford, CT
11
                              November 18, 2003
12
                              10:30 A.M.
13
                                - - -
14
                    DEPOSITION OF BASIL YOUNG
15                              - - -

16

17      APPEARANCES:

18          FOR THE PLAINTIFF:

19              WILLINGER, WILLINGER & BUCCI, P.C.
                BY:   THOMAS W. BUCCI, ESQ.
20                    855 Main Street
                      Bridgeport, CT  06604
21
            FOR THE DEFENDANT:
22
                TYLER, COOPER & ALCORN, LLP
23              BY:   DEBORAH DEHART CANNAVINO, ESQ.
                      2 Landmark Square
24                    Stamford, CT  06901

25
</pre>

14

1    Q.    What was the outcome of that action?

2    A.    It ended up in a plea.

3    Q.    And what was the plea that you took?

4    A.    I pled the Alfred doctrine.

5    Q.    What?

6    A.    The Alfred.

7    Q.    What does that mean?

8    A.    To my understanding, it's you are not

9    admitting to any guilt. At the time I couldn't

10   afford to go to trial so perhaps the best option

11   for me at that time.

12   Q.    What was the amount of the overpayment?

13   A.    I believe it was around $8,000.

14   Q.    What period of time was this complaint

15   made or pending?

16   A.    I think it was around 10 years ago.

17   Q.    So early '90s?

18   A.    Yes.

19   Q.    Do you have any documents in your

20   possession concerning the complaint that was

21   brought against you by the Department of Social

22   Services?

23   A.    No.

24   Q.    Did you retain a lawyer at that time?

25   A.    Yes.

1      Q.    Who was your lawyer?

2      A.    It's a law firm in Stratford,

3    Connecticut.  I don't recall the name.

4      Q.    Do you have any documents in your

5    possession that would refresh your recollection as

6    to what the name might be?

7      A.    No.

8      Q.    Is it a criminal law firm?

9      A.    Yes.

10      Q.    This was a criminal case?

11      A.    Yes.

12      Q.    Have you ever been accused of any other

13    crimes?

14      A.    No.

15      Q.    So let's go back to the complaints that

16    you brought against someone else.  Let me back

17    up.  With regard to the complaint brought by the

18    State of Connecticut Department of Social

19    Services, did you pay back the $8,000?

20      A.    Yes.

21      Q.    With a wage garnishment or did you make

22    payments?

23      A.    I made payments, yes.

24      Q.    You mentioned that you had brought

25    complaints to the Connecticut Commission on Human

1    Q.    It says you have been employed from

2    September 1999 to November 2000.  That's one of

3    your temporary positions?

4    A.    Yes.

5    Q.    Do you remember which one that was?

6    A.    Yes.  I believe this was the time

7    Perkin Elmer to Cooper Surgical.

8    Q.    So this was something prior to Cooper

9    Surgical?

10   A.    Yes.

11   Q.    How were you first contacted or who did

12   you first contact at Cooper Surgical when you came

13   to apply for a job?  How did that work, your first

14   contact with Cooper Surgical?

15   A.    The agency told me to report to Cooper

16   Surgical, and I don't recall who I met first,

17   whether it was Mr. Tom Flynn or Mr. Thomas

18   Williams.

19   Q.    When was that approximately when you

20   first came to Cooper Surgical?

21   A.    On or about November 6, 2000.

22   Q.    And you don't remember whether you met

23   Tom Williams or Tom Flynn?

24   A.    Correct.

25   Q.    What happened when you met either Tom

1    Williams or Tom Flynn?

2         A.    I recall just being put to work.

3         Q.    Was there any interviewing process or

4    were you put right to work because you came as a

5    temporary employee?

6         A.    Yes.

7         Q.    What job did you do?

8         A.    Quality assurance inspector.

9         Q.    You reported to Tom Flynn?

10        A.    Yes.

11        Q.    Did there come a time -- what was the

12   rate of pay?

13        A.    It was $14 an hour at the time.

14        Q.    Did there come a time when you were

15   offered an employment directly through Cooper

16   Surgical as opposed to being a temporary employee?

17        A.    Yes.

18        Q.    When was that?

19        A.    On or about December 20.

20        Q.    So between November 6 and December 20

21   you were a temporary employee for Cooper Surgical?

22        A.    Correct.

23        Q.    During that period, you were quality

24   assurance inspector working for Mr. Flynn?

25        A.    Yes.

1      Q.   Did you enjoy your job during that

2   six-week period?

3      A.   Yes.

4      Q.   Were you happy to be given a direct

5   opportunity at Cooper Surgical?

6      A.   Yes.

7      Q.   Do you believe you were a victim of

8   racial discrimination during that period?

9      A.   No.

10      Q.   Were you harassed by anybody during that

11   period?

12      A.   No.

13      Q.   Mr. Williams and Mr. Flynn treated you

14   with respect?

15      A.   Yes.

16      Q.   You felt they treated you with respect,

17   and in good faith, and in a fair fashion?

18      A.   Yes.

19      Q.   Who came to offer you the job, the job

20   directly with Cooper Surgical in December of 2000?

21      A.   Mr. Tom Williams.

22      Q.   What did he say?

23      A.   He said based on my exemplary

24   performance and work ethics, plus with an extended

25   background, which was beyond my quality assurance

1    peers, I was being offered the permanent position

2    and with a salary increase of $1.00.

3        Q.   Are you sure that you made $14 an hour

4    while you were a temporary employee?

5        A.   Yes.

6        Q.   Do you have pay stubs or anything to

7    reflect that?

8        A.   I did at one time.  I'm not sure.

9        Q.   And everything you have with regard to

10   Cooper Surgical has been provided to your counsel,

11   has it not?

12       A.   Yes.

13       Q.   But you are sure that you made $14 an

14   hour before you were given the direct job with

15   Cooper Surgical?

16       A.   I recall it to be 14.  I recall the

17   salary range of the QA inspector to be 12 to 14 an

18   hour.  But I negotiated -- I was given an extra

19   $1.00 by Mr. Tom Williams based on my performance.

20       Q.   Do you believe that Mr. Williams

21   discriminated against you in any way in offering

22   you the direct position for $15 an hour?

23       A.   Not during the period mentioned.  Up to

24   the conversion.

25       Q.   When Mr. Williams offered you the job,

1    did you believe there was anything discriminatory

2    about that offer?

3        A.    No.

4        Q.    You were happy with it?

5        A.    Yes.

6        Q.    You got more than the salary range, you

7    got $15 an hour?

8        A.    Yes.

9        Q.    Were there any other terms of your job,

10   of this job with Mr. Williams that you discussed

11   that you were pleased with such as tuition

12   reimbursement or anything else?

13       A.    Yes.

14       Q.    What were those?

15       A.    Well, it was agreed that I would be

16   allowed up to $4,000 of tuition reimbursement.

17       Q.    Was that the standard tuition

18   reimbursement at Cooper Surgical at the time or

19   was it in excess?

20       A.    It was in excess.

21       Q.    Do you know what the standard was?  Did

22   you negotiate something about what was the

23   standard with Mr. Williams?

24       A.    Yes.

25       Q.    Do you know what the standard tuition

1    reimbursement was?

2        A.    No.

3        Q.    You know it was less than $4,000?

4        A.    Yes.

5        Q.    Tell me why you asked for a larger

6    tuition reimbursement from Cooper Surgical.

7        A.    I needed an amount that would have

8    covered the courses I was anticipating, which

9    averaged over a thousand dollars per course.  And

10   I needed $4,000 for my course load.

11       Q.    Did you tell Mr. Williams that?

12       A.    Yes.

13       Q.    What was his response?

14       A.    That at first he said he would look into

15   it and then he got back and offered it.

16       Q.    And offered you the $4,000 tuition

17   reimbursement?

18       A.    Yes.

19       Q.    Did you and Mr. Williams during this

20   period where he was offering you a direct job, did

21   you and Mr. Williams discuss performance reviews

22   or raises for the new job at any time?

23       A.    Yes.  A review would be given in six

24   months, a salary review.

25       Q.    Was that the company standard procedure

1    or was that something that you were given that was

2    in excess of the company procedure?

3        A.    I think it was in excess.

4        Q.    In what regard?

5        A.    I don't recall if the reviews were

6    annually, but I negotiated six months with

7    Mr. Williams.

8        Q.    By negotiating six months as a review,

9    that would give you a raise within six months

10   rather than waiting a year?

11       A.    Yes.

12       Q.    It was a benefit that you were able to

13   negotiate with Mr. Williams a raise within six

14   months as opposed to having to wait for a full

15   year?

16       A.    Yes.

17       Q.    Were there any other discussions that

18   you had with Mr. Williams surrounding the offer

19   and the negotiation as you described for the new

20   job directly at Cooper Surgical?

21       A.    Yes.    That I was able to accrue vacation

22   by coming on board that particular fiscal year.

23       Q.    Could you explain what that conversation

24   entailed?

25       A.    There was a certain time period when I

1    would have not been eligible for vacation, so I

2    was told I would be brought on board before that

3    time.

4        Q.    Did you request this from Mr. Williams?

5        A.    No.  It was offered to me.

6        Q.    What was your response?

7        A.    I was delighted.

8        Q.    Because you got more vacation than what

9    was offered to you than the normal procedure would

10   have been?

11       A.    If the conversion to permanent would

12   have perhaps happened the 1st of the year, I would

13   not have been eligible.

14       Q.    As you understood it, if you had a

15   certain amount of vacation.  If you converted to a

16   permanent employee or direct employee after

17   January 1, you would have had to wait to accrue

18   vacation?

19       A.    Yes.

20       Q.    If you were converted to a direct

21   employee prior to January 1, you were able to get

22   some vacation time that you could use?

23       A.    Yes.

24       Q.    Do you remember any of the details about

25   that discussion?

1      A.   No.   That was brought to my attention by

2    Mr. Williams.

3      Q.   He offered he would do you this favor

4    essentially?

5      A.   Yes.

6      Q.   You were pleased by that?

7      A.   Yes.

8      Q.   Do you remember anything else -- we have

9    talked about, tuition reimbursement, review,

10   vacation.   Were there any other issues discussed

11   with Mr. Williams?

12     A.   Yes.   I made the Christmas party as well.

13     Q.   You were able to come because you were

14   hired in time?

15     A.   Yes.

16     Q.   Was that another benefit in your mind?

17     A.   Yes.

18     Q.   So it's fair to say that you were happy

19   with the negotiation of the transition to a direct

20   employee?

21     A.   Yes.   Absolutely.

22     Q.   No racial discrimination, harassment

23   issues at this point, right?

24     A.   No.

25     Q.   In fact, you were happy because you were

1    treated better than you might have otherwise been

2    in the circumstance; is that correct?

3        A.    I felt I was recognized for my skill.    I

4    was appreciated for my professional manner.

5    Especially from Mr. Williams.    I felt I had that

6    dialogue with him.    I was happy.    I was excited.

7        Q.    Was there a time at which you were

8    officially converted to a direct employee at

9    Cooper?

10        A.    Yes.

11        Q.    Do you know when that was?

12        A.    Yes, that was December 20, 2000.

13        Q.    And after that did you receive any --

14    strike that.

15            Did your employment in your mind change

16    in any way or was it the same job you were doing

17    both as a temporary and as a direct employee?

18    Were there any differences based on your change of

19    status?

20        A.    No.    The same.    Same position.

21        Q.    Same position, better benefits but same

22    position?

23        A.    Yes.

24        Q.    Were you happy in that new job as a

25    direct employee?

1    received?

2        A.    According to Mr. Flynn and Mr. Williams,

3    I was written up for falsifying company inspection

4    record.

5        Q.    Do you agree with that?

6        A.    No.

7        Q.    Why not?

8        A.    Because I followed the company's

9    protocol.

10       Q.    What was the company's protocol with

11   regard to this issue that you followed?

12       A.    The quality control manuals were very

13   explicit and also the engineering drawings that --

14   the part in question was to be only inspected

15   visually.

16       Q.    That's how you did it?

17       A.    Yes.

18       Q.    Let me back up to make sure we

19   understand.  Could you briefly describe what your

20   job duties were as a quality assurance inspector

21   at Cooper Surgical?

22       A.    Yes.  Basically to inspect received

23   parts and make sure that they were in compliance

24   to engineering specifications.

25       Q.    What type of parts were you inspecting?

1       Q.    You didn't question Mr. Tanner, you

2    didn't question your supervisor, you just went

3    ahead and did the measurements visually of the

4    threads; is that correct?

5       A.    Yes.

6       Q.    Could you see them -- but you couldn't

7    see them, could you, because they were so small?

8       A.    I could see them.  In terms of knowing

9    exactly how many thousandths of an inch the

10   threads were.

11      Q.    You couldn't tell that with the naked

12   eye?

13      A.    Correct.

14      Q.    The only way you can tell that is

15   through a magnification device?

16      A.    Usually shadow graph or optical

17   comparative.

18      Q.    That would go to the level of four

19   decimals out?

20      A.    Yes.

21      Q.    You knew when you checked it that you

22   really couldn't see it, right, without the use of

23   a shadow graph?  You knew when you checked the

24   threads, you knew you couldn't see it without a

25   shadow graph?

1                    <u>C E R T I F I C A T E</u>

2     STATE OF CONNECTICUT

3     JUDICIAL DISTRICT OF WATERBURY

4
            I, TERRI FIDANZA, Notary Public within and
5     for the State of Connecticut, duly Commissioned
      and qualified, do hereby certify that pursuant to
6     Notice, BASIL YOUNG, the deponent herein, was by
      me first duly sworn to tell the truth, the whole
7     truth and nothing but the truth of his knowledge
      touching and concerning the matters in controversy
8     in this case; that he was thereupon carefully
      examined upon his oath and his testimony reduced
9     to writing by me; and that the deposition is a
      true record of the testimony given by the witness.
10
            I further certify that I am neither attorney
11    or counsel for, nor related to or employed by, any
      of the parties to the action in which this
12    deposition is taken, and further that I am not a
      relative or employee of any attorney or counsel
13    employed by the parties thereto or financially
      interested in the action.
14
            IN WITNESS WHEREOF, I have hereunto set my
15    hand and affixed my notarial seal this 4th day of
      _____, 2003 at Prospect, Connecticut.
16

17                         _____
                           Terri Fidanza, LSR
18                         Notary Public
                           State of Connecticut
19

20    My Commission Expires:
      October 31, 2008

21

22

23

24

25