164

1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * * *

4    BASIL YOUNG,                        *       COPY

5                      Plaintiff        *

6    VS.                                 *       CIVIL ACTION NO.
                                                 303CV0216(AWT)
7

8    COOPER SURGICAL, INC.,              *

9                      Defendant        *

     * * * * * * * * * * * * *

10                                       Stamford, CT

11                                       February 27, 2004

12                                       10:45 A.M.

13                            - - -
                   DEPOSITION OF BASIL YOUNG

14                       VOLUME II

15                            - - -

16   APPEARANCES:

17        FOR THE PLAINTIFF:

18                WILLINGER, WILLINGER & BUCCI, P.C.
                  BY:  THOMAS W. BUCCI, ESQUIRE
19                855 Main Street
                  Bridgeport, CT    06604
20
          FOR THE DEFENDANT:
21
                  TYLER, COOPER & ALCORN, LLP
22                BY:  DEBORAH DeHART CANNAVINO, ESQUIRE
                  2 Landmark Square
23                Suite 214
                  Stamford, CT    06901
24
          ALSO PRESENT:  THOMAS G. WILLIAMS
25                        Director of Quality Assurance
                          Cooper Surgical

                    CAMPANO & ASSOCIATES
                    COURT REPORTING SERVICES

167

1  request.

2      Q.    Is this something you just recently

3  located?

4      A.    It was just mailed.

5      Q.    From whom?

6      A.    The state unemployment office in

7  Wethersfield.

8      Q.    Okay.

9           MS. CANNAVINO:  We'll mark this as

10 Exhibit 1.  No --

11          (Whereupon, there was a pause in the

12 proceedings.)

13          (Whereupon, statement from Unemployment

14 Compensation payment for 2003 was marked as

15 Defendant's Exhibit 8 for Identification.)

16     Q.    Mr. Young, where were you born?

17     A.    I was born in Kingston, Jamaica.

18     Q.    And what is your ethnic background?

19     A.    African-American.

20     Q.    Have you ever been convicted of a crime?

21     A.    Yes.

22     Q.    And what crime was that?

23     A.    It's welfare fraud.

24     Q.    And when was that?

25     A.    Approximately 10 years ago.

169

1  had not been convicted of a crime?

2      A.    I don't recall that I was asked.

3      Q.    Has any employer ever failed to hire you

4  or terminated your employment for lying on an

5  employment application with regard to the criminal

6  conviction?

7      A.    Yes.

8      Q.    And who was that?

9      A.    Sikorsky's Aircraft.

10     Q.    Can you tell me what happened at

11 Sikorsky?

12     A.    Approximately after a month of hire, at

13 the time I was going through a training program; and

14 I think it was -- it could have been the first week

15 on the manufacturing floor, I was called to Human

16 Resources and was told that they had discovered that

17 I had a felony conviction.  And I was told that

18 based on that conviction, for security clearance

19 purposes, my position would be terminated.

20     Q.    On your employment application for

21 Sikorsky, did you indicate that you had not been

22 convicted of a prior crime?

23     A.    I did not indicate that I was convicted.

24     Q.    Just so I'm clear, so the employment

25 application said "Were you convicted of a crime?"

170

1       A.    Yes.

2       Q.    And what was your response?

3       A.    I recall not indicating that I was

4    convicted.

5       Q.    So you said "No"?

6       A.    Yes.

7       Q.    And that wasn't true?  Was that true?

8       A.    Well, based on my understanding, I

9    believe I answered correctly.

10      Q.    Why is that?

11      A.    Because of the particular plea agreement

12   that I made regarding that particular matter.

13      Q.    And they told you that you had not --

14   someone told you that you had not been convicted of

15   a crime?

16      A.    Well, to my understanding from counsel,

17   the plea that I made regarding that particular

18   matter, I did not believe that I had to indicate

19   that there was any felony conviction.

20      Q.    And what was the basis for that

21   understanding?

22      A.    The basis was the type of plea agreement

23   I had made regarding that matter.

24      Q.    Did you ever seek legal advice on that?

25      A.    Well, then?

1      Q.    Would you take a look at that, please,

2  and identify it for the record?

3      A.    This is -- it's an affidavit of illegal

4  discriminatory practice filed with the Commission on

5  Human Rights and Opportunities.

6      Q.    If you look at page 4 in the packet, is

7  that your signature?

8      A.    Yes.

9      Q.    Did you file -- Is this an accurate copy

10  of the complaint that you filed with the Connecticut

11  Commission on Human Rights on or about March 31st of

12  1995?

13      A.    Correct.

14      Q.    What was the basis for this complaint?

15  It's against the Department of Social Service and

16  Miss Constance Onofrio; is that correct?

17      A.    Yes.

18      Q.    What was the basis for your complaint?

19      A.    Discrimination.

20      Q.    What happened?

21      A.    I believe this is what led to the charge

22  that was brought against me for welfare fraud.  I

23  had maintained that it was an administrative

24  overpayment, and I believe that this individual at

25  the Department of DSS discriminated in her handling

189

1  of my case.

2      Q.    What was the result of your charge --

3  your claim with CHRO for discrimination?

4      A.    I don't recall exactly, but it could have

5  been dismissed.

6              MS. CANNAVINO:   I'd like to mark

7  this as number 12.

8              (Whereupon, affidavit of illegal

9  discriminatory practice dated July 10, 1996, was

10  marked as Defendant's Exhibit 12 for

11  Identification.)

12      Q.    Before we two go on to 12, you mentioned

13  in this complaint in paragraph number 14 on page 3

14  that you were wrongfully discharged by your employer

15  KX Industries; do you see that?

16      A.    Yes.

17      Q.    Did you sue KX Industries?

18      A.    I did.   Not -- Well, not sue.   But I

19  brought a Labor Department complaint.

20      Q.    And what was the basis of the complaint,

21  failure to pay wages?

22      A.    Yes.

23      Q.    Why do you believe that as a result of

24  the State of Connecticut Department of Social

25  Services action that that led to you being

190

1   wrongfully discriminated against by KX Industries?

2        A.    I don't recall the particulars of this

3   matter.

4        Q.    I'd like you to take a look at this

5   document introduced as 12 that has been marked as

6   Defendant's Exhibit 12.  What is that?

7        A.    It's an affidavit of illegal

8   discriminatory practice filed with the Commission on

9   Human Rights and Opportunities.

10       Q.    Is it filed by you?

11       A.    Yes.

12       Q.    Is that your signature on page 11?

13       A.    Correct.

14       Q.    This is against SVG Lithography?

15       A.    Yes.

16       Q.    You subsequently sued them in court,

17  didn't you?

18       A.    Correct.

19       Q.    What was the outcome of that case?

20       A.    It was settled.

21       Q.    That's the $5,000 settlement you referred

22  to previously?

23       A.    Yes.

24            MS. CANNAVINO:  Could you mark this

25  as 13?

191

1              (Whereupon, affidavit of illegal

2    discriminatory practice dated March 23, 2000, was

3    marked as Defendant's Exhibit 13 for

4    Identification.)

5         Q.    Take a look at what's been marked as

6    Defendant's Exhibit 13 for me, please.

7         A.    (Witness complies.)

8         Q.    Yes?

9         A.    It's an affidavit of illegal

10   discriminatory practice filed with the Commission on

11   Human Rights and Opportunities against Precision

12   Sensors Division.

13        Q.    Is that your signature on page 5?

14        A.    Yes.

15        Q.    And you filed the complaint on or about

16   March 23, 2000?  It says date right above your

17   signature because there's no date on the front.

18        A.    Yes.

19        Q.    Is that your memory that you did it at

20   about that time?

21        A.    I don't remember; but if it's on this

22   document that I signed, then I believe that was the

23   date.

24        Q.    Okay.  And that was a claim against

25   Precision Sensors Division?

192

1        A.    Correct.

2        Q.    For failure to hire you?

3        A.    Yes.

4                    MS. CANNAVINO:   Mark that 14.

5              (Whereupon, affidavit of illegal

6    discriminatory practice dated April 6, 2000, was

7    marked as Defendant's Exhibit 14 for

8    Identification.)

9        Q.    Would you take a look at what's been

10   marked 14 for the record and identify it for the

11   record?

12       A.    It's an affidavit of illegal

13   discriminatory practice with the Commission on Human

14   Rights and Opportunities.   The respondent is Cytec

15   Industries.

16       Q.    Could you look at the fifth page back?

17       A.    (Witness complies.)

18       Q.    First of all, did you file this against

19   Cytec?

20       A.    Yes.

21       Q.    And is that your signature on the sixth

22   page of the document?

23       A.    Yes.

24       Q.    And you filed this at or about, you know,

25   April of 2000?

193

1      A.     Yes.

2      Q.     That's the case you referred to earlier

3  that you believe was withdrawn; is that correct?

4      A.     Yes.

5      Q.     And Defendant's Exhibit 13 which was the

6  Precision Sensor charge, do you see that?  It's a

7  separate document, 13.  It's for Precision Sensor?

8      A.     Yes.

9      Q.     That's that one you referred to earlier

10 as you believed having been withdrawn?

11     A.     Yes.

12            (Whereupon, affidavit of illegal

13 discriminatory practice dated 10/6/97 was marked as

14 Defendant's Exhibit 15 for Identification.)

15     Q.     Would you take a look at what's been

16 marked Defendant's Exhibit 15, Mr. Young?

17     A.     Okay.  It's an affidavit of illegal

18 discriminatory practice.  The respondent is Darlene

19 Rucker.

20     Q.     Who is that?

21     A.     Okay.  This was a landlord, someone we

22 had -- we had -- were renting from.

23     Q.     Okay.  And were you evicted from that  .

24 dwelling, as well?

25     A.     I don't recall.

194

1      Q.    Let's back up.  Is this your signature on

2  the fourth page of the document?

3      A.    Yes.

4      Q.    And it was submitted to the CHRO at or

5  around October 2, 1997; is that correct?

6      A.    Yes.

7      Q.    On the front page of the document, does

8  it indicate that judgment of eviction was entered on

9  October 1, '97?  On the very first page in the

10  center where it says "I was sent an eviction notice"

11  and then below that it says -- you indicated or it

12  was typed in here "notice to quit served on August

13  11, 1997," semicolon, "judgment of eviction entered

14  on 10/1/97."  Do you see that?

15      A.    Yes.

16      Q.    Did you put that in there?

17      A.    No.  Okay.  Okay.  If it's there, then ·I

18  believe that is correct.  In this particular matter

19  I was being represented.

20      Q.    Okay.  And who were you represented by?

21      A.    Attorney Richard A. Johnson.

22      Q.    What was the result of this claim of

23  racial discrimination, religious discrimination and

24  national origin discrimination?

25      A.    Okay.  I believe this one was also

1    A.    Yes.

2    Q.    Precision Sensors?

3    A.    Yes.

4    Q.    SVG Lithography?

5    A.    Yes.

6    Q.    Fermont Industries?

7    A.    Yes.

8    Q.    Okay.  Do you have a -- How do you know

9  that -- Does this refresh your recollection that you

10 made a complaint to the CHRO against Fermont

11 Industries?

12   A.    I did make claims against Fermont

13 Industries including a workers' compensation claim.

14 I don't recall whether I did or I have not, so --

15   Q.    So do you think that the answer here on

16 your interrogatory response is wrong?

17   A.    I don't know.

18   Q.    But as you sit here today, you don't know

19 if you made a complaint against Fermont

20 Industries --

21   A.    Yes.

22   Q.    -- with the Connecticut Commission on

23 Human Rights?

24   A.    Yeah, based on belief.

25   Q.    And the basis of your claim against

198

1   Fermont, you recall, was something other than

2   discrimination?

3        A.    No.   There was discrimination as well. .

4   But I did not recall exactly whether I'd made

5   complaint to CHRO, but I did make complaint to

6   workman's compensation.  So I was, you know,

7   pursuing other avenues based on my injury at that

8   particular --

9        Q.    And that was a back injury?

10       A.    Yes.

11       Q.    And was your basis or discrimination

12  arising from that back injury race discrimination?

13       A.    Yes, and accommodations, I recall, lack

14  of accommodations.

15       Q.    So am I correct that you filed -- that

16  you believe your claim against Fermont Industries

17  was that they failed to give you an accommodation

18  for your back because of your race?

19       A.    Yes.

20       Q.    Okay.  What was the result of that case

21  on that claim?

22       A.    It's pending.

23       Q.    It is still pending?

24       A.    Yes.

25       Q.    Where is it pending?

208

1  Under "date," it states "Date when form was
2  completed."  Okay.  I also maintain that the QC061
3  form that the employer state that I was in violation
4  in was not a valid QC061 form as it was not signed,
5  approved or dated which is also standard quality
6  protocol.
7      Q.    Anything else?
8      A.    There are other lines in these documents
9  which substantiate the fact that I did follow QC
10  process and procedure manuals.  And, of course, it
11  would take some time for me to go through these
12  manuals line by line.  I don't have the privy of my
13  underlined or highlighted manuals.
14      Q.    Am I correct that the manual that you've
15  relied upon that you described to earlier are now,
16  all of them, contained in Defendant's Exhibit 17?
17      A.    Yes, correct.
18      Q.    Okay.  Are you currently employed,
19  Mr. Young?
20      A.    No.
21      Q.    Are you receiving unemployment?
22      A.    Yes.
23      Q.    When does that run out?
24      A.    I have approximately two weeks left.
25      Q.    Mr. Young, in your document complaint you

209

1   allege that Tom Flynn, your supervisor,

2   intentionally and with a discriminatory motive

3   failed to properly train you on critical equipment

4   that you needed for your job.  What equipment was

5   that that you're referring to?

6        A.    Shadow Graph.

7        Q.    Is there any other equipment that you're

8   referring to in your complaint that Mr. Flynn failed

9   to properly train you on?

10       A.    No.

11       Q.    Okay.  And why do you believe that you

12  were improperly trained on the Shadow Graph?

13       A.    Well, I was not.

14       Q.    You mean you were never trained?

15       A.    I was never trained, yes.

16       Q.    And was the use of the Shadow Graph

17  critical to the performance of your job duties at

18  Cooper Surgical?

19       A.    I would say perhaps only 5 percent of the

20  time.

21       Q.    Did Mr. Flynn provide training on the

22  Shadow Graph to nonAfrican-American employees?

23       A.    Yes.

24       Q.    And who were they?

25       A.    Jeanette Freese.

210

1    Q.    Anyone else?

2    A.    And I suppose William Tanner.

3    Q.    Anyone else?

4    A.    Not that I'm aware of.

5    Q.    Okay.  What training did Mr. Flynn

6  provide to Jeanette Freese?

7    A.    I never saw him train Jeanette Freese.

8  However, William Tanner who is responsible for -- as

9  the senior inspector in the department, I saw him on

10  occasion, he would train Jeanette Freese.

11    Q.    Okay.  So you're not alleging any

12  discrimination from your coworker Bill Tanner, are

13  you?

14    A.    No.

15    Q.    So you're -- the only time you saw

16  Jeanette being trained was by Mr. Tanner --

17    A.    Yes.

18    Q.    -- is that correct?  And how was she

19  being trained?  What did the training encompass?

20    A.    It was more hands-on.

21    Q.    How long did it last?

22    A.    I would say perhaps half an hour.

23    Q.    And do you know what prompted the

24  training of Jeanette Freese?

25    A.    Yes.  Yes.  It depends on the type of

211

1  part that needed to be inspected.

2      Q.    So Jeanette Freese had a part that needed

3  to be inspected with a Shadow Graph, and that's when

4  she got the training?

5      A.    Yes.

6      Q.    So Mrs. Freese wasn't given training on

7  the Shadow Graph as part of her normal training of a

8  new employee; is that correct?

9      A.    I'm not aware of that.

10     Q.    So the only training you're aware of that

11  you're alleging is different than what you

12  received --

13     A.    Yes.

14     Q.    -- is the training that Jeanette Freese

15  received from William Tanner; is that correct?

16     A.    Yes.

17     Q.    And the training that Ms. Freese received

18  from Mr. Tanner was in response to a particular

19  question that she had or project, or how would you

20  describe it?

21     A.    Yes.  Question, part.  Usually it depends

22  on the type of part she was inspecting at that

23  particular time.

24     Q.    And if she had one that needed to have

25  the Shadow Graph to be inspected, she was provided

212

1    training?

2         A.    Yes.

3         Q.    Do you know if she asked Mr. Tanner for

4    the training?

5         A.    Yes.

6         Q.    She did ask?

7         A.    Yes.

8         Q.    Did you hear her ask?

9         A.    Yes.

10        Q.    What did she say?

11        A.    That she needed to do this particular

12   piece and if he could show her how.

13        Q.    Okay.  And then what was his response?

14        A.    He would show her what she needed every

15   time.

16        Q.    Okay.  Were there a number of times?

17        A.    Yes, yes, a number of times.  I wouldn't

18   say it was frequent because the use of a Shadow

19   Graph was very limited in the department.  So I

20   would say I just -- I may have only seen it a few

21   times.  And that was about it, yeah.

22        Q.    Do you believe that Ms. Freese was

23   capable of measuring with the Shadow Graph without

24   Mr. Tanner's assistance?

25        A.    Well, I've seen her measuring without his

213

1  assistance, yeah.

2      Q.    So she got the training from Mr. Tanner

3  and then she went and performed the functions

4  herself?

5      A.    Yes.

6      Q.    And Mr. Tanner, you said, was also

7  trained on the Shadow Graph; is that correct?

8      A.    Yes, I believe so.

9      Q.    Did you ever see him being trained by

10  Mr. Flynn?

11     A.    No.

12     Q.    What's your basis for believing that

13  Mr. Tanner was trained and you were not?

14     A.    Because he -- again, he was very capable

15  of the machine; he knew the particulars.  Also there

16  was no manual available with that piece of

17  equipment; so there was no way that even if you had

18  prior experience, each particular machine may have

19  different, you know, functions.  And Mr. Tanner

20  appeared to have had time or training to perform the

21  required inspections on that particular machine.

22     Q.    Were there -- What other employees were

23  in the Quality Assurance Department as inspectors at

24  that time other than you, Mr. Tanner and Ms. Freese?

25     A.    No other.

214

1      Q.    Okay.  Did you ever see Mr. Flynn

2   training Ms. Freese on the Shadow Graph?

3      A.    No.

4      Q.    And you never saw Mr. Flynn training

5   Mr. Tanner on the Shadow Graph?

6      A.    No.

7      Q.    In your complaint you also allege that

8   Mr. Flynn intentionally and with a discriminatory

9   purpose addressed you on a daily basis in a way that

10  I quote was, quote, demeaning and degrading manner.

11  Do you recall --

12     A.    Yeah.

13     Q.    -- that allegation?

14     A.    Yes.

15     Q.    When did Mr. Flynn begin addressing you

16  in a demeaning and degrading manner on a daily

17  basis?

18     A.    That was after I complained to Tom

19  Williams on or about February 2, 2001.

20     Q.    So prior to February 2, 2001, did

21  Mr. Flynn address you on a daily basis in a

22  demeaning and degrading manner?

23     A.    Well, I would say it was culminating

24  after I got hired as a permanent, culminating up to

25  February 2 when I complained.  And it didn't stop

221

1    highly respectable.

2        Q.    Can you think of any particular

3    incidences where Bill Tanner was treated better than

4    you or treated by Mr. Flynn?

5        A.    Again, in just a day-to-day course of

6    work, there was a lot of communication given to

7    Miss Freese and Mr. Tanner.  None was given to me.

8    And every time I would try to carry out my job

9    responsibility, I was treated as if I was being a

10   nuisance or something.

11       Q.    By whom?

12       A.    Mr. Flynn.

13       Q.    Any other details you can remember about

14   specific instances where Mr. Tanner was treated

15   better than you were?

16       A.    No.  I recall a particular month -- I

17   believe it was the month of February -- when the

18   incoming inspection sector had met a certain quota

19   based on -- there was some quality studies that were

20   being done in terms of our productivity.  And for

21   the month of February we had, I believe, exceeded

22   our quota.  And Mr. Tanner was given a box of candy,

23   could have been Whoppers or something, I think.  And

24   Mr. Williams was present; and I just felt that,

25   well, he got all the attention.  But I had really

222

1    worked hard and diligently that particular month as

2    a part of the incoming team, and I didn't feel as if

3    I was recognized at all --

4         Q.    Did --

5         A.    -- for my efforts.

6         Q.    Did Ms. Freese receive a box of candy on

7    that occasion from Mr. Flynn?

8         A.    No.

9         Q.    Did you ever see Mr. Flynn give

10   Miss Freese something above and beyond that wasn't

11   given to you?

12        A.    Well, yes.  I would say just she was

13   treated more favorably.

14        Q.    But was she ever given a gift that you

15   weren't given as you're saying with Mr. Tanner?

16        A.    I don't recall that, don't remember.

17        Q.    Was Miss Freese there when Mr. Tanner got

18   the box of candy from Mr. Flynn?

19        A.    Yes, I think so.

20        Q.    Any other specific instances that you can

21   recall where Mr. Tanner was treated better than you

22   by Mr. Flynn?

23        A.    No.

24        Q.    You mentioned a specialist, Miss Shane

25   Flaw?

223

1      A.      Sheri Pflugh.

2      Q.      Pflugh, pardon me.  Was Miss Pflugh

3   treated better than you were treated by Mr. Flynn?

4      A.      Yes.

5      Q.      And in what way?

6      A.      The same.

7      Q.      Same as what?

8      A.      Well, more favorably.

9      Q.      Can you describe in detail what you mean

10  by "more favorably"?

11     A.      Again, there was -- it's as if I was not

12  part of the team.  There was no communication from

13  Mr. Flynn.  And if -- And as a result, I would have

14  to go to, let's say, Mr. Tanner as I was told to.

15  And if I didn't get the answer from Mr. Tanner, I

16  would go to Sheri Pflugh because Mr. Flynn was not

17  communicating with me, but he communicated with

18  everyone else including Miss Pflugh.

19     Q.      Did Miss Pflugh ever get a box of candy

20  or a gift?

21     A.      No, not that I'm aware of.

22     Q.      Any other specific situations you

23  remember with regard to Miss Pflugh and how her

24  treatment from Mr. Flynn was better than yours?

25     A.      No.  But, again, I would say the same

234

1  had very rudely spoken down to me, stating I was

2  either wasting time or regarding -- or asking too

3  much questions or something.  But he did that in

4  front of the other employees, he spoke down to me;

5  and I felt that was very improper on his part, very

6  unprofessional.

7              And by that particular point, I was

8  noticing his behavior towards me culminating up to

9  February 2nd right after I was offered employment in

10  December, okay?  So I just -- I just couldn't take

11  it anymore, and I decided as much as I did not want

12  to go over his head to his boss, Mr. Williams, it

13  just became so unbearable and I was so -- so -- I

14  was suffering from, you know, mental duress at that

15  time.

16              You know what?  I felt betrayed.  I

17  really did.  It was like this high of the Christmas

18  party and I brought up my family which I'm a very

19  private individual, introduced to the -- you know,

20  the company and so on and then to get this treatment

21  right after.  So I went to Mr. Williams, and I told

22  him that I was being treated disparately --

23       Q.    Let me --

24       A.    -- that there was no other reason that I

25  believed other than disparate discriminatory

239

1      A.    Well, yes.  I saw it.  It was brief.  It
2  was brief, not as bad as with Jeanette Freese
3  because Mr. Flynn was not -- Mr. Williams was not
4  there at that time.  But I recall on February 2nd
5  when we were in the passageway and there was this
6  intense argument in going from Mr. Flynn.
7      Q.    Did you raise your voice to Mr. Flynn?
8      A.    No.
9      Q.    Do you remember -- Tell me what Mr. Flynn
10  said.
11      A.    Again, I just felt that he was speaking
12  down to me very rudely, very contemptuously as if,
13  you know, I was beneath him or something.
14      Q.    But you don't remember exactly what it
15  was he said; is that correct?
16      A.    Well, to the effect that I didn't follow
17  his instruction or I'm spending a lot of time on the
18  product or something which was not true.
19      Q.    Anything else you remember about what
20  Mr. Flynn said?
21      A.    No.  Basically I believe he attempted to
22  make a performance issue out of me just simply
23  asking him a question.
24      Q.    Did you complain to anyone else at this
25  time at or about February 2, 2001?

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

249

1      A.     Other than I just felt at that point that

2  I wasn't getting fair treatment, not by Mr. Williams

3  at that point.  I just felt as if --

4      Q.     And why did you feel that way?  Because

5  he agreed with Mr. Flynn on the written warning?

6      A.     Yes.  In other words, I wasn't given due

7  process, meaning in a matter of -- See, as far as

8  I'm concerned, this was never investigated.  I was

9  not even asked what had happened, how I came up with

10 these results, et cetera, et cetera.  I was accused

11 of it, I believe, on or about the 20th of March.

12 And then on the 21st, I'm slapped with a written

13 warning.

14     Q.     And by "this" you're holding up

15 Defendant's Exhibit Number 7?

16     A.     Yes, exactly.  So you know, at that time

17 I felt as if I was being set up by management all

18 based on the fact that I made an official complaint

19 on February 2nd about my supervisor.

20     Q.     Okay.  Now, you said you had a

21 confrontation with Miss Freese.  When did that

22 occur?

23     A.     I don't recall the exact date, but I

24 believe it was April of 2001.

25            (Whereupon, a recess was taken.)

1          (Whereupon, the requested portion of
2               the record was read by the reporter.)
3     Q.    Tell me what happened with the -- the
4  incident with Jeanette Freese.  How did the
5  situation begin?
6     A.    Okay.  I recall Jeanette Freese had --
7  she had a particular file -- Okay.  No.  First I saw
8  her at my desk, and she retrieved a particular file
9  that I believe was on my desk at the time.  And I
10 believe she asked me if I had -- if I had inspected
11 that particular part.  I'm not sure if she was about
12 to, you know, do some herself.

13          But then she opened the files, and she
14 said -- she asked me if I -- if I had used the
15 Shadow Graph for that particular part.  And I told
16 her no.  And she immediately said that I falsified
17 the record for not using the Shadow Graph.  So at
18 that particular moment, I got very upset.  And I
19 just felt that it was inappropriate for her to make
20 such a statement to me.

21          And I told her, I said if you have any
22 problems with the files or my work to go see the
23 supervisor.  I think Tom Flynn, who was not far
24 away, may have overheard the discussion.  And so he
25 immediately came towards me and was reprimanding me

251

1  for telling Jeanette not to accuse me of falsifying

2  an inspection report.

3          He began to say that she was the senior

4  employee and I should not speak to a senior employee

5  that way and so on.  And my statement to him simply

6  was "Jeanette Freese is accusing me of falsifying an

7  inspection report."  That was completely ignored.

8  Instead he was in my face yelling at me.  It was at

9  that time when the mucus fell in my face, and I kind

10 of squinted.

11         And from that point when I realized that

12 I was not getting any -- an appropriate response

13 from my supervisor, I decided to go to HR to

14 complain of the incident.  At that particular time I

15 just felt that Miss Freese was in cahoots with the

16 company because the fact that she stated -- or her

17 exact words was I was falsifying an inspection

18 report.  I've never had such discussion with her

19 regarding any -- you know, any incidents I may have

20 had with management regarding that matter.  So for

21 her to say those exact words to me, you know, just

22 made me feel that, you know, she was in cahoots.

23     Q.    How did you feel when Jeanette Freese

24 accused you of falsifying an inspection record?

25     A.    Yes, I was upset.

252

1    Q.    Were you angry?

2    A.    Yes.

3    Q.    How angry were you?

4    A.    Certainly not threatening.  I never

5    threatened Jeanette Freese.

6    Q.    I didn't ask you if you threatened her.

7    I just asked you how angry you were at her.

8    A.    I don't know how you'd measure that.

9    But, yes, I was angry.  I was upset.

10    Q.    Were you very angry?

11    A.    I would say no more angry than my prior

12    incidents with Mr. Flynn.

13    Q.    Had you had any issues with regard to ·

14    Ms. Freese prior to this April 2001 situation?

15    A.    Absolutely not.  In fact, I also treated

16    Miss Freese as if she was my daughter because I so

17    happen to have a daughter her age.  I was also fond

18    of Miss Freese.  She sat next to me.  I would --

19    Miss Freese had a way with her tongue; she would use

20    a lot of expletives.  And the company -- I know

21    Mr. Williams at one time printed a chart or -- that

22    stated that if Miss Freese would use any expletives,

23    she would have to put 50 cents in a bucket or

24    something.  I do have a copy of that, and that will

25    also be submitted for the record; I don't have it

257

1      A.    No.

2      Q.    Do you know what their ethnic background

3   was or race?

4      A.    No.

5      Q.    Did you ever hear Miss Freese ever make

6   any racial comments?

7      A.    No.

8      Q.    Or any comments directed at someone's

9   national origin?

10      A.    No.

11      Q.    Did she ever make any comments to you

12   about your race?

13      A.    No.

14      Q.    Did you ever hear anyone in the Quality

15   Assurance Department at Cooper Surgical while you

16   worked there utilize -- make comments about

17   someone's race?

18      A.    Not that I recall.

19      Q.    Did you ever hear anyone in the Quality

20   Assurance Department of Cooper Surgical while you

21   worked there make comments about someone's national

22   origin?

23      A.    Not that I recall.

24      Q.    And not limiting it just to the Quality

25   Assurance Department while you worked there, but of