258

1   all the people that you encountered at Cooper

2   Surgical while you were employed there, did you ever

3   hear anyone make any comments about an individual's

4   race?

5       A.    Well, I -- I've heard other employees

6   in -- For instance, there was an individual in Stock

7   and one in Shipping, I believe, that believed that

8   they were treated discriminatorily because of their

9   color.

10      Q.    And what race were they?

11      A.    African-American.

12      Q.    And who were they?

13      A.    I -- I don't recall their names.

14      Q.    Do you know if either of them made any

15  complaints to the company about that?

16      A.    I don't know.

17      Q.    Do you know what the basis for their

18  complaints were that they were treated differently

19  because of their race?

20      A.    I think promotion, I may have heard,

21  yeah.

22      Q.    Anything else?

23      A.    No.

24      Q.    Did you ever hear anyone at Cooper

25  Surgical -- and I mean anyone, not just Quality

259

1  Assurance -- tell any racial jokes?

2      A.    No.

3      Q.    And I want you to really think hard about

4  this:  Did you hear any comments about

5  African-Americans or any race made by anybody at

6  Cooper Surgical while you worked there?

7      A.    They -- Relative to promotion, I've heard

8  two African-American individuals state that they

9  believed they were being discriminated against

10 regarding promotion.

11     Q.    Other than that?

12     A.    Other than that, no.

13     Q.    Did you ever hear -- did you ever hear

14 any employees at Cooper Surgical make any negative

15 comments about African-Americans?

16     A.    No.

17     Q.    You mentioned in talking about

18 Miss Freese that you had a copy of the message with

19 the 50-cent jar about her swearing?

20     A.    Yes.

21     Q.    And you're going to give us a copy of

22 that, give it to your lawyer to provide to us?

23     A.    Yes.

24     Q.    Do you have any other documents that

25 relate to this claim that you have not provided to

276

1  meeting?

2      A.    No.   It was very brief.  Again, it was as

3  if I was called to -- in the office to be terminated

4  at that point because the company had came to a

5  conclusion that for the first time unbeknownst to me

6  that I am now an insubordinate.  So we ship it from

7  work performance to now insubordination.  And I

8  was --

9      Q.    Did you call Mr. Flynn a liar at the

10  meeting?

11              MR. BUCCI:   Could we let him finish

12  the question?

13              MR. CANNAVINO:   I'm sorry.  Did you

14  finish your answer?

15      A.    Yes.   I stated that accusations by

16  Mr. Flynn and Jeanette Freese were untrue, they were

17  false.

18      Q.    And what accusations were those?

19      A.    Miss Freese attempted to make it seem as

20  if I was harassing her, and it appeared that this

21  was the conclusion by Mr. Williams.  And I

22  reiterated that that was false, that it was untrue,

23  her statement regarding what had happened as well as

24  Mr. Flynn's statements regarding his treatment of

25  me.

277

1       Q.    Did you call Mr. Flynn a liar?

2       A.    I said it was untrue and false.  Those

3  were the words I used.

4       Q.    You didn't call him a liar?

5       A.    No.

6       Q.    Do you remember anything else that

7  happened at that meeting?

8       A.    No, other than I requested what was the

9  reason for my termination.  And there was a little

10  hesitancy, and then there was said insubordination

11  even though it was not checked off on the pink slip,

12  so --

13       Q.    What else do you remember about that

14  meeting?

15       A.    And then I took my personal effects and

16  left.  I would also add that with my meeting with

17  Mr. Pichotta, I did indicate to him that I would

18  like for him to solve the problem and the last thing

19  I want to do is have to go outside the company to

20  make any complaints.  I did make that statement to

21  Mr. Pichotta.

22       Q.    And what did you mean by that?

23       A.    Well, for instance, if the company did

24  not address the problem, then I would have no choice

25  but to go outside the company.

286

1    when I was terminated from the layoff; so it never

2    materialized, the health benefits.  Dental, however,

3    I do have from Boch.

4         Q.    Okay.  And you still have those?

5         A.    Yes.

6         Q.    And you're on COBRA?

7         A.    Yes.

8         Q.    And did you have health or dental

9    benefits from Measurement Systems in Fairfield?

10        A.    No.

11        Q.    Chromalloy?

12        A.    No.

13        Q.    How about Sikorsky, did you have medical

14   benefits from Sikorsky?

15        A.    That was also -- Well, I did maybe for

16   just maybe one month, within that first month or

17   something.  And then I was terminated there, so it

18   sort of canceled out the same month.

19        Q.    Did you elect COBRA benefits?

20        A.    No.

21        Q.    And when you left Cooper Surgical, did

22   you have an option for the COBRA?

23        A.    Yes.

24        Q.    And did you take it?

25        A.    No, couldn't afford it.

309

1                    C E R T I F I C A T E

2

3   STATE OF CONNECTICUT

4   JUDICIAL DISTRICT OF FAIRFIELD AT BRIDGEPORT

5        I, AIMEE SUHIE, Registered Professional
    Reporter and Notary Public within and for the State
6   of Connecticut, duly commissioned and qualified, do
    hereby certify that pursuant to Notice, BASIL YOUNG,
7   the deponent herein, was by me first duly sworn to
    testify the truth, the whole truth and nothing but
8   the truth of his knowledge touching and concerning
    the matters in controversy in this case; that he was
9   thereupon carefully examined upon his oath and his
    testimony reduced to writing by me; and that the
10  deposition is a true record of the testimony given
    by the witness.
11
         I further certify that I am neither attorney or
12  counsel for, nor related to or employed by, any of
    the parties to the action in which this deposition
13  is taken, and further that I am not a relative or
    employee of any attorney or counsel employed by the
14  parties thereto or financially interested in the
    action.
15
         IN WITNESS WHEREOF, I have hereunto set my hand
16  and affixed my notarial seal this  11th  day of
    _March___, 2004, at New Fairfield, Connecticut.
17

18

19                              _____
                                Aimee M. Suhie, RPR
20  My Commission Expires:      Notary Public
    May 31, 2004                State of Connecticut
21
                                LSR No. 00022
22

23

24

25

# EXHIBIT B

# Employee Warning Notice

PLEASE PRINT

Employee Name __BASIL YOUNG__    Date of Warning __03 / 21 / 01__

Employee/Payroll # __INSPECTOR__    Department __QUALITY ASSURANCE__    Shift __1__

## Type of Violation

| | | |
|---|---|---|
| ☐ Attendance | ☐ Carelessness | ☐ Insubordination |
| ☐ Lateness or Early Quit | ☐ Failure to Follow Instructions | ☐ Violation of Safety Rules |
| ☐ Rudeness to Employees or Customers | ☐ Willfull Damage to Material or Equipment | ☐ Working on Personal Matters |
| ☒ Unsatisfactory Work Quality | ☒ Violation of Company Policies or Procedures | ☒ Other |

## Previous Warnings

| | ORAL | WRITTEN | DATE | BY WHOM |
|---|---|---|---|---|
| 1st Warning | X | | 02 05 01 | T. WILLIAMS    T. FLYNN |
| 2nd Warning | | X | 03 21 01 | T. WILLIAMS    T. FLYNN |
| 3rd Warning | | | | |

## Employer Statement

Date of Incident __03 / 14 / 01__    Time ___ AM/PM

INSPECTION FORM QC073 REV 8/00 COMPLETED FOR PN# 33570. DIMENSION RESULT FALSIFIED. "SHADOW GRAPH" REQUIRED TO PERFORM TASK, EMPLOYEE USED "VISUAL" METHOD.

## Employee Statement

☐ I agree with Employer's statement.

☐ I disagree with Employer's description of violation for these reasons:

_____

_____

_____

_____

EMPLOYEE SIGNATURE _____    DATE _____

## Action to be taken    ☒ Warning  ☒ Probation ⓐ  ☐ Suspension  ☐ Dismissal  ☐ Other __30 DAYS__ ⓑ

Consequence should incident occur again __ETHICAL AND RESPONSIBLE JUDGMENT IS REQUIRED. FALSIFICATION OF COMPANY RECORDS IS GROUNDS FOR IMMEDIATE DISMISSAL. NOTED IMPROVEMENT ↓__

## I have read this Employee Warning Notice and understand it.

Declined to sign in the presence of [signatures]

SIGNATURE OF EMPLOYEE __Thomas O'Neill__

SIGNATURE OF SUPERVISOR WHO ISSUED WARNING __Tom Flynn__    DATE __03 / 22 / 01__

## Routing

IS NECESSARY FOR CONTINUED EMPLOYMENT. REFERENCE COOPERSURGICAL EMPLOYEE HANDBOOK.

DEFENDANT'S EXHIBIT TLF #7  11/18/03

FRIENDLY FORMS ®    Call toll free 800-999-9111 to reorder Employee W(...) tice #R7-40542 A
© 1997 G. Neil Companies, P.O. Box 450939, Sunr(...)    3345-0939 · Printed in U.S.A. (7/97)
G. Neil Companies assumes no responsibility for the r(...) er's use of this form or any decision the employer makes
which may violate local, state or federal law. By selling this form, G. Neil Companies is not giving legal advice.

# CooperSurgical

## INCOMING INSPECTION PROCEDURE SHEET

PART NAME: _Delivery Tube Conn._

PART NUMBER: _33590_

1) See comments for possible special instructions, before proceeding.

2) Select a sample using the C.O. sampling plan 1.5 associated A.Q.L.

3) Inspect all dimensions on the first piece. If any deviations are found, the correlating dimension is to be included in the inspection of the 1.5 sample lot, if not already a part of the existing dimensions to be inspected.

4) Inspect the sample lot --

    A)    Using red lined drawings inspect all circled dimensions.
    B)    If red lined drawings are not available, use the following procedure:
        1.    Inspect all dimensions with tolerances of ± .005 or less.
        2.    Inspect all threads and depth of threads.
        3.    Inspect all angles 1° or less.
        4.    Inspect all surfaces with #16 or less.
        5.    Inspect all holes and locations.
        6.    Inspect all dimensions accompanied with an asterisk.

| CHARACTERISTIC | EQUIPMENT & METHOD |
|---|---|
| .066/.064 – 1/2 – .010/.015R | Shadow graph. |
| .072 x .054 | Vernier & pin gauge |
| 2.000 | Vernier |
| | Do not use thread gauge. Special meter |
| | |
| | |
| | |
| | |

APPROVED _____  _____

## INCOMING INSPECTION REQUIREMENTS

RT NAME: _Delivery Connector Tube_     PART NUMBER | 3 | 3 | 5 | 9 | 0 | | | | |

REMARKS: _____

PPROVED SUPPLIER(S):                    _____

FFLOAD MANUFACTURING                 _____

_____

_____                     * READ ALL PRINT COMMENTS

---

SAMPLE PLAN: ANSI/ASQC Z1.4-1993          AQL LEVEL: 1.5 SINGLE, NORMAL

INSPECTION LEVEL: _____        REFERENCE: QC SOP # 00004

| TEST | SPECIFICATION | EQUIPMENT |
|---|---|---|
| VISUAL | Q.C. Spec. #00003 | 1 X |
| DIMENSIONAL | DRAWING # 33590 | VERNIER CALIPER |
| | Q.C. Spec. #00007 | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

ROVED: _____  —  DATE: _____          QCO61-6/99

# COOPERSURGICAL INSPECTION REPORT

PART NAME _Delivery Counter Tube_  PART NUMBER _33590_    VENDOR _Offload Mfg._

| | | | | |
|---|---|---|---|---|
| DATE RECEIVED | 11-29-00 | 3-14-01 | | |
| RECEIVER # | 22015 | 24491 | | |
| LINE ITEM # | 6 | 3,4,5 | | |
| PURCHASE ORDER # | 30305 | 30305 | | |
| WORK ORDER # | N/A | N/A | | |
| QUANTITY RECEIVED | 15 | 35 | | |
| QUANTITY TESTING SCRAP | 0 | 0 | | |
| QUANTITY NON-CONFORMING | 0 | 0 | | |
| QUANTITY RELEASED | 15 | 35 | | |
| QC RELEASE FILE # | 783481 | 870851 | | |
| TESTING SCRAP FILE # | N/A | N/A | | |
| QC DISPOSITION FILE # | N/A | N/A | | |
| NCMR # | N/A | N/A | | |
| **INSPECTION** | **RESULTS (AVERAGED AS APPLIES)  /  EQUIPMENT ID #** | | | |
| Visual | 0/8 | 0/8 | | |
| .066/.064 min thd | .065 | .065 | | |
| 2.000 ± .010 | 2.000 | 2.000 | | |
| $\frac{1}{2}$ | .500 | .500 | | |
| .010/.015 | ACC. | ACC. | | |
| .072 x .054 | .0715 x .053 | .0715 x .053 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| SAMPLE SIZE | 8 | 8 | | |
| INSPECTOR | BY | B. Young | | |
| DATE INSPECTED | 11-29-00 | 3-14-01 | | |
| DRAWING REVISION | C | C | | |

QC073 8/0

# EXHIBIT C

**CooperSurgical**

Shelton, CT 06484
(203) 929-6321
(800) 645-3760
FAX (203) 925-0135
E-mail@coopersurgical.com
www.coopersurgical.com

April 11, 2001

Mr. Basil Young
3370 Madison Avenue
Bridgeport, CT  06606

Dear Basil:

With reference to our conversation, enclosed please find the following:

- Cobra Form – Blue Cross (medical insurance)
- Cobra Form – The Guardian (dental insurance)
- Cobra Rate Sheet – Costs for continuing your medical and/or dental insurance
- Checks to include:
  – Pay period ending 4/8/01
  – Pay for the period 4/9/01 thru 4/11/01, including 8 hours pay for 4/11/01
  – Two weeks severance Pay
  – Vacation pay - 15 hours (Hours accrued through 4/11, less hours used)
- Unemployment Notice (Pink Slip)
- Termination Fact Sheet

The Cobra forms do have instructions on them, however, if you have any questions or need assistance, please feel free to give me a call.

Sincerely,

Joanne Augustine
Human Resources

Enclosure

Via Federal Express

# EXHIBIT D



DEFENDANT'S
EXHIBIT
Young 12
2/27/04 ams



RECEIVED

JUN 10 1996

COMM. ON HUMAN RTS. & OPP.
SOUTHWEST REGIONAL OFFICE

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES
**AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE**

AMENDED

DATE: <u>July 10, 1996</u>          CASE NO.: <u>96 20600</u>

My name is: **Mr. Basil Young**
and I reside at: <u>337 Sylvan Street, Bridgeport, Connecticut  06606</u>
the respondent is: <u>SVG Lithography Systems, Inc.</u>
whose business address is: <u>77 Danbury Road, Wilton, Connecticut  06894</u>
I was

(X) terminated
( ) suspended
(X) placed on probation
( ) demoted
(X) warned
(X) given a poor evaluation
( ) denied a raise
(X) less trained
( ) denied an office
( ) denied service(s)
(X) discriminated against in terms and conditions of employment
on: <u>July 9, 1996</u> and believe that my

( ) not hired/promoted
( ) not rented a dwelling
(X) harassed ( ) sexually harassed
(X) earning a different rate of pay
( ) constructively discharged
(X) retaliated against
( ) not hired due to a BFOQ
( ) not hired due to a disability
(X) delegated difficult assignments
( ) other

(X) race
(X) color
( ) sex ( ) male ( ) female
(X) previously opposed, filed or
    assisted
( ) ancestry
( ) age    DOB:
( ) religion
( ) pregnancy
( ) alienage

( ) national origin
( ) marital status
( ) physical disability
( ) mental retardation
( ) mental disorder
( ) religious creed ( ) creed
( ) familial status
( ) sexual orientation
( ) learning disability
( ) lawful source of income

was in part a factor in this action.  I believe that the respondent violated the
following Connecticut General Statutes and acts listed below; (X) enforced
through section 46a-58(a) (if applicable);

(X)  46a-60 (a) (1)
(X)  46a-60 (a) (4)
(  )  46a-60 (a) (7) ( ) ( ) ( )
(  )  46a-60 (a) (8) ( ) ( ) ( )
(  )  46a-64 ( ) ( )
(  )  46a-64a ( ) ( ) ( )
(  )  46a-81 ( ) ( ) ( )
(  )  46a-80

(X)  Title VII of the Civil Rights Act
       of 1964, as amended, 42 U.S.C. 2000e
       and the Civil Rights Act of 1991
       (cite for 15 individuals employed)
(  )  Age Discrimination in Employment Act
       of 1967, 29 U.S.C. 621-634
       (cite for over 20 individuals
       employed)

(  )  Americans With Disabilities Act, 42 U.S.C. 12101 et seq.
(X)  Equal Pay Act of 1964, U.S.C. 206
(  )  Section 504 of the Rehabilitation Act of 1973, as amended


other_____


2

I provide the following particulars:

1. My name is Mr. Basil Young. I currently reside at 337 Sylvan Street, Bridgeport, Connecticut 06606. I am an African-American and I am the complainant in this matter.

2. The respondent is SVG Lithography Systems, Inc. ("SVG"). Respondent's business address is: 77 Danbury Road, Wilton, Connecticut 06894. Respondent employs over fifteen (15) people.

3. I was hired by SVG in or about April 1995 as a temporary employee to work as a Technical Associate reporting to Mr. Gene Martin in respondent's Optical Cementing Department.

4. Due in large measure to my exemplary performance in this role, at the conclusion of my temporary assignment in August 1995, I was extended an offer by respondent to become a permanent, full-time employee.

5. Despite this background, since in or about September 1995 and on a continuing basis since that time, respondent SVG's group leader in the Optical Cementing Department, Ms. Bernadette Carvalho, has attempted to undermine my position and status within that department by subjecting me to disparate treatment.

6. This conduct by respondent's supervisor has taken the form of giving me less meaningful work assignments, severely curtailing and then eliminating my ability to work overtime hours, and subjecting me to an ever increasing hostile and oppressive work environment as opposed to that afforded the non-minority employees within the department.

7. When I attempted to discuss my employment status with Ms. Carvalho, I was subjected to remarks such as "[s]ome men think a woman can't do a good job, if you don't like it, leave!" and [d]on't you ever go to personnel because there will be payback."

3

8.  As a result of such treatment, and despite said admonition against doing so, on or about October 2, 1995, I sought out the counsel and advice of respondent's Human Resource Department.

9.  In addition, I informed my immediate supervisor, Mr. Gene Martin, about these developments and the steps I was taking in order to attempt to correct the difficulties I was encountering at SVG.

10. At this time and place, Mr. Martin assured me that I was still in good standing with respondent, that the conditions I was encountering would be addressed and that there would be no retaliation taken against me as a result of my seeking advice from respondent's Human Resources Department.

11. Despite this statement, and true to her discriminatory warning, on October 18 and again on November 7, 1995, I was called into the office of respondent's supervisor, Mr. Charles Mitchell, and was falsely accused by Ms. Carvalho of not complying with authorized overtime hours and procedure.

12. Specifically, at these meetings, I was accused of working two (2) hours of unauthorized overtime.

13. Said accusations were patently false as all of my overtime hours had been approved in advance by my immediate supervisor, Mr. Martin.

14. Despite my suggestion at this time that Ms. Carvalho consult with Mr. Martin to determine the clear authorization for all of my overtime hours, instead, I was issued a written disciplinary warning and further, on November 8, 1995 was informed that I could no longer work overtime hours until further notice.

15. As a result of the disparate discipline given to me -- upon information and belief, no white employee in the department has been given an indefinite suspension of their ability to work overtime hours -- I wrote a letter to Mr. Mitchell requesting that his warning be rescinded and removed from my personnel file. A copy of this letter is attached hereto.

16. Further on November 16, 1995, in a meeting with Mr. James McClay, respondent's Optical Operations Director, I was handed a Memorandum in which I was told that if I didn't follow company rules, I would be terminated. I believe that I have always followed company rules.   A copy of said Memorandum is attached hereto.

17. On that same date, I wrote to respondent's Director of Human Resources, Ms. Eileen Hantke, and once again requested that the written reprimand be rescinded and requesting that my ability to work overtime hours be restored. A copy of said letter is attached hereto.

18. Despite said facts, and further, despite my discriminatory prohibition against working on an overtime basis continuing for over two and one-half (2 1/2) months, on or about January 22, 1996, I asked Mr. Martin once again when would the respondent allow me to resume the ability to work overtime.

19. At that time and place, I was informed by Mr. Martin that my ineligibility for overtime hours would continue for an "indefinite" period.

20. One day after this encounter, on or about January 23, 1996, I was removed from my regular work assignment and assigned to a chemical cleaning station to clean optical glass utilizing hazardous chemical agents such as acetone, methanol, toluene and methylene chloride on a forty (40) hour per week basis.

21. Upon information and belief, no other employee in my department has ever performed this assignment for such an extended period of time.

22. By letter dated January 24, 1996, I again wrote to Ms. Hantke concerning the respondent's policy of continuing to deny me overtime opportunities and the fact that I was being subjected to continuing, unwarranted discipline. A copy of said letter is attached hereto.

23. Due to overexposure to the chemicals cited above, on February 8, 1996 I was forced to see my doctor as I had symptoms of vomiting, dizziness, disorientation and nausea. Further, on February 9, 1996, I was forced to leave work to go to a hospital emergency room suffering from the same symptoms.

24. My physician released me to return to work on February 13, 1996 with the instruction that I avoid exposure to the chemicals at the chemical cleaning station to which I had been assigned.

25. Despite said instructions from my physician, when I returned to work on February 13, my supervisors, Mr. Martin and Ms. Carvalho informed me that they had no other type of work for me in my department despite the fact that my regular work station was still available and despite the fact that other department employees were continually working overtime hours.  I was informed that I should wait until further notice and consequently, was given no assignments to perform for several days.

26. Thereafter, on or about February 14, 1996, I met with Mr. Bill Soltesz and with Ms. Hantke of respondent's Human Resources Department.

27. At this meeting, Ms. Hantke informed me -- for the first time -- that I had been placed on a ninety (90) day probationary period during which I was ineligible for overtime and that said probationary period would be ending on February 16, 1996.

28. Further, at this same meeting, Mr. Soltesz and Ms. Hantke requested a clarification from the emergency room physician that I had seen as to whether he was advising that I should avoid the chemical cleaning station area or the entire department altogether.  The concept of a mutually agreeable transfer was also discussed at about this same time.

29. I was further informed that while the respondent was waiting for a response to this request for "clarification" I would, in the interim, be temporarily assigned to the "stores" area.

30. By letter dated February 16, 1996, which I handed to Mr. Soltesz on February 20, 1996, my physician restated that my symptoms were consistent with an overexposure to chemicals and that prior to my being assigned to the chemical cleaning station, I did not have any medical problem while working in the department.

31. Despite said clearance by my physician to return to my regular work assignment, on February 21, 1996, I was assigned by respondent to work in a dusty, infrequently used optical grinding machine tool storage area and was left in isolation to sort and discard obsolete, corrosive and defective test plates.

32. On or about February 22, 1996, I asked Mr. Soltesz for the time frame on my interim assignment. I also requested the opportunity to review my personnel file at this time.

33. At this time and place, I was informed by Mr. Soltesz that no decision had been made on my status as the respondent "still needed more clarification" from and "dialogue" with my physician.

34. Further, on or about February 23, 1996, I was asked to see the respondent's physician for an independent medical examination which I agreed to.

35. Thereafter, on or about March 7, 1996, I contacted Mr. Soltesz once again to request a meeting.

36. When I did not hear back from him, I went to see Ms. Hantke to inform her that I was still being denied the ability to work overtime hours despite her claim that my "probationary status" had ended the prior month and despite the fact that I had been denied such opportunity for approximately four months.

37. I further informed Ms. Hantke that I was still assigned to an unclassified area, that the discussion of a mutual transfer was being ignored, that I had still not been allowed to review my personnel file, and that I was still being harassed by my former group leader, Ms. Carvalho.

38. At this time and place, Ms. Hantke assured me that she would review my situation once again and would immediately follow-up with Mr. Soltesz and Mr. Martin.

39. On March 8, 1996, I was finally allowed to review my personnel file and noted that at the time of my initial hire, I had been offered a salary that was

7

near the bottom of my salary range despite my extensive background, training and despite the recommendation of Mr. Gene Martin at the conclusion of my temporary assignment.

40. I believe that white employees with less experience, training and background then me have been employed by the respondent at a higher rate of pay than me.

41. As a result of such disparate treatment, I believe that the respondent is deliberately and systematically attempting to coerce, intimidate and demean me by depriving me of quantitative and qualitative employment opportunities, training and the ability to work overtime hours.

42. While other, non-minority employees have exceeded their overtime authorization, I am the only employee that has, to my knowledge and belief, been subjected to continual discipline and harassment and has been denied the opportunity to work overtime hours for such an extended period of time.

43. Further, since on or about January 23, 1996, I have been put into semi-isolation, first at the chemical cleaning station and now in a storage area, with limited contact and communication with other employees.

44. Further still, subsequent to my filing Complaint No. 9620600 with the Connecticut Commission on Human Rights and Opportunities, I obtained from my physician an additional written release expressly permitting me to return to my former tasks.  The original of this letter was mailed to Ms. Hantke in respondent's Human Resources Department and a copy of the letter was sent by my attorney to counsel for the respondent.  A copy of said letter is attached hereto.

45. Despite said express release, respondent has failed and refused to return me to my former position wherein I would be eligible for overtime hours once again.

8

46. When I questioned respondent as to when I would return to my former position I was informed that I would not be returned until I had completed my "assignment" in the storage area.

47. Respondent's failure and refusal to return me to my former position wherein I would be entitled to overtime hours once again in light of my obtaining the express written release requested by respondent and subsequent to my having filed a complaint with the Connecticut Commission on Human Rights and Opportunities was retaliatory in nature and had only occurred as a direct result of my having filed said complaint with the CHRO.

48. Further still, on July 1, 1996, I was summoned into a meeting convened by Mr. Bill Soltesz in which Mr. Gene Martin was also in attendance.

49. At that time and place, I was falsely accused of having arrived at work one half hour late on one occasion during the week ending June 28, 1996 but nevertheless had allegedly reported having worked a full eight hour shift on my time sheet.

50. I was further informed that this purported event had been witnessed by Mr. Andy Damon, an interim supervisor who, significantly, was not present at the meeting called by Mr. Soltesz.

51. In response to the accusation made against me, I categorically denied having arrived at work one half hour late as alleged and further, denied falsely reporting any time on my time sheets.

52. Despite my unequivocal denial of any wrongdoing and despite the fact that Mr. Damon was not even present at the meeting so that I might ask him what he was referring to, I was summarily handed a memorandum informing me that "[a] repeat occurrence will result in immediate termination." A copy of said memorandum is attached hereto.

53. I responded to this statement by stating to Messrs. Soltesz and Martin that I believed that the accusation was made solely to harass me and to attempt to intimidate me as a result of my having filed a complaint with the CHRO.

54. Further still, on the following day (July 2, 1996), I was issued another reprimand unfairly alleging that I had failed to complete an assignment in the storage area that had unilaterally been given a two week completion date despite the fact that said assignment could not possibly have been completed -- by a single individual working without the ability to work overtime -- in that period of time. A copy of this purported reprimand is attached hereto.

55. In fact, on or about June 5, 1996, Mr. Andy Damon had commented to me that said assignment represented a "difficult task that will take <u>months</u> to complete" as it was always a problem area.

56. Further still, despite said memorandum of July 1st expressly indicating that only a repeat occurrence of the purported violation would result in termination and further, despite the clear statement in the July 2nd memorandum indicating that I would be returned to my former position upon the completion of my "present assignment," and further still, despite the fact that subsequent to July 2nd I did not receive even an <u>allegation</u> of additional non-compliance with any company rules or policies, on July 9, 1996, I was summoned into the office of respondent's supervisory staff and was summarily terminated.

57. I fervently believe that the actions cited above, resulting in my termination from respondent's employ were done in retaliation for my having previously filed a complaint with the Connecticut Commission on Human Rights and Opportunities alleging discrimination in the work-place. (CHRO No.: 9620600).

WHEREFORE, I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

__Basil Young__, being duly sworn, on oath, states that he is the Complainant herein; that he has read the foregoing complaint and knows the contents thereof; that the same is true of his own knowledge, except as to the matter herein stated on information and belief and that as to these matters he believes the same to be true.

Dated at Fairfield, Connecticut this 10th day of July, 1996.

(Complainant's Signature)

Subscribed and sworn to before me this 10th day of July, 1996.

Notary Public/Commissioner
of the Superior Court

11



# STATE OF CONNECTICUT
*COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES*
### SOUTHWEST REGION OFFICE
1057 BROAD STREET BRIDGEPORT, CONNECTICUT 06604
TEL. (203) 579-6246
FAX: (203) 579-6950

IN REPLY:

Certified Mail No.P 168 840 793

October 9,1996

Basil Young
337 Sylvan Street
Bridgeport, CT 06606

NOTICE OF FINAL AGENCY ACTION
    CHRO NO.:9720600 Young   v SVG Lithography Systems,Inc.
    EEOC NO:  Pending

Dear Mr.Young:

Notice is hereby given that pursuant to Section 46a-83(b) of C.G.S,
the Commission has processed your complaint through its Merit
Assessment processes.

Further, you are hereby notified that as a result of these
activities, your complaint has been reviewed out for the reason
that there is no reasonable possibility that further
investigation will result in a finding of reasonable cause inasmuch
as it was determined that you were counselled on several occasions
that you were not to work overtime without authorization,yet you
continued to work overtime.This was regarded as an act
ofinsurbordination by the respondent.

Also evidence show that you signed your timesheet as working 40
hours when in essence you were late and did not work 40 hours.
Respondent regarded this as falsifying documents and was a rule
which automatically was grounds for discharge.

Therefore based upon the evidence it does not appear that your
termination was in retaliation or due to being of the race/color
Black.

Complainant may apply for reconsideration, requesting that the
Commission reconsider its decision dismissing the complaint, as
provided in subsection (b) of Section   46a-83 of the C.G.S.
(formerly Public Act 94-238). The reconsideration request must be
in writing and <u>filed</u> at the Commission's administrative office
stated on the letterhead <u>within fifteen (15) calendar days from the</u>
<u>date of this letter</u>. It is the complainant's responsibility to

FL407(1)

Issued 12/94
Revised 1/1/96

file a timely request. No additional information after this fifteen (15) day period <u>will be considered</u>. <u>Untimely requests will not be considered</u>. The request should state specifically the grounds upon which the application is based. Generally, no new documentation or evidence can be considered as only documentation in the case file at the time of dismissal will be reviewed. Any request for reconsideration must be submitted to The Commission on Human Rights,1057 Broad Street, Bridgeport, CT 06604.

A copy of your request for reconsideration must be mailed to the respondent and respondent's attorney, if any, <u>at the address listed at the bottom of this letter</u>. You should certify that you have done so in your request for reconsideration filed with the Commission.

Instead of filing a <u>timely</u> request for reconsideration, the complainant may appeal this disposition to the Superior Court of the State of Connecticut. Any appeal must strictly comply with all of the applicable statutory procedures, requirements, and time frames. You may wish to consult an attorney regarding the proper filing of an administrative appeal.

Sincerely,

Femi/Hogle- Assegai
Regional Manager
mm
cc:Complainant's Attorney:Joseph Varon,1275 Post Road,Suite
            A14,Fairfield, CT
    Respondent:Eileen Hantke, Human Resource Mgr.SVG Lithography
            Systems , Inc.77 Danbury Road, Wilton, CT
    Respondents Attorney: Steven Younes,Epstein,Becker & Green, Six
            Landmark Square,Stamford, CT 06901,
    Certified Mail No. P 168 840 794
    Complainant(s)'/Respondent(s) Certification Form #004

FL407(1)

2