UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BASIL YOUNG | CIVIL ACTION |
| Plaintiff, | NO: 3:03CV0216 (MRK) |
| v. | |
| COOPERSURGICAL, INC. | |
| Defendant. | April 16, 2004 |

### DEFENDANT'S AMENDED STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 9(c) of the Local Rules of Civil Procedure for the District of Connecticut, defendant CooperSurgical, Inc. ("CooperSurgical") hereby files its amended statement of undisputed facts. This amended pleading is being filed to make certain corrections to the previously filed Statement dated April 12, 2004.[1]

1. CooperSurgical is a premium supplier of medical devices sold to and used by obstetricians and gynecologists both domestically and worldwide. Affidavit of Tom Williams dated April 12, 2004 ("Williams Aff.") ¶ 3.

2. CooperSurgical is dedicated to serving women's healthcare providers with innovative and high quality products. Williams Aff. ¶ 4. Among other things, for instance, CooperSurgical manufactures a variety of instruments used to perform gynecological examinations and to treat gynecological problems in women, such as culposcopes, specula, in vitro diagnostics, an array of uterine manipulators, and cryo surgery devices. Williams Aff. ¶ 4.

3. Because of the sensitive nature of the medical devices, as well as the potential harm to women by improper manufacture, CooperSurgical is heavily regulated and falls under the scrutiny of medical device industry regulatory bodies, including the United States Food and Drug Administration ("FDA"), United States federal regulatory requirements found in 21 CFR 200-299 and 800-1299, the Federal Drug and Cosmetic Act (the "Act"), the International European Conformity Standards

---

[1] The affidavits and other exhibits cited herein were filed with the Court on April 12, 2004 in the Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment.

("IEC"), International Standards Organization ("ISO"), Canadian Health regulations, the Medical Device Directive 99-42- EEC (for all European countries), Health Canada Medical Devices Regulations, and Underwriter Laboratories ("UL"). Williams Aff. ¶5.

4. The FDA, British Standards Institute, and UL conduct frequent on-site audits of CooperSurgical to ensure that their stringent requirements are being met. Williams Aff. ¶6. Customers also routinely conduct on-site audits of CooperSurgical to ensure the quality of the products, as well as compliance with domestic and international standards. Williams Aff. ¶ 6.

5. To comply with these numerous regulations and to ensure that their medical devices are of the highest quality, CooperSurgical has created a quality assurance program, which includes a manual and a formalized procedure by which CooperSurgical's medical devices (and component parts) are tested. Records are created to ensure that the proper quality controls are in place and to ensure that such controls are effective. Williams Aff. ¶6.

6. During audits, the agencies review, among other things, these quality assurance records to ensure their compliance. Williams Aff. ¶6. Accordingly, CooperSurgical's Employee Handbook states that falsification of company records is a basis for immediate termination of employment. Williams Aff. ¶ 6; Affidavit of Joanne Augustine dated April 12, 2004 ("Augustine Aff.").

7. In 2000, CooperSurgical had approximately 84 employees at its facility in Shelton, Connecticut. Augustine Aff. ¶ 4. All of these employees were involved in the development, manufacturing, distribution and sale of premium health care devices used in women's healthcare. Augustine Aff. ¶ 4.

8. In November 2000, plaintiff was placed by a temporary agency at CooperSurgical as a Quality Assurance Inspector. See Certified Copy of Basil Young's Deposition Transcript (hereinafter "Young Depo.") at 73:11-18, 74:20-22; Affidavit of Tom Flynn dated April 8, 2004 ("Flynn Aff.") ¶ 4; Williams Aff. ¶ 9.

9. As a Quality Assurance Inspector, plaintiff was responsible for following procedures to ensure inspections resulted in satisfactory release of individual pieces used in the manufacturing process and that they were in strict compliance with specifications. Williams Aff. ¶8; Flynn Aff. ¶5;

2

Young Depo. 84:18-24. Specifically, the Quality Assurance Inspector reviews specifications for a specific equipment piece and takes the measurements as directed on what is called an Incoming Inspection Procedure Sheet. Williams Aff. ¶ 8; Flynn Aff. ¶ 5.

10. The Inspection Sheet sets forth the characteristic, i.e., measurement, to be taken and the equipment and method to be used in performing the measurement. Williams Aff. ¶ 8; Flynn Aff. ¶5. During the inspection process, the Inspector takes the measurements, and then the Inspector records the results on the Inspection Report Form. Williams Aff. ¶ 8; Flynn Aff. ¶ 5.

11. The Inspector writes the following information: (a) the date the piece was received, (b) the date of the inspection, (c) the Purchase Order number, (c) the Work Order number, (d) the inspections performed, (e) the results, and (f) whether the results match the required measurements. Then, the Inspection Sheet is signed by the Inspector. Williams Aff. ¶ 8; Flynn Aff. ¶5.

12. As a Quality Assurance Inspector, plaintiff reported to Tom Flynn, Quality Assurance Supervisor. Young Depo. 74:6-9; Flynn Aff. ¶6; Williams Aff. ¶9. Mr. Flynn reported to Tom Williams, Director, Quality Assurance and Regulatory Affairs. Williams Aff. ¶9; Flynn Aff. ¶ 6. At the time of plaintiff's employment, there were two other Quality Assurance Inspectors in the department, Jeanette Freese and William Tanner. Young Depo. 213:22-24.

13. During his time as a temporary employee, plaintiff got along well with his co-workers and felt that Mr. Flynn and Mr. Williams treated him with respect, in good faith, and in a fair fashion. Young Depo. 75:13-18.

14. Mr. Flynn and Mr. Williams reviewed plaintiff's performance and job skills over his four weeks as a temporary employee. Williams Aff. ¶10; Flynn Aff. ¶7. Because CooperSurgical needed another Inspector on a long-term basis, Mr. Flynn recommended that plaintiff be hired as a direct employee of the company. Young Depo. 74:14-25; Flynn Aff. ¶7; Williams Aff. ¶ 10. Mr. Williams approved the hire and completed it before December 31st so that plaintiff could receive more favorable benefits which would not be available to him if he became a regular employee on January 1st or later. Williams Aff. ¶ 10.

3

15. On December 20, 2001, Mr. Williams offered plaintiff a regular position as a Quality Assurance Inspector, which plaintiff accepted. Young Depo. 74:14-19; Williams Aff. ¶ 12. The negotiated wage was agreed to at $15.00 an hour. Williams Aff. ¶ 12.

16. In conjunction with plaintiff's direct employment, Mr. Williams agreed to pay plaintiff a higher hourly rate than had been previously approved for the position. Young Depo. 76:13-22; Williams Aff. ¶ 13. Mr. Williams also told plaintiff he could be reviewed as early as six months from the date of hire, with the opportunity for a raise at that time, rather than the standard twelve months. Young Depo. 78:19-79:16; Williams Aff. ¶14.

17. In addition, Mr. Williams agreed to authorize plaintiff's request for a $4,000 tuition reimbursement toward college level courses, even though the company's policy only provided for tuition reimbursement up to $2,000. Young Depo. 77:9-78:18; Williams Aff. ¶15.

18. When Mr. Williams reviewed the Inventory Movement Audit Report for all Quality Assurance Inspectors on or about January 18, 2001, he became concerned about plaintiff's productivity level. Williams Aff. ¶ 17. The Inventory Movement Audit sets forth the date, the product, and the name of the Inspector who conducts each inspection. Williams Aff. ¶ 17. Mr. Williams determined that plaintiff was not meeting the target of inspecting 17 items a day. Williams Aff. ¶ 17.

19. On January 19, 2001, Mr. Williams met with plaintiff to review his productivity. Williams Aff. ¶ 18. Mr. Williams explained to him that he was not meeting expectations as to the number of pieces inspected, and reminded him that the goal was 17 pieces. Williams Aff. ¶ 18. Plaintiff was not given a formal warning or disciplined at this time about this issue. Williams Aff. ¶ 17.

20. On Monday, February 5, 2001, Mr. Williams and Mr. Flynn met with the plaintiff to discuss his performance and to encourage correction and improvement. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. Mr. Williams told plaintiff he was spending too much time asking the same questions to multiple employees. Williams Aff. ¶ 20; Flynn Aff. ¶ 12. This behavior had been reported to Mr.

4

Williams as distracting the other employees and resulted in decreased department efficiency. Williams Aff. ¶ 20; Flynn Aff. ¶ 12.

21. Mr. Flynn also reminded plaintiff that his productivity needed to improve. Williams Aff. ¶ 20; Flynn Aff. ¶ 12.

22. Mr. Flynn told the plaintiff that they would continue to evaluate the situation with hopes of improving his performance to a satisfactory level. Williams Aff. ¶ 20; Flynn Aff. ¶ 12.

23. A few weeks later, on March 14, 2001, Mr. Flynn was reviewing and updating the Quality Assurance Inspection Reports to ensure their accuracy, as is routine. Flynn Aff. ¶ 13. Mr. Flynn reviewed an Inspection Report for an inspection plaintiff had performed. Flynn Aff. ¶ 13. The piece that plaintiff was inspecting, part no. 33590, is a delivery connector tube used in a cryo surgery device to remove genital warts and other lesions from female patients. Williams Aff. ¶ 20; Flynn Aff. ¶18.

24. Mr. Flynn asked plaintiff how he had performed the inspection. Flynn Aff. ¶ 13. Plaintiff told Mr. Flynn that he had "visually" inspected and recorded measurements of the minor threading and the radius of the threading. Flynn Aff. ¶13.

25. Mr. Flynn told him that was impossible to take such measurements with the naked eye. See Flynn Aff. ¶13. Measurements that small (thousandths of an inch) can only be made using the shadow graph, as specifically instructed on the Incoming Inspection Procedure Sheet. Flynn Aff. ¶ 13.

26. Mr. Flynn told plaintiff that he considered him to have falsified the records by recording imaginary numbers, as plaintiff had admitted he did. Even if plaintiff had merely noted that the measurements were "acceptable" without properly measuring the dimensions, such actions would not have been in accordance with the instructions on the Incoming Inspection Procedure Sheet. Flynn Aff. ¶ 15. Mr. Flynn instructed plaintiff to take the measurements with the shadow graph, which he later informed Mr. Flynn he did with the help of co-worker Bill Tanner. Flynn Aff. ¶ 15.

27. On March 21, 2001, Mr. Williams and Mr. Flynn held a meeting to review the situation concerning the falsified measurements with plaintiff. Williams Aff. ¶ 20; Flynn Aff. ¶16. They

5

reviewed what had transpired and emphasized that ethical and responsible judgment is required in the job of Quality Assurance Inspector. They further pointed out that falsification of company records is grounds for immediate dismissal pursuant to the CooperSurgical Employee Handbook. Williams Aff. ¶ 20; Flynn Aff. ¶ 16. 28. However, because plaintiff had honestly admitted that he had not used the shadow graph and stated that he did not know how to use the device, he was not terminated. Williams Aff. ¶ 20; Flynn Aff. ¶ 16. Instead, management agreed they would provide him with additional training on the shadow graph, but at the same time issued a stern warning that reporting inaccurate information during an inspection would not be tolerated, and placed him on a 30-day probation. Williams Aff. ¶ 20; Flynn Aff. ¶ 16.

29. Just days later, on April 3, 2001, while still on probation, plaintiff was involved in a verbal altercation with another Quality Assurance Inspector, Jeannette Freese. Young Depo. 249:20-250:25; Flynn Aff. ¶ 19.

30. During the altercation, plaintiff admits that he became "very upset because [he] felt it was inappropriate for her to make such a statement to [him that he was misarranging the files and falsifying inspection records]." Young Dep. 250:17-20.

31. Mr. Flynn heard raised voices in the open quality assurance inspection area. Flynn Aff. ¶19. He walked over and spoke to the plaintiff and Ms. Freese. After listening to some interchange between them, to avoid further confrontation with the plaintiff, Mr. Flynn told Ms. Freese to have the part they were discussing set aside until the next day when Mr. Tanner could assist her. Flynn Aff. ¶ 19. At this point, Mr. Flynn thought the matter was closed. Flynn Aff. ¶ 19.

32. Plaintiff did not let the matter drop and proceeded to tell Ms. Freese that she was not his boss and that he did not need her to give him problems. Flynn Aff. ¶ 20. Plaintiff said this in response to Ms. Freese's request that he tell her how he had performed the same type of inspection last time. Upon hearing the interchange, Mr. Flynn came back and reminded plaintiff that in Mr. Tanner's absence, Ms. Freese was the lead person in the department and that if she asked him something, he needed to respond. Flynn Aff. ¶20.

33. Ms. Augustine initiated an investigation into the plaintiff's subsequent complaint about Ms. Freese and Ms. Freese's complaint about the plaintiff following the incident. Augustine Aff. ¶ 9. During the investigation, Ms. Augustine interviewed Mr. Flynn, Ms. Freese, and Mr. Rutowski (a co-worker witness). Augustine Aff. ¶ 9. Ms. Freese said that she had to take a measurement of an equipment piece that required her to use the shadow graph. Augustine Aff. ¶ 9. Normally, she would ask Bill Tanner to assist her. Augustine Aff. ¶ 9. He was not in. Augustine Aff. ¶ 9. She first asked Chet Rutkowski, but he was unable to assist her. Augustine Aff. ¶ 9.

34. So, Ms. Freese looked through the records to see which Inspector had done the prior inspection on the same piece of equipment, and she saw that it was plaintiff. Augustine Aff. ¶ 9. She asked plaintiff if he remembered how he got the dimension, or if Mr. Tanner had helped him. Augustine Aff. ¶ 9.

35. Plaintiff raised his voice and proceeded to create an altercation with Ms. Freese. Augustine Aff. ¶ 9.

36. Ms. Freese complained to CooperSurgical that she felt verbally attacked by plaintiff for asking a simple question. Augustine Aff. ¶ 10; Williams Aff. ¶ 28. She accused plaintiff of harassing her. Augustine Aff. ¶ 10; Williams Aff. ¶ 28. She told Ms. Augustine that, given the proximity of their work areas, she was afraid that it could happen again, and she wondered who might be around next time. Augustine Aff. ¶ 10; Williams Aff. ¶ 28. She indicated she was scared. Augustine Aff. ¶ 10; Williams Aff. ¶ 28.

37. Mr. Rutowski corroborated Ms. Freese's version of events. Augustine Aff. ¶ 11.

38. Ms. Freese is a 22-year-old woman who had worked at CooperSurgical for three and one-half years at the time. Augustine Aff. ¶ 12. Mr. Rutowski had worked for CooperSurgical for three years. Mr. Flynn, Ms. Freese and Mr. Rutowski (an independent witness) were credible, longer term employees with good work records, who relayed the exact same facts. Augustine Aff. ¶ 12.

39. Based upon the investigation, CooperSurgical could not substantiate plaintiff's complaint. Augustine Aff. ¶ 13.

7

40. The company tried to resolve the situation by holding a conflict resolution meeting with all of the parties. Augustine Aff. ¶ 14; Williams Aff. ¶ 29.

41. On April 11, 2001, in an effort to resolve the interpersonal conflict between plaintiff and Ms. Freese, Mr. Williams held a conflict resolution meeting. Augustine Aff. ¶ 14; Williams Aff. ¶30.

42. During the meeting, Ms. Augustine asked Ms. Freese to explain her feelings regarding the incident. Young Depo. 277:19-25. Ms. Freese began by stating that she would not tolerate being yelled at by the plaintiff again. Augustine Aff. ¶16. She stated that all she trying to do was to ask for his help in using the shadow graph as she could not remember how to use it, and she saw on the Inspection Sheet that he had inspected the same equipment in the past using the shadow graph. Augustine Aff. ¶ 16. Ms. Freese said she did not want to be yelled at by plaintiff or anyone else, or spoken to in that manner again. Williams Aff. ¶ 30; Augustine Aff. ¶ 16.

43. Plaintiff responded that Ms. Freese was wrong. Williams Aff. ¶ 30; Augustine Aff. ¶ 17. He stated that he had always been respectful towards her and it was she who had not spoken to him since February 2. Williams Aff. ¶ 30; Augustine Aff. ¶ 17. He said Chet Rutkowski, the witness, was not in the area. Williams Aff. ¶30; Augustine Aff. ¶17. He said he would not be falsely accused of falsifying documents by Ms. Freese or anyone else. Williams Aff. ¶ 30; Augustine Aff. ¶ 17. Plaintiff's voice was elevated during the meeting. Williams Aff. ¶ 30; Augustine Aff. ¶ 17.

44. Ms. Freese, who remained calm and professional throughout the meeting, stated that Chet Rutkowski was present, and that she never said plaintiff falsified records. Williams Aff. ¶ 31; Augustine Aff. ¶ 18.

45. Plaintiff then stated to Ms. Freese that she was not telling the truth. Williams Aff. ¶ 31; Augustine Aff. ¶ 19. Shortly thereafter at the meeting, he accused his supervisor, Mr. Flynn, of lying about his description of the incident. Flynn Aff. ¶ 24; Augustine Aff. ¶ 19; Williams Aff. ¶ 32. Mr. Williams then ended the meeting and excused Mr. Flynn and Ms. Freese. Williams Aff. ¶ 33; Augustine Aff. ¶ 20.

8

46. Based upon plaintiff's most recent conduct, and in light of his record of problems over the few months he had worked as a regular employee, Mr. Williams made the decision to terminate plaintiff's employment. Williams Aff. ¶ 34.

47. In accordance with CooperSurgical's policy, insubordination is grounds for immediate termination. Augustine Aff. ¶ 22; Williams Aff. ¶ 34.

48. In May 2001, less than one month after being terminated by CooperSurgical, plaintiff obtained comparable employment at Sikorsky Aircraft. Plaintiff was paid $15.62 an hour (more than he had been paid by CooperSurgical) and was offered health insurance benefits. Young Depo. 286:13-20; Exhibit F. Less than one month after being hired by Sikorsky, plaintiff was terminated for providing false information on his employment application. Young Depo. 169:10-19. Sikorsky listed "Falsification of company documents" as the reason for plaintiff's termination on his pink slip. Exhibit F.

49. When asked on the Sikorsky job application whether he had ever been convicted of a crime, plaintiff indicated that he had not. Young Depo. 169:24-170:7. Plaintiff had been convicted of "felony welfare fraud" in 1994. Young Depo. 167:23-25. As a result of the conviction, plaintiff was sentenced to five years' probation and ordered to repay approximately Eight Thousand Dollars ($8,000.) in restitution. Young Depo. 167:20-168:14.

50. When Sikorsky learned that plaintiff had lied on his employment application, it terminated his employment. Young Depo. 169:10-19.

Dated at New Haven, Connecticut this 16th day of April, 2004.

By: *Lori B. Alexander*
Lori B. Alexander (CT 08970)
Deborah DeHart Cannavino (CT 08144)
TYLER COOPER & ALCORN, LLP
205 Church Street
New Haven, CT 06510
Telephone: (203) 784/8200
Fax: (203) 789-2133
alexander@tylercooper.com
cannavino@tylercooper.com

9

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed first class mail, postage prepaid, to all counsel and pro-se parties of record this 16th day of April, 2004:

Thomas W. Bucci
Willinger, Willinger & Bucci, P.C.
855 Main Street
Bridgeport, CT 06604

_____
Lori B. Alexander