# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BASIL YOUNG, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03CV0216(MRK) |
| | : | |
| v. | : | |
| | : | |
| COOPER SURGICAL, INC., | : | |
| Defendant. | : | June 7, 2004 |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.      Background

The defendant attempts to characterize the termination of the plaintiff's employment as a simple matter involving the plaintiff's "insubordination and [his] demonstrated inability to work cooperatively with members of his department." (Defendant's Memorandum, p. 1). However, the disputed facts surrounding the plaintiff's discharge raise serious material issues as to whether racial bias was the true reason behind the termination of the plaintiff's employment. The admissible evidence[1] properly before the Court on the defendant's motion for summary judgment, if believed by a trier of fact, would justify a verdict in the plaintiff's favor.

---

[1] The plaintiff has filed with his papers in opposition to the defendant's motion to dismiss a motion to strike with regard to facts which would not be admissible in evidence, in particular, the defendant's inappropriate attempt to insert alleged statements of a key witness, Jeanette Freese, and the purported corroborating statements of a bystander, Rutowski, not by their affidavits, but by way of inadmissible hearsay contained in the affidavit of another witness. Further, the defendant has improperly made reference to the plaintiff's prior employment history - "Plaintiff admitted at his deposition that he had been employed by numerous companies in the last 10 years." Similarly, plaintiff's claim in this case of race discrimination and retaliation are consistent with a pattern of short-term employment followed by a lawsuit claiming unlawful race discrimination." The plaintiff's prior employment history has no bearing on whether the defendant discriminated against the plaintiff. The only relevance, if any, may be on the issue of the plaintiff's credibility, which, most certainly, is not a matter under consideration in deciding a motion for summary judgment.

The plaintiff claims that the termination of his employment was the direct result of the defendant's racial bias.  He also asserts that while employed by the defendant, he complained on various occasions to company officials that he was the subject of unlawful race discrimination, and he wanted the bias to stop.  Instead, the plaintiff charges that the defendant retaliated against him by manufacturing reasons for his dismissal.

On December 20, 2000, the defendant offered the plaintiff a regular position as a Quality Assurance Inspector, which the plaintiff accepted.  At the time the defendant extended the job offer to the plaintiff, he had been working for a temporary employment agency, when, in November of 2000, he accepted an assignment on a temporary basis to work at Cooper Surgical, the defendant in this action, as a Quality Insurance Inspector.  The plaintiff was the only African-American working in the defendant's Quality Assurance Department.[2]  The plaintiff's direct supervisor was Thomas Flynn, an employee of the defendant.  Flynn's supervisor was Thomas Williams, the director of the Quality Assurance Department.

On February 5, 2001, the plaintiff had a meeting with Flynn and Williams.  The reason behind the meeting is in dispute.  The defendant claims the meeting was the result of Flynn's dissatisfaction with the plaintiff's job performance.  On the other hand, the plaintiff asserts that the meeting was convened to address the plaintiff's verbal complaint that the plaintiff lodged with Williams against Flynn on account of what the plaintiff asserted was Fynn's discriminatory conduct.  On February 2, 2001, the plaintiff complained to Williams that the plaintiff's

---

[2] In its answer to the plaintiff complaint, the defendant denies that the plaintiff was the only African American assigned to its Quality Assurance Department.  However, in its answer to the plaintiff's CHRO complaint, the defendant admitted this identical allegation.  See Exhibit 8, plaintiff's CHRO complaint and Exhibit 9, defendant's answer.

supervisor, Flynn, was discriminating against him on account of the plaintiff's race.  Flynn had

been treating the plaintiff with hostility, as compared to the treatment he accorded the two white

employees, Tanner and Freese, with whom the plaintiff worked.

***

"I complained to him about Flynn's behavior towards me.  That he was not
communicating with me.  That he was berating me in front of other employees,
yelling at me and what I believe to be intimidation because he was very rude.  He
wouldn't exchange pleasantries.  When I would ask him a question about my job,
he would, you know, respond as if I was stupid.  Also I was not treated the same
as the other white employees.  That I was receiving disparage treatment at the
hands of Flynn.  And, you know, that I believed at that point it was becoming
hostile because other employees, you know, they didn't seem to be as anxious to
communicate with me.  I just felt that, you know, that there was hostile
environment being created based on Flynn's, you know, his heavy-handedness of
me in front of the other employees...I told him I believe I was being differently,
disparately.  In a discriminatory fashion.  And, again, as I had mentioned his tone,
his manner.  In fact, there was an instance where he yelled at me so much that spit
went in my eye and I had to sort of squint or blink.  I made a defensive response
because actually it was mucus from him in my face...  It was like sort of this drill
sergeant and he only did this to me.  I was the only one treated this way.  I was
very disappointed.  Very hurt.  And I wanted it to stop.  That's why I went -- with
hesitation I went to Mr. Williams about it."  Young, Tr.  142 – 144.

***

"The other white employees were treated with respect and I got none from him."  Young, Tr.

151.  See also, Young, Tr.  216 – 219, 223.

The substantive discussions that took place in the meeting on February 5, 2002, are

likewise at issue.  The plaintiff claims that the dialogue centered on his assertions that he had

been subjected to race discrimination.  He further states that the meeting resulted in a reporting

process being adopted whereby the plaintiff's first line of contact would be with a more senior

3

co-worker, William Tanner.  Tanner, in effect, would act as a buffer between Flynn and the plaintiff. .  "I was given new instructions that I would report to William Tanner as my first line of contact for any questions I might have.  And that he would be responsible for any training that I might need as well."  Young, Tr.  147, 242, 243.

The defendant's account of the meeting diverges significantly from the plaintiff's rendition.  Other than agreeing that a meeting took place and who were the participants, the parties disagree over the reason for the meeting and the outcome of the meeting, as well as what was discussed during the meeting.  The defendant characterizes the meeting as being disciplinary in nature.  The defendant contends it was arranged to deal with issues relating to the plaintiff's job performance.  On a warning issued the plaintiff by the defendant, on March 21, 2001, the defendant indicated that the plaintiff was issued a verbal warning at the conclusion of the February 5, 2001 meeting.  To the contrary, the plaintiff is just as adamant that he never was informed that he was being issued a verbal warning.  In fact, it was only after he reviewed the March 21, 2001 warning, which the plaintiff refused to sign, did he learn that the defendant was claiming that he had been provided a verbal warning on February 5, 2001.  The plaintiff contends that he was not issued any document that referred to a verbal warning until March 21, 2001.  "I was *not* told I was being orally or verbally reprimanded.  There were no memos to that fact." Young, Tr. 147, 241, 305.  (Emphasis added).  The plaintiff stresses that he had never been issued an oral warning.  The meeting the plaintiff had with Thomas Williams and Thomas Flynn was the result of the plaintiff's complaint to Williams on February 2, 2001 that Flynn had been discriminating against the plaintiff on account of the plaintiff's race.

The plaintiff claims that he attempted to ignore the racial prejudice to which he had been subjected.  But, on March 21, 2001, the plaintiff testified that the defendant unfairly and without legitimate reason issued him a disciplinary warning (Exhibit 1), placing him on thirty day probation and threatening him with termination.  The warning was issued by the same individual, Flynn, whom the plaintiff claims had been subjecting him to discriminatory behavior and which behavior the plaintiff brought to the attention of Williams on February 2, 2001.  Flynn, according to the plaintiff, unjustifiably accused him of falsifying company records.  On the warning, the defendant indicated that the plaintiff had been issued a verbal warning on February 5, 2001; and as noted above, a claim which the plaintiff vehemently denies.

Most importantly, the plaintiff disputes the truth of the allegation contained on the warning notice "inspection form QC073 Rev 8/00 compiled for PN# 33590...Dimension Falsified.  'Shadow Graph' required to perform task, Employee used 'visual' method".  On March 14, 2001, the plaintiff was given a batch of a particular part, "Delivery Connector Tube", which was manufactured by the defendant, to inspect.  The plaintiff claims that he performed the inspection strictly according to the defendant's standard operating procedures.  The plaintiff asserts that the warning issued to him by Flynn was the result of Flynn's racial bias and in retaliation against the plaintiff because of the complaint the plaintiff had made against Flynn on February 2, 2001.

When assigned the inspection of the shipment of the "Delivery Connection Tubes", the plaintiff accessed the quality assurance file corresponding to the "Delivery Connection Tube", pursuant to the instructions contained in "SOP 00001"(Exhibit 3).  Young Tr. 93.  Every part

manufactured by the defendant has a file which contains a QC 061 form which identifies the method of inspection, and if inspection tools are required, the tools to be used. Young, Tr. 95, 96, 98. The method of inspection and the quality assurance tools to be employed in the inspection of a particular part are identified by the engineer who designed the part. Young, Tr. 99. The parts blueprint would contain the engineer's instructions.

When performing the inspection of the "Delivery Connection Tube" on March 14, 2001, the plaintiff claims that he discovered an inconsistency in the quality assurance file kept for the "Delivery Connection Tube". The engineering blueprint called for a "visual" inspection of the threads, because they "for gripping only", while the incoming inspection procedure sheet required the use of a shadow graph in conducting the inspection. (Exhibit 3 and Exhibit 5); Young, Tr. 111, 112, 113. The incoming inspection procedure sheet which accompanied parts to be inspected by the plaintiff was undated and unsigned. It was the plaintiff's job responsibility to assure that the incoming inspection procedure sheet was dated, signed and approved per FDA requirements. Young, Tr. 114, 115. The defendant's quality control protocol, which the plaintiff was obligated to follow, required that the incoming inspection procedure sheet be signed and dated. Young, Tr. 112. If it was not signed, the plaintiff was required to review the form, update if it needed revision, and submit it to his supervisor, Thomas Flynn, for his review and approval. Young, Tr. 114, 115. Additionally, it was the plaintiff's job responsibility to update the incoming inspection procedure sheet with the correct specifications as determined by the engineering drawings. Young, Tr. 112 – 114. With the correct specifications, the plaintiff was duty-bound to submit the corrected form to his supervisor Thomas Flynn for his review and

approval.  Young, Tr.  112.  The plaintiff maintains that he followed this particular procedure on

numerous occasions with other parts which he had inspected when he came across incoming

inspection procedure sheets that either were outdated or were not signed or dated.  Young, Tr.

115.  Therefore, on March 14, 2001, the plaintiff states that he  prepared a revised incoming

inspection requirement sheet (Exhibit 7) for the "Delivery Connector Tube", matching its

requirements with those found in the quality assurance file kept by the defendant on the

particular part, and submitted it to his supervisor, Thomas Flynn, for his review and approval.

Young, Tr. 111 – 115, 136, 137.  The plaintiff insists that after he gave this form to Flynn, Flynn

then accused him of falsifying the test results.  Young, Tr.  112, 115, 136, 137.

   The warning stated that the "dimension result [was] falsified" by the plaintiff.  (Exhibit 1)

The statement, "falsification of company records is grounds for immediate termination",

contained in the warning issued to the plaintiff, clearly implies that the plaintiff had falsified a

company record.  (Exhibit 1).  The record which the company claims the plaintiff falsified was

the report of the plaintiff's inspection of the "Delivery Connector Tube" dated March 14, 2001.

(Exhibit 2).  The plaintiff denies that he falsified the report which he prepared to document the

results of his inspection of the "Delivery Connector Tube".  Young, Tr. 105 – 137.  The plaintiff

insists that he truthfully reported that he conducted the inspection of the "Delivery Tube

Connector" by visually inspecting the part.  (Exhibit 2 – Cooper Surgical Inspection Report);

Young, Tr. 105 – 137.  On the report of his inspection of the "Delivery Tube Connector", the

plaintiff accurately states that the sample size was 8, the inspector was B. Young (the plaintiff),

and the method of inspection was "visual".  As the record of the plaintiff's inspection of the

"Delivery Tube Connector" indicates, the plaintiff inspected two lots of 8 units of the "Delivery Tube Connector"; one inspection was conducted on November 29, 2000, the other on March 14, 2001.  The plaintiff performed the inspections of the "Delivery Tube Connector" on March 14, 2001 in exactly the same manner he performed the inspections on November 29, 2000 and, and, his reports of the inspections were identical.  The plaintiff was not warned, counseled or disciplined in any fashion for the manner in which he conducted the inspection of the "Delivery Tube Connector" on November 29, 2000.  Young, Tr. 135.

In performing the inspection of the "Delivery Connection Tube", the plaintiff alleges that he fully complied with the defendant's "SOP 00001", which the defendant had promulgated for the purpose of defining "the Quality Assurance inspection and testing activities in a procedural format"  (Exhibit 3) .  "SOP 00001" specifies that "[c]omponent and finished product will be inspected and tested per instruction found in the Quality Assurance (QA) file that corresponds to the component or finished product part number."  "SOP 00001" further specifies, "[p]rior to inspection, the inspector or technician will retrieve the file folder associated with the component or finished product to be inspected.  The folders are located in either a component or finished product file cabinet, ordered by numeric or alphabetic part number."  Additionally, "SOP 00001" requires, "[t]he inspector or technician will then conduct inspection and testing according to the file instructions."  (Exhibit 3, (Young Tr. Exhibit 17)).  "SOP 00003" was implemented by the defendant "to describe in procedural form, the necessary requirements when performing a visual and identification inspection."  "SOP 00003" specifies, "[e]ach piece in the sample will be visually inspected at 1X unless a higher magnification is required.  The plaintiff maintains that

he had visually inspected the part as opposed to using a "shadow graph". Young, Tr. 105. The defendant's engineering drawing for the "Delivery Connection Tube" specifies *threads for gripping only - visual inspection only."* (Exhibit 4). According to the defendant's protocols, it is the engineering drawing that dictates the method of inspection to be employed. Young, Tr. 111, 118, 125.

After the defendant issued the plaintiff the warning on March 22, 2001, the plaintiff contends that he complained to the defendant's president, Nick Pichotta. Young, Tr. 138. "I brought the actual part to him and showed him what I had done, *and he said to me it appears it seems someone is out to get you.* He said he would look into the matter and get back to me." Young, Tr. 138. Also, the plaintiff related to Pichotta the on-going discriminatory conduct to which he had been subjected by Flynn. The plaintiff informed the Pichotta that he was being subjected to racial bias. Young, Tr. 139 – 142. The plaintiff requested that Pichotta investigate his complaint because he desired to have the matter handled internally as opposed to going "beyond the company to file any complaints". Young, Tr. 140. Although Pichotta informed the plaintiff that he would look into the plaintiff's complaint, Pichotta never communicated with the plaintiff after March 22, 2001. Young, Tr. 139. The plaintiff made the same complaint he had made to Pichotta to Joanne Augustine, the defendant's human resources manager. Young, Tr. 138, 141.

Contrary to the defendant's assertion, the plaintiff asserts that the facts supporting his allegations of unlawful discrimination involve much more than mere pleasantries and gifts of candy; the plaintiff has testified that the discriminatory treatment to which he was subjected involved "lack of communication on the job, being singled out, treated like a pariah...I felt like I

was in the back of the bus.  Why?  And my statement to that effect means that I was in the corner of the quality department; Mr. Flynn would make his rounds, and I would be totally ignored, okay?  He would communicate with all the other employees, laugh, joke, communicate about work, or personal matters or pleasantries, whatever.  And I was left in that corner, ignored, okay?  So I'm not just talking only pleasantries.  But if I were to go up to him with a job request to do my job, he would show contempt for me as if why I am I asking this question, as if I was stupid or something or I'm wasting time or I'm asking everybody in the department the same question." Young, Tr.  247.

The plaintiff states that the defendant's have misrepresented the events leading up to his termination.  The plaintiff charges that the defendant's assertion that a conflict resolution meeting took place on April 11, 2001 between the plaintiff, a co-employee, Jeanette Freese, Joanne Augustine, Thomas Flynn and Thomas Williams, during which meeting the plaintiff lost control of his emotions, is a complete deception.  A meeting of no longer than ten minutes took place on April 11, 2001, at which time the plaintiff was informed he had been terminated.  Present at that meeting were the human resources manager, Joanne Augustine, the director of the quality assurance division, Thomas Williams, the plaintiff's supervisor, Thomas Flynn, and the plaintiff's co-worker, Jeanette Freese.  The plaintiff was informed at the very start of the meeting by Williams that the defendant had determined that a previous disagreement between Freese and the plaintiff was the result of the plaintiff's misbehavior, and, as a result, his employment was being terminated.  Young, Tr. 273 - 277.

10

***

Q. Now, who spoke first when you first go to the meeting?

A. Mr. Williams.

Q. And what did he say?

A. Basically that I was at fault with everything that had happened up to that point and that I was being terminated.

***

The plaintiff further testifies that the only topic of discussion at the meeting on April 11, 2001 was his termination and the facts the defendant claimed supported its decision to terminate the plaintiff's employment.  Young, Tr.  307.   The plaintiff maintains, in spite of the defendant's deliberate attempt at misrepresenting his deposition testimony, that he never called Flynn a liar[3].

---

[3] In its memorandum, the defendant at page 16, fn. 4 inexcusably leaves out a significant portion of the colloquy.

    A.   No.  It was very brief.  Again, it was as  if I was called to -- in the office to be terminated at that point because the company had came to a conclusion that for the first time unbeknownst to me that I am now an insubordinate.  So we ship it from work performance to now insubordination.  And I was --

    Q.   Did you call Mr. Flynn a liar at the

        MR. BUCCI:  Could we let him finish the question?

        MR. CANNAVINO:  I'm sorry.  Did you finish your answer?

    A.   Yes.  I stated that accusations by Mr. Flynn and Jeanette Freese were untrue, they were false.

        ***

    Q.   Did you call Mr. Flynn a liar?

    A.   I said it was untrue and false.  Those were the words I used.

    Q.   You didn't call him a liar?

    A.   No.

        ***

Young, Tr.  276, 277.

Young, Tr.  276, 277.  He does admit that he refuted the defendant's accusations that he had behaved inappropriately.  Young, Tr.  276, 277.

Prior to the meeting of April 11, 2001, the plaintiff had a meeting with Joanne Augustine, to discuss a complaint he had made against a co-employee, Jeanette Freese[4], and his supervisor, Flynn.  The plaintiff contends that he had been falsely accused by Freese of falsifying an inspection report.  When the plaintiff objected to the accusation, Flynn interceded and proceeded immediately to openly berate the plaintiff.

***

Q. Tell me what happened with the -- the incident with Jeanette Freese.  How did the situation begin?

A.    Okay.  I recall Jeanette Freese had -- she had a particular file -- Okay.  No.  First I saw her at my desk, and she retrieved a particular file that I believe was on my desk at the time.  And I believe she asked me if I had -- if I had inspected

---

[4] The defendant puts an entirely different spin on the disagreement between the plaintiff and Freese, labeling it a verbal altercation.  However, the only substantive evidence it has submitted with regard to this matter, are the inadmissible hearsay testimony of Freese and Rutowski.  The defendant has not submitted affidavits of either Freese or Rutowski.  It relies solely on the affidavit of Augustine, who allegedly spoke to Freese and Rutowski, which contains the purported declarations of Freese and Rutowski.  This is hearsay for which there is no exception which would allow for its admissibility.  See *Feingold v. New York*, 366 F.3d 138(2d Cir. 2004) ("To support this rationale, they offer the inadmissible hearsay testimony of an MNO clerk that ALJ Haynes also complained of a disproportionate workload when she began work at the MNO.  In reviewing the district court's grant of summary judgment, however, we may only consider admissible testimony.  See Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997)").

that particular part.  I'm not sure if she was about

to, you know, do some herself.

But then she opened the files, and she

said -- she asked me if I -- if I had used the

Shadow Graph for that particular part.  And I told

her no.  And she immediately said that I falsified

the record for not using the Shadow Graph.  So at

that particular moment, I got very upset.  And I

just felt that it was inappropriate for her to make

such a statement to me.

And I told her, I said if you have any

problems with the files or my work to go see the

supervisor.  I think Tom Flynn, who was not far

away, may have overheard the discussion.  And so he

immediately came towards me and was reprimanding me

for telling Jeanette not to accuse me of falsifying

an inspection report.

He began to say that she was the senior

employee and I should not speak to a senior employee

that way and so on.  And my statement to him simply

was "Jeanette Freese is accusing me of falsifying an

13

inspection report." That was completely ignored.

Instead he was in my face yelling at me. It was at

that time when the mucus fell in my face, and I kind

of squinted.

And from that point when I realized that

I was not getting any -- an appropriate response

from my supervisor, I decided to go to HR to

complain of the incident. Young, Tr. 251, 252.

***

Augustine informed the plaintiff during this meeting, which was a couple of days before

the April 11, 2001 meeting, that she could not substantiate his claim. The plaintiff accepted her

conclusion and returned to work. The plaintiff states that during his meeting with Augustine, she

never mentioned that there would be a future conflict resolution meeting or that the defendant

had determined that the plaintiff was the instigator and at fault in the dispute with Freese.

Young, Tr. 269 - 273.

At the April 11, 2001 meeting, the plaintiff was issued a completed unemployment

notice, indicating that the defendant had decided to terminate the plaintiff's employment prior to

the meeting of April 11, 2001, sometime prior to the meeting. Young, Tr. 277; (Exhibit 6). It is

also significant that the notice did not list insubordination as a reason for the plaintiff's

discharge.

The most likely motive behind the defendant's attempt to misrepresent the plaintiff's testimony regarding its allegation that the plaintiff called Flynn a liar is the weakness of its other reasons for justifying the termination of the plaintiff.  Without plaintiff's admission, the defendant cannot maintain that there does not exist any material facts in dispute over whether the defendant had a legitimate basis for immediately terminating the plaintiff's employment.

After losing his employment, the plaintiff made efforts to find other employment.  He applied and was offered a position at Sikorsky Aircraft.  After he started his job at Sikorsky Aircraft, Sikorsky discovered that the plaintiff did not reveal on his application for employment that he had been convicted of a felony.  A felony conviction was a disqualifying event for employment at Sikorsky Aircraft.  Therefore, even if he revealed his felony record, he would not have been made a job offer by Sikorsky Aircraft.  Nevertheless, Sikorsky immediately terminated the plaintiff's employment upon its discovery of the plaintiff's criminal record. Thereafter, the plaintiff sought other employment, finding temporary work with  a number of employers.

## II.    Discussion

### a.  Legal Standard, Motion for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 202 (2d Cir. 1995) ; *Chambers v. TRM Centers Corp.*, 43 F.3d 29, 36 (2d Cir. 1994); *Stern v. Trustees of Columbia University in City of New York*, 131 F.3d 305

(2d Cir. 1997) ("It is of course well established that a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See Fed.R.Civ.P. 56(c).  In assessing the record to determine whether there is such an issue, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. . ."); <u>Kerzer v. Kingley Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998) ("Summary judgment is inappropriate unless 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c).  On a motion for summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, and the district court's task is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them . . . In deciding such a motion, we, . . . must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. . . Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact. . . Furthermore, in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment . . .").  The burden rests on the party seeking summary judgment, the moving party, to demonstrate that no genuine factual dispute exists.  *Kerzer v. Kingley Mfg.*, <u>supra</u> at p. 400.  In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and

factual inferences in favor of the party against whom summary judgment is sought.  The inferences to be drawn from the underlying facts revealed in material such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.  See *Stern v. Trustees of Columbia University in City of New York,* supra at p. 312; *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994).

In deciding a motion for summary judgment, the court cannot try issues of fact, but can only determine whether there are issues of fact to be tried.  Kerzer v. Kingley Mfg., supra at p. 400; Cronin v. Aetna Life Insurance Co., supra at p. 203.  If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference can be drawn in favor of the non-moving party, summary judgment is improper. Chambers v. TRM Copy Centers Corp., supra at p. 37; Lafond v. General Physics Services Corp., 50 F.3d 165, 171 (2d Cir. 1995).  The trial court's function at this stage is to identify issues to be tried, not decide them.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In an employment discrimination case where intent of the employer is at issue, the trial court must be especially cautious about granting summary judgment.  *Kerzer v. Kingley Mfg.*, supra at p. 400.  Summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error. See *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir. 1998);  "Although 'it is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of

17

discrimination cases,' *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 466 (2d Cir. 2001),

'in discrimination cases where state of mind is at issue, we affirm a grant of summary judgment

in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal

circumstantial evidence to support the required inference of discrimination." *Mandell v. County

of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34,

38 (2d Cir. 2000*))"*.  *Feingold v. New York*, 366 F.3d 138, *19 (2d Cir. 2004).

The plaintiff concedes that the evidence he submits regarding the defendant's race

discrimination is based mainly on his uncorroborated account of how he was treated by the

defendant during the time he was employed by the defendant.   Nonetheless, this evidence is

sufficient to raise issues of material fact precluding the entry of summary judgment.  See *Holtz v.

Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001).  ("Holtz's testimony is the only evidence in

the record directly ascribing discriminatory intent to Cowan or RCI, and consists largely of her

uncorroborated accounts of what Cowan said.  We nonetheless conclude that her statements raise

a genuine issue of fact as to the defendant's intent.  See   *Owens v. New York City Hous. Auth.,*

934  F.2d 405, 410 (2d Cir. 1991) (stating that employer's contention that discrimination

plaintiff's proffered evidence of discriminatory comments 'is uncorroborated and not credible is a

jury argument inappropriate on a motion for summary judgment'), cert. denied, 502 U.S. 964,

116 L. Ed. 2d 451, 112 S. Ct. 431 (1991*); Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7

(2d Cir. 1989) ('The plaintiff may preclude summary judgment by producing evidence from

which the trier of fact reasonably could draw an inference of discrimination.').").

b.  *Race Discrimination*

18

i.  *Prima Facie Case*

The ultimate issue in a Title VII race discrimination case is whether the plaintiff has

proved by a preponderance of evidence that his race played a motivating role in, or contributed

to, the employer's decision.  "Because direct evidence of discrimination -- a ' 'smoking gun' ...

attesting to a discriminatory intent,' *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir. 1991) -- is

typically unavailable, plaintiffs and courts ordinarily proceed by way of the three-part burden-

shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 36 L. Ed. 2d 668,

93 S. Ct. 1817 (1973).  'The allocation of burdens under the McDonnell-Douglas framework and

the creation of a presumption by the establishment of a prima facie case is intended progressively

to sharpen the inquiry into the elusive factual question of intentional discrimination.' *Texas*

*Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 n.8, 67 L. Ed. 2d 207, 101 S. Ct. 1089

(1981)."  *Holtz v. Rockefeller & Co.,* 258 F.3d at 76.  Under the McDonnell Douglas framework,

the plaintiff must first establish a prima facie case of discrimination.  See  *Reeves v. Sanderson*

*Plumbing Prods., Inc.,* 530 U.S. 133, 142, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).  A Title

VII plaintiff satisfies his burden of establishing a *prima facie* case of discrimination in violation

of Title VII, by showing (1) that he belongs to a protected class, (2) that he was that he was

qualified for the position he held or was performing his duties satisfactorily, (3) that he suffered

an adverse employment action, and (4) that action took place in circumstances giving rise to an

inference of discrimination..  See  *Feingold v. New York*, 366 F.3d at *29; *Chambers v TRM*

*Copy Centers Corp.,.* 43 F.3d 29, 37 (2d Cir. 1998); *Stern v. Trustees of Columbia University in*

*City of New York,* supra at p. 311, 312; *Brown v. Coach Stores, Inc,.* 163 F.3d 706, 709 (2d Cir.

1998).  "By making out this 'minimal' prima facie case, ... the plaintiff creates a presumption that the employer unlawfully discriminated, and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action."  *Holtz v. Rockefeller & Co.*, 258 F.3d at 77.

The plaintiff's evidence satisfies the elements of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) disparate treatment analyses.  The plaintiff clearly has established the first three elements of a prima facie case for disparate treatment in violation of Title VII.  In fact, in its memorandum, the defendant does not contest that the plaintiff satisfied the first three requirements of his prima facie burden.  First, he is an African American, and, thus, a member of a protected category.  Second, the plaintiff undisputedly was qualified for the position of Quality Assurance Inspector, as he had in fact been hired for that position.  The plaintiff has a long history of employment in the Quality Assurance field.  He demonstrated his capabilities when working on a temporarily for an employment agency on assignment to the defendant as a Quality Assurance Inspector.  Before the plaintiff's temporary work assignment had concluded, the defendant extended a job offer to the plaintiff, which the plaintiff accepted.  Thereafter, in December of 2000, the plaintiff began employment with the defendant.  Although the defendant does not explicitly contest the plaintiff's ability to perform his job duties, its assertions that the plaintiff's performance led to the plaintiff being counseled on February 5, 2001 and March 21, 2001, are disputed by the plaintiff.  The plaintiff has testified under oath that the February 5, 2001 meeting he had with Williams and Flynn resulted from the complaint he made to Williams that Flynn was discriminating against him on the basis of race.  Additionally, other than for the

affidavits of Williams and Flynn, the defendant has not produced any corroborating records, contemporaneous with the February 5, 2001 meeting, demonstrating the purpose and outcome of the meeting.  There exists a disciplinary warning form (Exhibit 1), which the defendant certainly could have used to document the fact that it issued the plaintiff a verbal warning on February 5, 2001.  It was only after the plaintiff complained to Williams regarding the racial bias of Flynn did the defendant first take a disciplinary action against the plaintiff, the issuance of a written warning.  (Exhibit 1).  But this warning, which was issued to the plaintiff for allegedly falsifying company records, did not criticize the plaintiff's job performance.  And even with regard to this particular disciplinary warning, the plaintiff has submitted sufficient evidence to raise a material issue as to whether the defendant untruthfully claimed that the plaintiff failed to follow company procedures.  Third, the plaintiff experienced an adverse employment action: the termination of his employment.

The defendant maintains that the plaintiff has not met his burden of establishing the fourth element of the disparate treatment analysis.  "In this matter, plaintiff cannot establish a prima facie case of discrimination because he cannot show that he was terminated under circumstances that create an inference of discrimination."  In addressing this issue, the defendant confuses "adverse employment actions" with evidence of discriminatory behavior.  Although evidence of discriminatory behavior, will not always amount to "an adverse employment action", such evidence certainly is probative in determining the racial animus of the defendant.  For instance, treating the plaintiff, the only black employee in the department, like a pariah, while being friendly to the white co-workers, may not amount to an "adverse employment action"; it

can establish the bias of the actor. See *Rexach v. University of Connecticut*, 2004 U.S. Dist. Lexis 6231 (D.Conn. March 31, 2004) (The defendant's supervisor had told the plaintiff to stop talking 'sh*t' when he spoke Spanish to his Latino coworkers. Although this behavior standing alone may not amount to an adverse employment action, the Court found it relevant, along with other evidence, in determining the issue of racial animus).

There exists considerable evidence to meet the fourth requirement to establish a prima facie case. The plaintiff's testimony under oath is relevant evidence in making a determination of race discrimination. *Feingold v. New York*, 366 F.3d at * 31, 32. Contrary to the defendant's assertion, the facts supporting the plaintiff's allegations that he was subjected to discriminatory treatment involve much more than mere pleasantries and gifts of candy; the plaintiff has testified that the discriminatory treatment to which he was subjected involved "lack of communication on the job, being singled out, treated like a pariah...I felt like I was in the back of the bus. Why? And my statement to that effect means that I was in the corner of the quality department; Mr. Flynn would make his rounds, and I would be totally ignored, okay? He would communicate with all the other employees, laugh, joke, communicate about work, or personal matters or pleasantries, whatever. And I was left in that corner, ignored, okay? So I'm not just talking only pleasantries. But if I were to go up to him with a job request to do my job, he would show contempt for me as if why I am I asking this question, as if I was stupid or something or I'm wasting time or I'm asking everybody in the department the same question." Young, Tr. 247.

This treatment led the plaintiff to complain to the director of the quality assurance department, Williams, that Flynn, was discriminating against him on account of the his race.

Flynn had been treating the plaintiff with hostility, as compared to the treatment he accorded the two white employees, Tanner and Freese, with whom the plaintiff worked. "I complained to him about Flynn's behavior towards me. That he was not communicating with me. That he was berating me in front of other employees, yelling at me and what I believe to be intimidation because he was very rude. He wouldn't exchange pleasantries. When I would ask him a question about my job, he would, you know, respond as if I was stupid. Also I was not treated the same as the other white employees. That I was receiving disparage treatment at the hands of Flynn. And, you know, that I believed at that point it was becoming hostile because other employees, you know, they didn't seem to be as anxious to communicate with me. I just felt that, you know, that there was hostile environment being created based on Flynn's, you know, his heavy-handedness of me in front of the other employees...I told him I believe I was being differently, disparately. In a discriminatory fashion. And, again, as I had mentioned his tone, his manner. In fact, there was an instance where he yelled at me so much that spit went in my eye and I had to sort of squint or blink. I made a defensive response because actually it was mucus from him in my face... It was like sort of this drill sergeant and he only did this to me. I was the only one treated this way. I was very disappointed. Very hurt. And I wanted it to stop. That's why I went -- with hesitation I went to Mr. Williams about it." Young, Tr. 142 – 144. "The other white employees were treated with respect and I got none from him." Young, Tr. 151. See also, Young, Tr. 216 – 219, 223.

On the heels of the plaintiff's complaint to the Williams, the plaintiff was issued a written disciplinary warning by Flynn on March 21, 2001 for reasons that a trier of fact could determine

were not legitimate.  The plaintiff contends, and the defendant's protocols fully support his contention, that his inspection of the parts for which he received a warning, was sanctioned by the defendant's procedures.  A jury could determine that the warning issued to the plaintiff for falsifying test results was completely unjustified and that it was based on false information. Young, Tr. 105 – 137, 147, 241, 305.  In performing the inspection of parts on  March 14, 2001, the plaintiff followed the very same procedure he employed when he inspected a set of "Delivery Connector Tubes" on November 29, 2000.  At that time, the plaintiff went to a senior co-worker, William Tanner, and sought his advice regarding the method of inspection he was to follow. Tanner instructed him to visually inspect the threads because it was not a critical measurement pursuant to the engineering notes in the file.  Young, Tr.  134.  In particular, this senior co-worker directed the plaintiff to forego using a shadow graph to take the measurements.  Young, Tr. 105 – 110, 114, 119, 120, 122.  The plaintiff was not warned, counseled or disciplined in any fashion for the manner in which he conducted the inspection of the "Delivery Tube Connector" on November 29, 2000.  Young, Tr. 135.  Flynn found fault with the method of inspection employed by the plaintiff only after the plaintiff complained about Flynn's discriminatory conduct.  Additionally, the evidence demonstrates that the warning was duplicitous in other ways.  The warning asserted that the plaintiff was issued a verbal warning on February 5, 2001. However, there is no record of this verbal warning being issued on February 5, 2001.  The plaintiff is adamant that he was not issued such a warning.  "I was *not* told I was being orally or verbally reprimanded.  There were no memos to that fact."  Young, Tr. 147, 241, 305. (Emphasis added).  Further, the statement in the warning that the plaintiff falsified company

records is, likewise, deceitful.  The plaintiff did not falsify the report which he prepared to document the results of his inspection of the "Delivery Connector Tube".  (Exhibit 2 – Cooper Surgical Inspection Report); Young, Tr. 105 – 137.  The plaintiff truthfully reported that he conducted the inspection of the "Delivery Tube Connector" by visually inspecting the part. (Exhibit 2 – Cooper Surgical Inspection Report); Young, Tr. 105 – 137.  On the report of his inspection of the "Delivery Tube Connector", the plaintiff accurately states that the sample size was 8, the inspector was B. Young (the plaintiff), and the method of inspection was "visual". (Exhibit 2 – Cooper Surgical Inspection Report).  The report correctly indicates that the plaintiff inspected two lots of 8 units of the "Delivery Tube Connector"; one inspection was conducted on November 29, 2000, the other on March 14, 2001.  (Exhibit 2 – Cooper Surgical Inspection Report).  The defendant's assertion that the plaintiff was required to use a shadow graph in conducting the inspection is contradicted by the records contained in its quality control file for this part.  The engineering blue print could not be more explicit.  It states *"threads for gripping only - visual inspection only."*

Admittedly, the plaintiff is not an individual who will silently sit by in the face of unfair treatment.  The plaintiff will exercise his rights to complain when he believes he is being treated unfairly on account of his race.  In this situation, after receiving the warning on March 21, 2001, the plaintiff went directly to the defendant's president to lodge a complaint.  "I brought the actual

part to him and showed him what I had done, and he said to me it appears it seems someone is out to get you.[5]  He said he would look into the matter and get back to me."  Young, Tr.  138. The plaintiff informed Pichotta about the on-going discriminatory conduct to which he had been subjected by Flynn.  The plaintiff informed Pichotta that he was being subjected to racial bias.  Young, Tr.  139 – 142.  The plaintiff requested that Pichotta investigate his complaint because he desired to have the matter handled internally as opposed to going "beyond the company to file any complaints".  Young, Tr.  140.  Although Pichotta informed the plaintiff that he would look into the plaintiff's complaint, Pichotta never communicated with the plaintiff after March 22, 2001.  Young, Tr.  139.  The plaintiff made the same complaint he had made to Pichotta to Joanne Augustine, the defendant's human resources assistant.  Young, Tr.  138, 141. The evidence demonstrates that after the plaintiff had made these latest complaints, the defendant set out to fire the plaintiff.

The defendant has asserted, among other nebulous reasons, that it terminated the plaintiff's employment because of the plaintiff's insubordination and a demonstrated inability to work cooperatively with members of his department.  Both charges are spurious.  The defendant claims that the plaintiff called Flynn a liar and that he had had an angry outburst at a "conflict resolution meeting" on April 11, 2001, meant to improve relationships between him and a co-worker.  As noted earlier, and contrary to the defendant's assertion that the plaintiff admitted calling Flynn a liar, the plaintiff explicitly denied this claim.  Admittedly, the plaintiff, at this so-called conflict resolution meeting, disputed the account of his dispute with Freese which was

---

[5] Although this is a hearsay statement, it would be admissible at trial as an admission made by the defendant.

related by Flynn.  He stated that the rendition of the events as stated by Flynn were untrue[6].

However, the meeting was never intended to resolve a conflict between the plaintiff and his co-

workers; it was meant to inform the plaintiff that he had been terminated.  The meeting took no

longer than ten minutes, at which time the plaintiff was informed by Williams that his

employment had been terminated.  Present at that meeting were the  Augustine, Williams,

Flynn, and Freese.  The plaintiff was informed at the very start of the meeting by Williams that

the defendant had determined that a previous disagreement between Freese and the plaintiff was

the result of the plaintiff's misbehavior, and, as a result, the plaintiff's employment was being

terminated.  Young, Tr. 273 - 277.

***

> Q. Now, who spoke first when you first go to the meeting?
>
> A. Mr. Williams.
>
> Q. And what did he say?

A. Basically that I was at fault with everything that had happened up to that point and that

I was being terminated.

***

The issuance at the meeting of a completed unemployment notice to the plaintiff belies

the defendant's claim that the meeting of April 11, 2001 was an attempt at conflict resolution.

---

[6] But isn't that the purpose of a conflict resolution meeting?  To elicit the statements of the participants so that a discussion could ensue, and conflict resolved.

The "pink slip" is clearly evidence that the defendant had determined, prior to the meeting, to fire the plaintiff, once again, taking an "adverse employment action[7]" against him almost immediately after he complained to the defendant's President that he was the victim of race discrimination.

Individually and in the aggregate, these events satisfy the fourth element of a prima facie case. The treatment of the plaintiff by Flynn, which was clearly different from his treatment of the two white employees, even without the use of racial epithets or ethnically degrading terms, is sufficient in the circumstances of the present case to evidence racial bias. The defendant attempts to minimize the treatment Flynn directed at the plaintiff. However, viewing the plaintiff's description of this behavior in a light most favorable to the plaintiff demonstrates its odious character. The department in which the plaintiff was working was small; it was composed of three employees and Flynn, the supervisor. All were white except for the plaintiff. Flynn treated the two white employees with courtesy and respect. However, the plaintiff was treated with disrespect and hostility. "I complained to him about Flynn's behavior towards me. That he was not communicating with me. That he was berating me in front of other employees, yelling at me and what I believe to be intimidation because he was very rude. He wouldn't exchange pleasantries. When I would ask him a question about my job, he would, you know, respond as if I was stupid. Also I was not treated the same as the other white employees..."

---

[7] The defendant cannot seriously argue that the issuance of a warning on March 21, 2001 was not an "adverse employment action." "Plaintiff also suffered adverse employment actions, including negative work performance evaluations, refusal of promotion, warning letters regarding her workplace behavior, and disciplinary actions, all culminating with her discharge of employment on November 10, 1998." *Barlow v. Connecticut,* 2004 U.S. Dist. LEXIS 9237 (D.Conn. May 5, 2004).

Young, Tr. 142 – 144. In a small department, this behavior broadcast a resounding message, the plaintiff was unwanted.

*ii. Defendant's Stated Reason For Terminating The Plaintiff's Employment Is A Pretext For Unlawful Discrimination.*

Under the *McDonnell Douglas Corp*. analysis, once the plaintiff proves a prima facie case, the burden of production then shifts to defendant, who must offer through the introduction of admissible evidence a non-discriminatory reason for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action. See *Heyman v. Queens Village Comm. For Mental Health For Jam. Community Adolescent Program, Inc*. 198 F.3d 68, 73 (2d Cir. 1999).

The plaintiff concedes, for the purposes of this discussion, that the reasons proffered by the defendant satisfy its burden of production. "[O]nce a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the McDonnell Douglas presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Assn*., 233 F. 3d 149, 156 (2d Cir. 2000). Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

A showing that the defendant's stated reason is not the true reason for its action is probative of unlawful discrimination. See *Reeves v. Sanderson Plumbing Products, Inc.*, supra ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive...In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose ... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision...Thus a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.")(Internal quotations and citations omitted). See also *Bickerstaff v. Vassar College*, 196 F.3d 435, 447(2d Cir. 1999). However, although a showing that the defendant's stated reason is not the true reason for its action is probative of unlawful discrimination, it is not the only method by which the plaintiff can satisfy his ultimate burden of proof. "*Fisher [v. Vassar College*, 114 F. 3d 1332 (2d Cir. 1997) (in banc), cert. denied, 522 U. S. 1075 (1988)] does not require evidence that the employer's reason was false. It requires only evidence adequately supporting a finding of discrimination.

The plaintiff has presented sufficient evidence for a reasonable trier-of-fact to conclude that the defendant's stated reason for the plaintiff's termination was pretextual. First, as earlier discussed, the plaintiff's inspection of the Delivery Tube Connector was

performed according to the defendant's own procedures.  The plaintiff followed the engineering

instructions with regard to the method of inspection he employed.  Also, he obtained direction

and affirmation from a senior Quality Assurance Inspector before he proceeded with the visual

inspection.  He did not falsify any document; he openly wrote on his report that he visually

inspected the parts.  The plaintiff then submitted a revised instruction sheet, which was

consistent with the Quality Assurance file, to Flynn, for his review and approval.  Instead, Flynn,

who had been the subject of the plaintiff's earlier complaint of discrimination, issued the plaintiff

a written warning, untruly claiming the plaintiff falsified company records.  The further evidence

that the warning had unjustifiably asserted that the plaintiff had previously been issued a verbal

warning further bolsters a finding of pretext, and, as the defendant's President admitted[8], that

someone was out to get the plaintiff.

Second, the spin the plaintiff put on the February 5, 2001 meeting, likewise, points to a

finding of pretext.  The defendant, belatedly on March 21, 2001, informed the plaintiff that he

had received a verbal warning on February 5, 2001.  However, the plaintiff contends that he was

never informed that he had been issued a verbal warning at any time prior to his reading the

March 21, 2001 warning, which the plaintiff refused to sign.  Further, the plaintiff maintains that

the February 5, 2001 meeting was held to discuss his discrimination complaint and not job

performance issues.

Third, the evidence regarding the immediate events surrounding the plaintiff's

termination would support a finding by a reasonable trier-of-fact that the charges of

---

[8] The defendant does not dispute the plaintiff's assertion that he complained to Pichotta, and Pichotta, after hearing
the plaintiff's explanation, opined that it seemed to him that someone is out to get the plaintiff.

"insubordination" and an "unwillingness to work together as a team member" were, similarly, untrue. Whether the plaintiff called Flynn a liar, is an issue for the jury. The plaintiff, in spite of the defendant's assertion to the contrary, denied explicitly that he called Flynn a liar. If the trier-of-fact believes the plaintiff, then it could find that the defendant lied about the reason for firing the plaintiff; the plaintiff was summoned to the meeting and told he was terminated, without any attempt to reconcile the dispute he had with Freese; the decision to terminate the plaintiff had already been made prior to the meeting, as evidenced by the completed "pink slip". A trier-of-fact could, therefore, conclude that the these belated reasons for terminating the plaintiff's employment, his alleged outburst at the meeting and his calling Flynn a liar, were not the true reasons for the plaintiff's termination, since the defendant had already decided to terminate the plaintiff before the meeting had taken place. There is no other rationale explanation for the defendant having the unemployment notice ready to be delivered to the plaintiff at the conclusion of the April 11, 2001 meeting.

This evidence could permit a trier-of-fact to conclude that defendants' stated rationale for plaintiff's termination was pretextual, and that his termination was the result of unlawful discrimination. In the very least, there are sufficient serious questions of material fact to support placing the issues before the trier-of-fact.

*iii. Same Actor Defense*

The defendant asserts that because Williams and Flynn hired the plaintiff, an inference must be drawn against the plaintiff on his claim that his termination was the result of unlawful race discrimination. However, assuming that the same actor defense applies in a Title VII

setting[9] a change in circumstances between the date of hiring and the date of firing negates such

an inference.  The plaintiff's complaints of discrimination which he made to Williams,

Augustine and Pichotta, could be found to have altered the circumstances of his employment:

Viewing the evidence in the light most favorable to the plaintiff, after complaining about

discrimination the plaintiff became not merely an African American employee but an African

American employee who would not tolerate a discriminatory workplace.  See *Feingold v. New*

*York*, 366 F.3d  at *38 ("Feingold's complaints of discrimination could be found to have altered

the circumstances of his employment: Viewing the evidence in the light most favorable to the

plaintiff, after complaining about discrimination Feingold became not merely a white Jew but a

white Jew who ... would not tolerate a discriminatory office culture.)

> c.  *Retaliation*

It is a violation of Title VII when an employer discriminates against an employee

"because [such employee] has opposed any practice made an unlawful employment practice by

this subchapter..."  Title 42 U.S.C. § 2000e-3(a).  "Title VII is violated when a retaliatory motive

plays a part in adverse employment actions toward an employee, whether or not it was the sole

cause." *Terry v. Ashcroft*, 336 F.3d 128, 140-141 (2d Cir. 2003) (Citation and quotation marks

omitted).

> i.  *Prima Facie Case*

To establish a prima facie case for retaliation under Title VII, a plaintiff must show that

(1) the employee was engaged in protected activity by opposing a practice made unlawful by

---

[9] See *Feingold v. New York*, 366 F.3d  at *37, 38.

Title VII; (2) the employer was aware of that activity; (3) the employee suffered an adverse

employment action; and (4) there was a causal connection between the protected activity and the

adverse employment action. *Holtz v. Rockefeller & Co*. 258 F.3d at 79 (2d Cir. 2001); *Reed v.*

*A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996).  The plaintiff has satisfied all four

elements.  First, when the plaintiff complained to Williams, Augustine and Pichotta, he

participated in protected activity.  He complained on both occasions that he was being treated

unfairly on account of his race.  As such, he was participating in protected activity under Title

VII.  Second, the defendant was aware of the plaintiff's complaint.  The plaintiff complained to

the Williams, the Director of Quality Assurance, Augustine, the party in charge of human

resources, and Pichotta, the company president.  Third, the plaintiff suffered adverse

employment actions.  He was first issued a written warning on March 21, 2001 and then

terminated on April 11, 2001, both actions occurring immediately after he complained about the

discrimination he was encountering.  Fourth, the requirement that the plaintiff show a causal

connection between his complaints and his termination is satisfied by the temporal proximity

between the two. See *Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir.*

*2001)* ("The causal connection needed for proof of a retaliation claim can be established

indirectly by showing that the protected activity was closely followed in time by the adverse

action."  (Internal quotations and citations omitted); *Quinn v. Green Tree Credit Corp.,* 159 F.3d

759, 769 (2d Cir. 1998) (finding that the causal connection requirement was satisfied simply

because the plaintiff's discharge came less than two months after one complaint and just ten days

after another); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons* 842 F.2d 590, 593

(2d Cir. 1988) ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

It is undisputed that that the plaintiff complained to Augustine and Pichotta immediately after receiving the warning on March 21, 2001.  Less than three weeks later, the plaintiff was terminated.  Likewise, after the plaintiff complained to Williams on February 5, 2001, he was issued a warning on March 21, 2001.  The sequence of events clearly establishes a causal connection between the plaintiff's complaints and the defendant's retaliatory actions.

### ii.  Pretext

Since the plaintiff has stated a prima facie case of retaliation, the burden shifts to defendants to state a legitimate non-discriminatory reason for the plaintiff's termination.  See *Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir. 1999)* (stating that burden-shifting applies to retaliation claims under Title VII).  Here, as before, defendants allege that the plaintiff was fired due to, among other reasons, his inability to get along with his co-workers, and his insubordination.  These reasons, if true, would be legitimate and non-discriminatory.

For the reasons explained in the discussion regarding the plaintiff's claim of race discrimination, the plaintiff has produced sufficient evidence for a reasonable trier-of-fact to conclude that defendant's stated reasons for his termination was a pretext for unlawful discrimination.  Accordingly, summary judgment on the plaintiff's retaliation cause of action is inappropriate.

### d.  Title 42 U.S.C. 1981

The discussion with regard to the plaintiff's Title VII claim fully addresses the issues involved in his cause of action brought pursuant to Title 42 U.S.C. § 1981.

### e.  Mitigation of Damages

In arguing that once the plaintiff was fired by Sikorsky Aircraft, he was no longer entitled to back pay from that point in time, the defendant misstates the prevailing law regarding mitigation of damages.  See *Johnson v. Spencer Press of Maine Inc*., 364 F.3d 368, 381, 382 (1st Cir. 2004) ("The district court was correct that once Johnson was fired from Hannaford for misconduct, he was no longer mitigating his damages, as was required.  But that did not mean that the possibility of back pay was permanently cut off.  Although the district court did not explicitly endorse, or even give reasons for, such a rule, its holding necessarily relied on this supposition of law.  We hold that this was error... We hold that back pay is not permanently terminated when an employee is fired for misconduct or voluntarily quits interim employment. This view comports with the purpose of the back pay remedy as articulated in *Albermarle*. Albermarle taught that back pay is a presumptive entitlement of a victim of discrimination and that the discriminating employer is responsible for all wage losses that result from its unlawful discrimination, at least until the time of judgment.  [Albemarle Paper Co. v. Moody, 422 U.S. 405, 419-21 (1975)]  Had there been no discrimination at employer A, the employee would never have come to work (or have been fired) from employer B.  The discriminating employer (employer A) should not benefit from the windfall of not paying the salary differential when the employee is re-employed by employer C.  Further, the use of per se rules is contrary to the general principle that the necessary balancing of the equities requires a case-by-case approach.

*Rosario-Torres v. Hernandez-Colon,* 889 F.2d 314, 321 (1st Cir. 1989) (en banc) ('The hallmark of equity is the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis.'); *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 555 (10th Cir.), cert. denied, 528 U.S. 813, 145 L. Ed. 2d 42 (1999)")(footnotes omitted).

In view of the plaintiff's job seeking activities and employment after the termination of his employment by Sikorsky Aircraft, the plaintiff is entitled to back pay from, in the very least, the subsequent temporary employment assignments he had received through the Monroe Group.

### f.   Conclusion

As the discussion above illustrates, there exists numerous disputed material facts, which if decided in the plaintiff's favor, would justify a verdict for the plaintiff on both his discrimination and retaliation causes of action.

THE PLAINTIFF – BASIL YOUNG


BY_____
Thomas W. Bucci, for
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Fed. Bar #ct07805
Email:thomasbucci@earthlink.net

## CERTIFICATION

I hereby certify that a copy of the foregoing *Memorandum In Opposition To Motion for Summary Judgment* has been sent, by First Class Mail, postage prepaid, on this 7th day of June, 2004, to:

Deborah Dehart Cannavino, Esquire
Tyler, Cooper & Alcorn, LLP
One Landmark Square
Stamford, CT  06901-2501

Lori B. Alexander, Esquire
Tyler, Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New Haven, CT 06510

_____
Thomas W. Bucci